1   ROBBINS GELLER RUDMAN
    & DOWD LLP
2   SHAWN A. WILLIAMS (213113)
    Post Montgomery Center
3   One Montgomery Street, Suite 1800
    San Francisco, CA  94104
4   Telephone:  415/288-4545
    415/288-4534 (fax)
5   shawnw@rgrdlaw.com
            – and –
6   DAVID C. WALTON (167268)
    BRIAN E. COCHRAN (286202)
7   655 West Broadway, Suite 1900
    San Diego, CA  92101
8   Telephone:  619/231-1058
    619/231-7423 (fax)
9   davew@rgrdlaw.com
    bcochran@rgrdlaw.com
10
    Attorneys for Plaintiff
11
    [Additional counsel appear on signature page.]
12
                UNITED STATES DISTRICT COURT
13
             NORTHERN DISTRICT OF CALIFORNIA
14

| GREGG BADGER, Individually and on Behalf of All Others Similarly Situated, | Case No. |
|---|---|
| Plaintiff, | CLASS ACTION |
| vs. | COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| NATUS MEDICAL INCORPORATED, JAMES B. HAWKINS and JONATHAN A. KENNEDY, | |
| Defendants. | DEMAND FOR JURY TRIAL |

Plaintiff Gregg Badger, individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Natus Medical Incorporated ("Natus Medical" or the "Company"), as well as media and analyst reports about the Company and conference call transcripts.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of the common stock of Natus Medical between October 16, 2015 and April 3, 2016, inclusive (the "Class Period"), alleging violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

2.      Defendant Natus Medical designs, manufactures and markets newborn care and neurology healthcare products and services worldwide.  On October 16, 2015, Natus Medical announced that its Argentinian subsidiary had entered into a three-year supply contract with the Ministry of Health of Venezuela (the "Ministry of Health") pursuant to which the Company would receive $232.5 million, including $69 million in prepayments "expected" during the first quarter of 2016, ending March 31, 2016 (the "Supply Contract").  Thereafter, on October 21, 2015, citing the "$232.5 million equipment and supply contract" with the Ministry of Health, Natus Medical issued a press release in which it increased its revenue and earnings guidance for its fiscal year ending December 31, 2015.  The Company stated that for the fourth quarter of 2015 it had "increased its revenue guidance to $102.0 million to $105.0 million and guided non-GAAP earnings per share of $0.47 to $0.49," and that for fiscal 2015 its "earnings guidance was increased with expected non-

GAAP earnings per share of $1.51 to $1.53" and its "revenue guidance also increased to $378 million to $381 million compared to previous guidance of $376 million to $378 million."

3.      Unbeknownst to investors, the Supply Contract was not as defendants had publicly portrayed it.  Specifically, defendants did not disclose: (i) that the Venezuelan government had failed to make tens of millions of dollars in prepayments to Natus Medical, which were required to have been paid beginning in October 2015; (ii) that Natus Medical had no means to effectively enforce its rights under the Supply Contract, as Venezuela was the exclusive forum for dispute resolution; (iii) that Natus Medical's receipt of revenues pursuant to the Supply Contract was contingent on the outcome of Venezuelan elections; (iv) that the Supply Contract was subject to foreign currency exchange risks; (v) that the Supply Contract did not have the economic benefits or certitude that defendants had represented; and (vi) that as a result of the foregoing, Natus Medical was not on track to achieve the increased guidance provided by defendants and such guidance lacked a reasonable basis.

4.      As a result of defendants' false and misleading statements, Natus Medical stock traded at artificially inflated prices during the Class Period, reaching prices above $50 per share in intraday trading on December 18, 2015 – an all-time high.  Certain of the Company's senior executives immediately cashed in, including the two defendants named herein who alone collectively sold more than $10.7 million worth of Natus Medical stock in the days following these announcements.  In total, Natus Medical insiders collectively sold $14.5 million worth of their personally held stock to the unsuspecting public.

5.      On January 11, 2016, Natus Medical issued a press release revealing that it expected to fall short of its fourth quarter and fiscal year 2015 guidance, and now only expected to report fourth quarter revenues of approximately $100 million, compared to its prior guidance of $102 million to $105 million, and fiscal year 2015 revenues of $375.9 million, compared to its prior

guidance of $378 million to $381 million.  The Company also disclosed that "[t]he guidance provided by the Company in October for the fourth quarter of 2015 included expected revenue of approximately $4 million under the new Venezuelan Ministry of Health contract," but "[t]he Company was not able to ship product on the anticipated schedule because the prepayment under the contract was delayed."  The release further represented that "[t]he Company believes the delay was most likely due to a combination of important national elections that occurred in Argentina in November and Venezuela in December, Argentina's currency devaluation in December as well as national Christmas holidays."  As a result, defendants stated that "[t]he Company now expect[ed] to receive prepayment and begin shipments in the first quarter of 2016," and that the first quarter 2016 "guidance include[d] $5 million of revenue from Venezuela and $60 million of revenue for [fiscal year 2016] guidance."  The Company also provided revenue guidance of $96.5 million to $97.5 million for the first quarter of 2016 and $445 million to $450 million for fiscal year 2016.

6.     On this revelation of a purported "delay" in the payments from the Ministry of Health, the price of Natus Medical common stock declined, falling from its close of $43.20 per share on January 8, 2016 to close at $38.25 per share on January 11, 2016, a decline of almost $5 per share, or 11%, on usually high trading of approximately 1.4 million shares, or more than four times the average daily volume over the preceding ten trading days.  However, due to defendants' mischaracterization of the Ministry of Health's failure to perform as a mere "delay" and their failure to disclose the true terms and risks under the Supply Contract, the price of Natus Medical stock remained artificially inflated.

7.     On January 27, 2016, Natus Medical issued a press release reaffirming that the revenue shortfall in the fourth quarter of 2015 was the result of a purported "delay" in receiving prepayments under the Supply Contract, and that Natus Medical's guidance depended on revenues

from the Supply Contract.  The release also disclosed unspecified "risks associated with [the Company's] Venezuela contract."

8.     Following this release, numerous analysts expressed skepticism that the Supply Contract would convey the economic benefits that defendants had previously reported.  For instance, stock research analysts from William Blair stated in their January 27, 2016 research report that while they still held out hope that the Ministry of Health prepayments would come in, they were removing them from their modeling, stating in pertinent part as follows:

> As the company alluded to in its prerelease, the top line fell short of original guidance by about $4 million due to a delay with the implementation of a recently signed contract with the Venezuelan Ministry of Health. . . .
>
> Regarding Venezuela, management remains optimistic the contract will be executed fairly. ***However, it seems clear that the timing of payments and ability to actually record revenue from the prepayments is still uncertain and we remain skeptical that the full $60 million of revenue attributable to the Venezuela contract in 2016 will materialize this year. As a result, we continue to strongly advise investors to focus exclusively on the impressive performance in the base business***.
>
> The company also reiterated first-quarter guidance (revenue of $96.5 million–$97.5 million and adjusted EPS of $0.34-0.35) and 2016 guidance ($445 million–$450 million in revenues and $1.84-$1.88 in EPS), both of which include contribution from Venezuela.  ***Excluding Venezuela, guidance appears to call for 2%-4% revenue growth and EPS of around $1.67 or $1.68.***

9.     On this news, the price of Natus Medical stock fell once again, from its close of $37.15 per share on January 27, 2016 to close at $34.71 per share on January 28, 2016, a decline of $2.44 per share, on abnormally high trading volume.

10.     On February 29, 2016, Natus Medical filed its Annual Report on Form 10-K for fiscal year 2015 with the SEC (the "10-K").  The filing disclosed that, "[f]ollowing the announcement of [the Ministry of Health] contract, there ha[d] been elections in both Venezuela and Argentina leading to significant political changes in those countries" and "it [had been] reported that Venezuela [was] experiencing a highly inflationary economy and recessionary economic conditions," stating that "[t]hese developments may impact the likelihood of the Venezuelan Ministry of Health's following through with orders under the agreement, and Medix [Natus Medical's Argentinian subsidiary] ha[d]

not yet received any prepayments under the agreement and no products or services ha[d] been shipped or provided."  The 10-K now warned that "[i]f, for these or any other reasons, the Venezuelan Ministry of Health does not make the required prepayments to initiate deliveries under the Medix agreement, we will not receive any benefit from it."  The Company finally attached a copy of the Supply Contract to the 10-K, which disclosed that the $69 million in prepayments by the Ministry of Health had been due by the end of 2015 (with more than $24 million due in *October 2015*) – and thus the prepayments had been late for months – not the first quarter of 2016 as defendants had represented.  As to Natus Medical's ability to legally enforce the terms of the Supply Contract, the contract provided that it was governed solely by Venezuelan law, meaning the Venezuelan government could unilaterally renege on all aspects of the agreement.

11.     On this news, the price of Natus Medical stock once again declined, falling from its close of $37.21 per share on February 26, 2016 to close at $36.32 per share on February 29, 2016. However, because defendants failed to remove their prior guidance, which incorporated purportedly expected revenues from the Supply Contract and represented that they expected timely performance under the contract, the stock price remained artificially inflated.

12.     Then, on April 4, 2016, Natus Medical issued a press release pre-announcing its preliminary first quarter 2016 results.  The release disclosed that "[r]evenue for the first quarter of 2016 [was] expected to be approximately $87.5 million versus previous guidance of $91.5 million to $92.5 million, excluding revenue from the Venezuela Ministry of Health contract."  The release specifically disclosed that Natus Medical did not have "'any revenue associated with the Venezuela Ministry of Health contract as [it] did not receive any prepayments during the quarter.'"  On this news, the price of Natus Medical stock declined precipitously, falling from its close of $39.64 per share on April 1, 2016 to close at $31.84 per share on April 4, 2016, a decline of $7.80 per share, or

nearly 20%, on unusually high trading volume of more than 2.7 million shares, or more than eight times the average daily trading volume over the preceding ten trading days.

13.     When the Company finally released its first quarter 2016 results on April 20, 2016, defendants slashed the Company's fiscal year 2016 guidance, finally publicly conceding that they could "no longer include revenue or earnings from the agreement in . . .  guidance until there is more clarity" on Venezuela's performance under the agreement.

14.     As a result of defendants' materially false and misleading statements, Natus Medical stock traded at artificially inflated prices during the Class Period.  However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down more than $19 per share, or 37%, from their Class Period high.

**JURISDICTION AND VENUE**

15.     The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5.  Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.

16.     Venue is proper in this district pursuant to §27 of the Exchange Act.  The acts and transactions giving rise to the violations of law complained of occurred and Natus Medical's headquarters are located in this District.

**THE PARTIES**

17.     Plaintiff Gregg Badger purchased Natus Medical common stock during the Class Period as described in the Certification attached hereto and incorporated herein by reference and suffered damages.

18.     Defendant Natus Medical, based in Pleasanton, California, designs, manufactures, and markets newborn care and neurology healthcare products and services worldwide.  During the

Class Period, shares of Natus Medical traded in an efficient market on the NASDAQ under the ticker symbol "BABY."

19.     Defendant James B. Hawkins ("Hawkins") is, and was at all relevant times, the President and Chief Executive Officer ("CEO") of Natus Medical and a member of its Board of Directors.

20.     Defendant Jonathan A. Kennedy ("Kennedy") is, and was at all relevant times, the Executive Vice President and Chief Financial Officer of Natus Medical.

21.     Defendants Hawkins and Kennedy are referred to herein as the "Individual Defendants."

22.     During the Class Period, the Individual Defendants ran Natus Medical as "hands-on" managers overseeing Natus Medical's operations and finances and made the material false and misleading statements described herein.  The Individual Defendants had intimate knowledge about core aspects of Natus Medical's financial and business operations, including its major contracts and revenue sources, such as the Supply Contract.  They were also intimately involved in deciding which disclosures would be made by Natus Medical.  Indeed, the Individual Defendants made various public statements for Natus Medical during the Class Period and participated in all Class Period investor conferences, wherein they represented to investors that they were knowledgeable on the topics about which they spoke.

## MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS

23.     The Class Period starts on October 16, 2015.  On that day, Natus Medical filed a Current Report on Form 8-K with the SEC which stated that on October 15, 2015, the Company's Argentinian subsidiary, Medix I.C.S.A ("Medix"), had entered into a supply agreement with the Ministry of Health "to provide medical equipment, supplies and services over a three-year period,

including certain third party products."  The filing purported to describe the terms of the Supply Agreement, stating in pertinent part as follows:

> Under the terms of the Supply Agreement, products and services **will be delivered** pursuant to prepayments made by the Ministry of Health. ***Prepayments totaling approximately $69 million are expected by the first quarter of 2016***. Payments will be received in Argentine Pesos based on the current exchange rate of the U.S. dollar and the Argentine Peso at the time of payment.  The agreement may be canceled at any time by the Ministry of Health except for the amount of any prepayments.  If fully performed, the total sales under the agreement would aggregate $232.5 million.

> Medix has partnered with a local distributor to provide distribution and technical service support to hospitals in Venezuela.

> Natus expects the operating profitability over the life of the Supply Agreement to be similar to the company's corporate average operating margin.

24.     The Supply Contract was not attached to the Form 8-K despite the fact that Item 1.01 of the Instructions to SEC Form 8-K and the SEC's interpretive releases mandate the disclosure of the material terms of any "Material Definitive Agreement" entered into by issuers within four business days.  These rules also expressly state that the SEC "***encourage[s] companies to file the [contract as an] exhibit with the Form 8-K when feasible, particularly when no confidential treatment is requested***."[1]  The Company's description of the Supply Contract thus failed to provide the "brief description of the terms and conditions of the agreement or amendment that are material to the registrant," as required by Item 1.01 of the Instructions to Form 8-K.[2]

25.     On October 21, 2015, Natus Medical issued a press release announcing its third quarter 2015 results.  Defendant Hawkins commented on the results and spoke positively about the Supply Contract, stating in pertinent part as follows:

> "I am most satisfied that we achieved a 20% non-GAAP operating profit margin during the quarter and am now confident that we will exceed our full year non-GAAP operating margin goal of 18%. ***We are increasingly confident that we can achieve and potentially exceed our long term operating margin goal of 20% in 2016*** . . . . ***In addition to our record performance during the quarter, we recently***

---

[1]     *See* Final Rule: Additional Form 8-K Disclosure Requirements and Acceleration of Filing Date, 69 F.R. 15594, at 15597 (Mar. 25, 2004).

[2]     *Id*. at 15620.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                                    - 8 -

*secured a $232.5 million, three-year agreement between our Argentina subsidiary, Medix, and the Venezuelan Ministry of Health. This agreement will provide over fifty hospitals with a broad range of obstetric and neonatal devices, supplies and services including more than $50 million of Medix and Natus equipment and supplies . . . ."*

26.     The release further provided the following increased "Financial Guidance":

For the fourth quarter of 2015, the Company increased its revenue guidance to ***$102.0 million to $105.0 million and guided non-GAAP earnings per share of $0.47 to $0.49***.

Full year 2015 earnings guidance was increased with ***expected non-GAAP earnings per share of $1.51 to $1.53***.  Full year 2015 revenue guidance also increased to ***$378 million to $381 million*** compared to previous guidance of $376 million to $378 million.

27.     Following the earnings release, Natus Medical held a conference call with analysts and investors to discuss the Company's earnings and operations.  During the conference call, defendants made additional positive statements about the Supply Contract.  Defendant Hawkins stated in pertinent part as follows:

Last Friday we announced that Medix, our Argentine subsidiary, signed a three-year agreement with the Ministry of Health of Venezuela for $232.5 million to supply Venezuela with neonatal and obstetric equipment supplies and services.  ***As stated in our filing, we are to receive three payments totaling $69 million by the end of the first quarter of 2016.  Prepayments are to continue throughout the contract period as we fulfill our requirements***.  We expect to commence on this contract in our fourth quarter, but revenue is expected to be minimal in the fourth quarter.

28.     During the conference call, defendant Hawkins concluded his prepared remarks by emphasizing the value of the Supply Contract to Natus Medical, stating in pertinent part as follows:

Our newborn care business continues to perform well, leveraging our leading newborn care products and our salesforce with our rapidly growing Peloton hearing screening service business, combined with the recent addition of fast-growing NicView, ***and now the large order from Venezuela, uniquely positions Natus for an exciting future***.

29.     Defendants further emphasized the purported benefits of the Supply Contract in their question and answer session with analysts.  For example, a ROTH Capital Partners analyst asked defendant Hawkins to "provide a little bit more color just on how we should think about that contract contributing next year, both in terms of revenues and earnings, and the cadence of when those

1  prepayments expected by the first quarter will be recognized as revenues throughout 2016."  In

2  response, defendant Hawkins stated that the Company's revenue under the Supply Contract "***will***

3  ***probably be fairly even throughout the three years***."  Defendant Hawkins continued: "***We expect to***

4  ***receive some payments here by the end of the year, to start those three payments totaling the $69***

5  ***million. And then to – most likely those would extend into the first quarter of next year***."

6  Defendant Hawkins also emphasized that Natus Medical is "***going to be prepaid throughout the***

7  ***entire contract***.  So we'll ship after we get prepaid.  We'll get more prepayments, and it will have

8  that kind of cadence."  Later in the call, defendant Kennedy claimed that the revenues under the

9  Supply Contract would be frontloaded, allowing the Company to "always" be ahead: "The contract

10  has a little bit heavier prepayments in the front and as it tails down, ***so we will always be in a***

11  ***position of being ahead***."

12  

13  

14       30.      In response to another analyst question regarding how the Supply Contract would

15  impact the Company's gross profits, defendant Hawkins stated: "We believe ***it will carry about the***

16  ***same operating profit margin that our regular business has***."  Defendant Hawkins would later

17  confirm that revenue from the Supply Contract had factored into the Company's fourth quarter 2015

18  guidance, stating that "we put in a couple million dollars in there," but claiming that this estimate

19  and the other forecasted economic impact of the Supply Contract was "***conservative***," and that "***[i]t's***

20  ***sort of a practice of ours anyway.  We'd rather be on the conservative side***, and if we do better,

21  great."

22  

23       31.      On the conference call, defendants Hawkins and Kennedy not only failed to disclose

24  the highly contingent and unenforceable nature of the Supply Contract, they instead stated that the

25  Supply Contract was likely to lead to continued business and additional revenues with the

26  Venezuelan government after the three-year Supply Contract expired.  For example, defendant

27  Hawkins broke down the purported economic benefit of the Supply Contract as follows:

28  

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                                    - 10 -

Of Natus product itself, it's about $50 million between Natus and Medix that it we'll [sic] be supplying. Then there's the biggest component of that will be for other products that we don't manufacture. And then there's also a service, installation, and training component to it that totals the $232.5 million.

*And yes, we think you're right: after this contract expires, we do believe there will be a continuing relationship for supplies, other products going forward. So, yes, this contract was a long time in the making, and we're very excited to have it and very pleased about it.*

I think we had mentioned a few different times that it was a possibility, even when we acquired Medix five years ago, this was certainly something that we had thought as a possibility. And *here it's happened really bigger than we thought. So, very excited.*

32.     Continuing on the theme that the economics of the Supply Contract were "really bigger than we thought," defendant Kennedy stated:

*The other comment to make about this, this isn't the first contract with Venezuela that Medix has entered into. So this is a continuation of an ongoing relationship. While it's lumpy, it comes over the course of several years. The orders are typically very large, and stretch out over many years. So when we acquired Medix in 2010, they had just completed, I want to say, about a $100 million deal with Venezuela. So there is an ongoing relationship between Medix and other South American countries that is valuable.*

33.     Later in the call, defendant Kennedy assured investors that the currency risk of dealing with a South American buyer was adequately addressed in the Supply Contract and that any such risk was "minimal," stating in pertinent part as follows:

There is foreign exchange, no doubt. Any time you deal with the countries in South America, there is currency controls and there's exchange risk. *The thing that's the most protective on us here is that we do get – the contract is denominated in dollars, and our payment is a dollar-denominated payment.* So over time, we will be recognizing – we're taking prepayments in a constant currency. Once we convert the currency into pesos to pay our vendors and employees, then we will take the currency risk, to the extent that that peso stays on our balance sheet.

*But our intent would be to time that to go equally timed, so that as we're collecting pesos we're paying pesos, and it minimizes the currency risk. But there is some risk, although I'd call it minimal.*

34.     On November 19, 2015, defendant Hawkins presented for Natus Medical at the Jefferies Autumn Global Healthcare Conference.  Opening his remarks, defendant Hawkins reiterated the guidance provided on October 21, 2015, stating in pertinent part that "[t]o look at our financials, which we are very proud of, we've been able to show very consistent revenue growth

over the last few years.  ***And we have guided to almost $380 million mid guidance this year***."

Expressly lauding the *bona fides* of the Supply Contract, defendant Hawkins went on to state in pertinent part as follows:

> ***We also recently announced a major contract, supply agreement, with Venezuela where our Argentine subsidiary received a $232 million agreement to supply medical products and services to Venezuela over a three-year period***. Not only is this for our products, but a variety of newborn care and obstetric products to service over 50 hospitals in Venezuela.

> You can see that the Natus products represent about $50 million and the other products that we will be bringing in and then also the service, warranty, installation and all that is for the rest of the contract. It is a very exciting piece of business. ***We will be paid up front as we go on this business***.

> ***We are looking to get our first payment in by the end of the year, and those payments would continue throughout the life of the contract***. It is not really good for Natus, but it's great for the Venezuelan newborns that have been somewhat deprived of great medical care over the last number of years due to financial reasons, ***but this money has come free*** and it is something that we are very happy to be involved in.

35.   In response to a question from his Jefferies host as to how confident the Company was that the Ministry of Health would make good on its payments under the contract, defendant Hawkins downplayed any risks and reaffirmed his "***confidence***" in Natus Medical receiving payment, because they had been told that the "***money is set aside***," stating:

> Yes, so, always a potential risk with any contract.  The one thing I would say with this one, before we bought our subsidiary, which is located in Buenos Aires, which is who received this order, a company called Medix, they had received an $82 million order maybe seven years ago and it came through just fine.  The money showed up as expected, and it did happen.

> ***So, we have pretty good confidence that it should happen.  We have been told the money is set aside, and we are looking to get our first payment here by the end of December***.

36.   Later in the call, defendant Hawkins stated that the Supply Contract would lead to earnings "growth" at the Company in the coming years, stating in pertinent part that "with ***Venezuela we are going to have rate growth***. . . .  So, we are quite happy overall of just keeping to what we are doing and ***growing the business and growing earnings***."

37.     On December 1, 2015, defendant Hawkins presented for Natus Medical at the Piper Jaffray Healthcare Conference.  He opened his remarks by stating that "[y]ou can see that our revenues have been growing nicely, ***and we've guided this year to $378 million to $381 million***." He went on to again laud the *bona fides* of the Supply Contract, stating in pertinent part as follows:

> Another announcement that we recently made: ***we have a very large order that we received from Venezuela totaling $232.5 million*** for newborn and obstetric equipment along with supplies and service for over 50 hospitals in Venezuela. This is an order that will be over three years. We have a Venezuelan partner that will be responsible for doing all the installation, training, and service and we're going to be the ones selling our products along with purchasing other products.

> As you can see from the graph here, approximately $51 million is products that Natus manufacturers, with the remainder being other people's products. And that also then breaks down into equipment, supplies, and services, as you can see in the bar chart.

> ***We look for some of these revenues to start in December. We expect to get our first $23 million payment in the weeks ahead and then we'll be prepaid on all of this as we go forward on a rolling basis. It's quite a big order for us and we are very excited to not only have it ourselves, but also for the babies and mothers in Venezuela.***

38.     During the Q&A session, defendant Hawkins gave what he called "a little more color" on the Supply Contract "and certainty of revenue," without disclosing the fact that the Venezuelan government had ***already*** failed to make tens of millions of dollars in prepayments under the Supply Contract and that the Company had no means of enforcing the Supply Contract. Similarly, instead of disclosing the fact that the Supply Contract was contingent on political and economic circumstances in Venezuela, defendant Hawkins claimed that Venezuela was following through on a "commitment" to make the required payments, stating in pertinent part as follows:

> Sure. The question was for those that are listening on the Venezuela contract, a little more color on that and the certainty of revenue. How are we going to get paid and all of that.

> Well, certainly, it's a very interesting situation. The order has come through our Argentinean subsidiary, which is one of the largest, if not the largest, medical device company in Argentina. Argentina has a very strong relationship with Venezuela that Argentina historically has had a commitment: whenever they buy oil outside of Argentina, they buy it from Venezuela. And Venezuela has said whenever we buy medical devices, when appropriate, we'll buy them through Argentina.

And with that, there's been this balance of trade situation that Argentina has bought a lot more oil than Venezuela has bought medical devices.  So it's now such that ***Venezuela is now exercising this commitment to fund the medical device purchases***.

The money is being [sic] that we are receiving for this purchase is all in US dollars. And there always is some potential currency risk as we transfer those dollars into Argentine pesos to do the purchasing and delivering of product. ***But overall, over this three-year period, we are convinced it's going to be a good piece of business for us***.

***It will have average corporate margins of 18% to 20%***. And although the gross profits won't be near that, but the bottom line operating margin should be the same. So we are quite encouraged. ***We're expecting to get payment here in the next few weeks and looking for this to kick off, Bill***.

39.     The statements referenced above in ¶¶23 and 25-38 were materially false and misleading because they failed to disclose the following material facts that were known to defendants and recklessly disregarded by them:

(a)     the Venezuelan government had failed to make tens of millions of dollars in prepayments to Natus Medical under the Supply Contract, $24 million of which was required to have been paid in October 2015;

(b)     Natus Medical had no  means to effectively enforce its rights under the Supply Contract, as Venezuela was the exclusive forum for dispute resolution;

(c)     Natus Medical's receipt of revenues under the Supply Contract was contingent on the outcome of Venezuelan elections;

(d)     the Supply Contract was subject to foreign currency exchange risks;

(e)     the Supply Contract did not have the economic benefits or certitude that defendants had represented; and

(f)     as a result of the forgoing, Natus Medical was not on track to achieve the increased guidance defendants had led the market to believe the Company was on track to achieve during the Class Period and such guidance lacked a reasonable basis.

40.     On January 11, 2016, Natus Medical issued a release announcing its first quarter and fiscal year 2016 financial guidance, which revealed that Venezuela had not made expected payments under the Supply Contract due to a purported "delay," causing Natus Medical to miss its earnings guidance:

> For the full year 2016, the Company expects to report revenue of $445 million to $450 million and non-GAAP earnings per share of $1.84 to $1.88. For the first quarter of 2016, the Company expects to report revenue of $96.5 million to $97.5 million and non-GAAP earnings per share of $0.34 to $0.35, an increase of 10% to 13% over the first quarter of 2015 non-GAAP earnings per share of $0.31.

> The Company expects to report revenue of approximately $100.0 million for the fourth quarter of 2015, compared to prior guidance of $102.0 million to $105.0 million and full year 2015 revenue of $375.9 million compared to prior guidance of $378.0 million to $381.0 million. *The guidance provided by the Company in October for the fourth quarter of 2015 included expected revenue of approximately $4 million under the new Venezuelan Ministry of Health contract. The Company was not able to ship product on the anticipated schedule because the prepayment under the contract was delayed. The Company believes the delay was most likely due to a combination of important national elections that occurred in Argentina in November and Venezuela in December, Argentina's currency devaluation in December as well as national Christmas holidays. The Company now expects to receive prepayment and begin shipments in the first quarter of 2016*. The first quarter 2016 guidance includes $5 million of revenue from Venezuela and $60 million of revenue for the full year guidance.

41.     On this revelation, the price of Natus Medical common stock declined, falling from its close of $43.20 per share on January 8, 2016 to close at $38.25 per share on January 11, 2016, a decline of almost $5, or 11%, on usually high trading of approximately 1.4 million shares, or more than four times the average daily volume over the preceding ten trading days.

42.     However, due to defendants' mischaracterization of the Ministry of Health's failure to perform as a mere "delay" and their failure to disclose the true terms and risks under the Supply Contract, the stock price remained artificially inflated.  For instance, stock analyst Roth Capital Partners' January 12, 2016 "Company Note" stated in pertinent part that "[w]hile Venezuela remains an uncertainty, *management is confident shipments will begin in 1Q*," referring to a mere "delay with its Venezuela contract."  Similarly, on January 20, 2016, Roth Capital Partners sent a "FLASH NOTE" to its brokerage customers entitled "BABY 4Q Preview: Preannouncement Should Leave

Little Surprise," in which it claimed to have received the following additional reassurances from Natus Medical's management:

- . . . Based on our discussions, management remains confident the contract should begin this quarter after political elections in Argentina and Venezuela, along with the Argentinian currency devaluation, all of which occurred in 4Q, caused the delay.

- Management has assumed it will receive Venezuelan prepayments by the end of February and begin shipping on the contract thereafter, which would allow Natus to record ~$5 million of revenues in 1Q and remain on track with the $60 million revenue assumption imbedded in its 2016 guidance.

43.     On January 27, 2016, Natus Medical issued a press release reaffirming that the revenue shortfall in the fourth quarter of 2015 was a result of the purported "delay" in receiving prepayments under the Supply Contract, and that Natus Medical's guidance depended on revenues from the Supply Contract.   The release also disclosed unspecified "risks associated with our Venezuela contract."

44.     Later that day, when Natus Medical held a conference call with analysts and investors to discuss the press release, defendant Hawkins again acknowledged that, "[a]s previously announced, the guidance . . .  provided in October 2015 included expected revenue of approximately $4 million under the new $232 million Venezuela Ministry of Health contract to supply neonatal and obstetric equipment," but claimed that the Company "did not ship product on the anticipated schedule because the prepayment under the contract was delayed."   Later in the call, discussing guidance, defendant Hawkins confirmed that "[t]he first-quarter revenue guidance include[d] approximately $5 million from the Venezuela contract" and that the "[f]ull-year revenue guidance include[d] approximately $60 million from the Venezuela contract."   Defendant Hawkins concluded his opening remarks by emphasizing that "***the large order from Venezuela uniquely positions Natus for an exciting future***."

45.     Later on the call, when asked by an analyst "[w]hat gives you confidence that that contract will begin this quarter," defendant Hawkins reiterated that he was "***very confident that this***

*business will happen*."  Hawkins also responded "yes" to an analyst questioning whether it was "*safe to assume guidance implies about $0.20 in earnings from Venezuela this year*."  He later stated, "We look to grow, *hopefully, faster than we've guided*, and also earnings."

    *46.*    Defendant Kennedy provided a similar confidence in the economic benefits of the Supply Contract, stating in response to an analyst's question: "***The operating piece we can pretty much predict.  If I had a gun to my head and had to predict, it's probably in the mid-40%s for a gross profit margin, and Jim said just under 20% for the operating***."

    47.    Following the release and conference call, numerous analysts expressed skepticism that the Supply Contract would convey the economic benefits that defendants had previously reported.  For instance, stock research analysts from William Blair stated in their January 27, 2016 research report that while they still held out hope the Ministry of Health prepayments would come in, they were removing them from their modeling, stating in pertinent part as follows:

> As the company alluded to in its prerelease, the top line fell short of original guidance by about $4 million due to a delay with the implementation of a recently signed contract with the Venezuelan Ministry of Health. . . .

> Regarding Venezuela, management remains optimistic the contract will be executed fairly. ***However, it seems clear that the timing of payments and ability to actually record revenue from the prepayments is still uncertain and we remain skeptical that the full $60 million of revenue attributable to the Venezuela contract in 2016 will materialize this year. As a result, we continue to strongly advise investors to focus exclusively on the impressive performance in the base business***.

> The company also reiterated first-quarter guidance (revenue of $96.5 million-$97.5 million and adjusted EPS of $0.34-0.35) and 2016 guidance ($445 million-$450 million in revenues and $1.84-$1.88 in EPS), both of which include contribution from Venezuela. ***Excluding Venezuela, guidance appears to call for 2%-4% revenue growth and EPS of around $1.67 or $1.68***.

    48.    On this news, the price of Natus Medical stock fell once again, from its close of $37.15 per share on January 27, 2016 to close at $34.71 per share on January 28, 2016, a decline of $2.44 per share, on abnormally high trading volume.

    49.    On February 29, 2016, Natus Medical filed the 10-K, disclosing that, "[f]ollowing the announcement of [the Ministry of Health] contract, there ha[d] been elections in both Venezuela and

Argentina leading to significant political changes in those countries" and "it [had been] reported that Venezuela [was] experiencing a highly inflationary economy and recessionary economic conditions," stating that "[t]hese developments may impact the likelihood of the Venezuelan Ministry of Health's following through with orders under the agreement, and Medix ha[d] not yet received any prepayments under the agreement and no products or services ha[d] been shipped or provided."  The 10-K now warned that "[i]f, for these or any other reasons, the Venezuelan Ministry of Health does not make the required prepayments to initiate deliveries under the Medix agreement, we will not receive any benefit from it."

50.    The Company finally attached a copy of the Supply Contract to the 10-K, which disclosed that the $69 million in prepayments by the Ministry of Health were due by the end of 2015, including more than $24 million that was due in *October 2015* – and thus the prepayments had been past due for months – not the first quarter of 2016 as defendants had represented.  As to Natus Medical's ability to legally enforce the terms of the Supply Contract, the Supply Contract provide that "all aspects relative to the interpretation, application, performance and compliance of this Agreement, shall be ruled by the Laws of the Bolivarian Republic of Venezuela and they have chosen the City of Caracas as their special domicile for such effects."  This choice of law provision rendered the Supply Contract essentially unenforceable by Natus Medical against the Venezuelan government.[3]

51.    On this news, the price of Natus Medical stock once again declined, falling from its close of $37.21 per share on February 26, 2016 to close at $36.32 per share on February 29, 2016.

---

[3]    For example, the International Commission of Jurists ("ICJ") has identified "key deficiencies in the Venezuelan legal system, which threaten the rule of law," and issued a 2014 report which documented "failures by the authorities, as well as interference, intimidation, arbitrary suspensions and other pressures, that have undermined the independence and impartiality of the country's judges and prosecutors, and the ability of lawyers to be effective and independent in upholding people's rights."  ICJ, *Venezuela: weak legal system threatens democracy* (June 5, 2014), https://www.icj.org/venezuela-weak-legal-system-threatens-democracy-and-human-rights-reforms-urgently-needed-new-report-says/ (last visited Jan. 26, 2017).

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                          - 18 -

However, because defendants failed to remove their prior guidance, which incorporated purportedly expected revenues from the Supply Contract and represented that they expected timely performance under the contract, the stock price remained artificially inflated.

52.   On a March 14, 2016, defendants Hawkins and Kennedy presented at the ROTH investor conference call.  On the call, defendant Hawkins conceded that analysts could discount the expected revenues from the Supply Contract, but stated "***we really believe this is going to happen***." However, instead of the misleading confidence and certainty that he had previously conveyed regarding the Supply Contract, Hawkins acknowledged that "trying to handicap exactly when, with all the changes going on in both governments, Ministry of Health, oil prices, it has made it very difficult."  Later in the call, he characterized Venezuela as being, "quote, in the toilet," and stated that the Company had "an agent there that is the number one distributor and supplier of product in Venezuela who we rely upon to really give us this feedback."

53.   Then, on April 4, 2016, Natus Medical issued a press release pre-announcing its preliminary first quarter 2016 results.  The release disclosed that "[r]evenue for the first quarter of 2016 [was] expected to be approximately $87.5 million versus previous guidance of $91.5 million to $92.5 million, excluding revenue from the Venezuela Ministry of Health contract."  The release revealed that Natus Medical did not have "'any revenue associated with the Venezuela Ministry of Health contract as [it] did not receive any prepayments during the quarter.'"

54.   On this news, the price of Natus Medical stock declined precipitously, falling from its close of $39.64 per share on April 1, 2016 to close at $31.84 per share on April 4, 2016, a decline of $7.80 per share, or nearly 20%, on unusually high trading volume of more than 2.7 million shares, or more than eight times the average daily trading volume over the preceding ten trading days.

55.   When the Company finally released its first quarter 2016 results on April 20, 2016, defendants slashed the Company's fiscal year 2016 guidance, finally publicly conceding that they

could "no longer include revenue or earnings from the agreement in . . . guidance until there is more clarity" on Venezuela's performance under the agreement.

## NO SAFE HARBOR

56.     Natus Medical's "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  Because most of the false and misleading statements related to existing facts or conditions, the Safe Harbor has no applicability.  To the extent that known trends should have been included in the Company's financial reports prepared in accordance with GAAP, they are excluded from the protection of the statutory Safe Harbor.  15 U.S.C. §78u-5(b)(2)(A).

57.     The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer and/or director of Natus Medical who knew that the FLS was false.  In addition, the FLS were contradicted by existing, undisclosed material facts that were required to be disclosed so that the FLS would not be misleading.  Finally, most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide any meaningful disclosures of the relevant risks.

## ADDITIONAL SCIENTER ALLEGATIONS

58.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Natus Medical, their control over, and/or receipt or

1  modification of Natus Medical's allegedly materially misleading misstatements and/or their

2  associations with the Company which made them privy to confidential proprietary information

3  concerning Natus Medical, participated in the fraudulent scheme alleged herein.

4  59.    Meanwhile, defendants' false and misleading statements artificially inflated the price

5  of Natus Medical stock, which reached all-time highs of over $50 per share during the Class Period.

6

7  While the price of Natus Medical stock was artificially inflated, certain of the Company's senior

8  executives and directors cashed in, selling hundreds of thousands shares of their personally held

9  Natus Medical stock at fraud-inflated prices, including defendants Hawkins and Kennedy, who sold

10  228,958 shares and received more than $10.7 million in gross proceeds:

11

| DEFENDANT | DATE | SHARES SOLD | PRICE | GROSS PROCEEDS |
|---|---|---|---|---|
| Kennedy | 10/27/15 | 10,496 | $45.75 | $480,192 |
| Kennedy | 10/28/15 | 18,462 | $45.70 | $843,713 |
| Hawkins | 10/28/15 | 56,189 | $45.89 | $2,578,513 |
| Hawkins | 10/29/15 | 6,162 | $45.89 | $282,774 |
| Hawkins | 10/30/15 | 37,649 | $45.53 | $1,714,159 |
| Hawkins | 11/10/15 | 15,731 | $48.12 | $756,976 |
| Hawkins | 11/12/15 | 26,758 | $47.32 | $1,266,189 |
| Hawkins | 11/25/15 | 14,103 | $48.86 | $689,073 |
| Hawkins | 11/27/15 | 43,408 | $49.17 | $2,134,371 |
| *Totals:* | | *228,958* | | *$10,745,960* |

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**
**FRAUD-ON-THE-MARKET DOCTRINE**

60.    At all relevant times, the market for Natus Medical common stock was an efficient

market for the following reasons, among others:

(a)    Natus Medical stock met the requirements for listing, and was listed and

actively traded on the NASDAQ, a highly efficient and automated market;

(b)    According to the Company's Form 10-Q filed on November 3, 2016, the

Company had more than 32.9 million shares outstanding as of October 28, 2016.  During the Class

Period, on average, 330,000 shares of Natus Medical stock were traded on a daily basis,

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 21 -

demonstrating a very active and broad market for Natus Medical stock and permitting a very strong presumption of an efficient market;

(c)     Natus Medical was qualified to file a less comprehensive Form S-3 registration statement with the SEC that is reserved, by definition, to well-established and largely capitalized issuers for whom less scrutiny is required;

(d)     as a regulated issuer, Natus Medical filed periodic public reports with the SEC;

(e)     Natus Medical regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services, the Internet and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(f)     Natus Medical was followed by many securities analysts who wrote reports that were distributed to the sales force and certain customers of their respective firms during the Class Period and each of these reports was publicly available and entered the public marketplace; and

(g)     unexpected material news about Natus Medical was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

61.     As a result of the foregoing, the market for Natus Medical common stock promptly digested current information regarding Natus Medical from publicly available sources and reflected such information in Natus Medical's stock price.  Under these circumstances, all purchasers of Natus Medical common stock during the Class Period suffered similar injury through their purchase of Natus Medical common stock at artificially inflated prices, and a presumption of reliance applies.

**LOSS CAUSATION**

62.     During the Class Period, as detailed herein, defendants made false and misleading statements and omitted material information concerning Natus Medical's business and prospects and engaged in a scheme to deceive the market.  By artificially inflating and manipulating the price of Natus Medical stock, defendants deceived plaintiff and the Class and caused them losses when the truth was revealed.  When defendants' prior misrepresentations and fraudulent conduct became apparent to the market, this caused Natus Medical's stock price to fall precipitously as the prior artificial inflation came out of the stock price.  As a result of their purchases of Natus Medical stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**CLASS ACTION ALLEGATIONS**

63.     This is a class action on behalf of all purchasers of Natus Medical common stock during the Class Period (the "Class").  Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

64.     Common questions of law and fact predominate and include: (a) whether defendants violated the Exchange Act; (b) whether defendants omitted and/or misrepresented material facts; (c) whether defendants knew or recklessly disregarded that their statements were false; (d) whether the price of Natus Medical common stock was artificially inflated during the Class Period; and (e) the extent of and appropriate measure of damages.

65.     Plaintiff's claims are typical of those of the Class.  Prosecution of individual actions would create a risk of inconsistent adjudications.  Plaintiff will adequately protect the interests of the

Class.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

### COUNT I

**For Violation of §10(b) of the Exchange Act
and Rule 10b-5 Against All Defendants**

66.    Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

67.    Throughout the Class Period, defendants, in pursuit of their scheme and continuous course of conduct to inflate the market price of Natus Medical common stock, had the ultimate authority for making, and knowingly or recklessly made, materially false or misleading statements or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

68.    During the Class Period, defendants, and each of them, carried out a plan, scheme, and course of conduct using the instrumentalities of interstate commerce and the mails, which was intended to and, throughout the Class Period did: (a) artificially inflate and maintain the market price of Natus Medical common stock; (b) deceive the investing public, including plaintiff and other Class members, as alleged herein; (c) cause plaintiff and other members of the Class to purchase Natus Medical common stock at inflated prices; and (d) cause them losses when the truth was revealed over time.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein, in violation of §10(b) of the Exchange Act and Rule 10b-5, 17 C.F.R. §240.10b-5.

69.    In addition to the duties of full disclosure imposed on defendants as a result of their affirmative false and misleading statements to the investing public, defendants had a duty to promptly disseminate truthful information with respect to Natus Medical's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that

the market price of the Company's common stock would be based on truthful, complete and accurate information.

70.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were either known or readily available to them.

71.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts as set forth above, the market price of Natus Medical common stock was artificially inflated during the Class Period.  In ignorance of the fact that the market price of Natus Medical common stock was artificially inflated, and relying upon the integrity of the market in which the shares traded, plaintiff and other members of the Class purchased Natus Medical stock during the Class Period at artificially high prices and, when the truth was revealed, were damaged thereby.

72.     Had plaintiff and the other members of the Class and the marketplace known of the true facts, which were knowingly or recklessly concealed by defendants, plaintiff and the other members of the Class would not have purchased their Natus Medical shares during the Class Period, or if they had purchased such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

73.     By virtue of the foregoing, defendants Natus Medical and the Individual Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10-5.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against All Defendants

74.     Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

75.     The Individual Defendants had control over Natus Medical and made the materially false and misleading statements and omissions on behalf of Natus Medical within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their share ownership, executive and board positions and stock ownership, and their culpable participation, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which plaintiff contends were false and misleading.  The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

76.     In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein. Natus Medical had the power to control and influence, and did control and influence, the Individual Defendants and all of its employees.

77.     By reason of such wrongful conduct, Natus Medical and the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

1     A.     Determining that this action is a proper class action, designating plaintiff as Lead

2 Plaintiff and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil

3 Procedure and plaintiff's counsel as Lead Counsel;

4
     B.     Awarding compensatory damages in favor of plaintiff and the other Class members
5
against all defendants, jointly and severally, for all damages sustained as a result of defendants'
6
7 wrongdoing, in an amount to be proven at trial, including interest thereon;

8     C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this

9 action, including counsel fees and expert fees; and

10     D.     Awarding such other and further relief as the Court may deem just and proper.

11

**JURY DEMAND**

12     Plaintiff demands a trial by jury.

13 DATED: January 30, 2017        ROBBINS GELLER RUDMAN
                                                                       & DOWD LLP
14                                                 SHAWN A. WILLIAMS

15

16                                         *s/ Shawn A. Williams*

17                                      SHAWN A. WILLIAMS

18                       Post Montgomery Center
                       One Montgomery Street, Suite 1800
19                       San Francisco, CA 94104
                       Telephone:  415/288-4545
20                       415/288-4534 (fax)

21                       ROBBINS GELLER RUDMAN
                        & DOWD LLP
22                       DAVID C. WALTON
                       BRIAN E. COCHRAN
23                       655 West Broadway, Suite 1900
                       San Diego, CA 92101
24                       Telephone:  619/231-1058
                       619/231-7423 (fax)

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
MARY K. BLASY
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

JOHNSON & WEAVER, LLP
FRANK J. JOHNSON
PHONG L. TRAN
600 West Broadway, Suite 1540
San Diego, CA  92101
Telephone:  619/230-0063
619/255-1856 (fax)

Attorneys for Plaintiff

I:\Admin\CptDraft\Securities\Cpt Natus Medical.docx

## CERTIFICATION OF PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, Gregg Badger, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.      I have reviewed the complaint with my counsel and authorize its filing.

2.      I did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.      I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4.      I made the following transactions during the Class Period in the securities that are the subject of this action.

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| March 2, 2016 | 140 | 35.47 |
| March 10, 2016 | 343 | 37.70 |
|  |  |  |

**Sales:**

| | | |
|---|---|---|
| | | |
| | | |
| | | |

5.      I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

6.      I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years, except if detailed below:

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 27th day of January, 2017.

DocuSigned by:

*Gregg Badger*

Gregg Badger