1  **GLANCY PRONGAY & MURRAY LLP**
   ROBERT V. PRONGAY (#270796)
2  KARA M. WOLKE (#241521)
   ALEXA MULLARKY (#307932)
3  1925 Century Park East, Suite 2100
   Los Angeles, California 90067
4  Telephone:  (310) 201-9150
   Facsimile:   (310) 201-9160
5  Email:  info@glancylaw.com
6
7  *Attorneys for Lead Plaintiff John Costabile*

8

       **UNITED STATES DISTRICT COURT**
10     **NORTHERN DISTRICT OF CALIFORNIA**

11

12 | JOHN COSTABILE, Individually and On Behalf of All Others Similarly Situated, | Case No.: 4:17-cv-00458-JSW |

13 Plaintiff,                          CLASS ACTION

14 v.                                  **FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL**
15 NATUS MEDICAL INCORPORATED,          **SECURITIES LAWS**
   JAMES B. HAWKINS and JONATHAN A.
16 KENNEDY,

17 Defendants.                         **DEMAND FOR JURY TRIAL**

18

19

20

21

22

23

24

25

26

27

28

1

2

# TABLE OF CONTENTS

3

4

I.      NATURE AND BACKGROUND OF THE ACTION ........................................................ 1

II.     JURISDICTION AND VENUE .......................................................................... 9

III.    PARTIES .................................................................................................. 10

IV.     PARTIES WITH KNOWLEDGE REPORT THAT THE SUPPLY CONTRACT WAS
        NOT EXECUTED BY THE MINISTRY OF HEALTH .................................................... 11

V.      PARTIES WITH KNOWLEDGE REPORT A HISTORY OF PROBLEMS WITH
        VENEZUELAN CONTRACTS, INCLUDING THAT THE COMPANY'S  PREVIOUS
        CONTRACT WITH VENEZUELA – TOUTED BY DEFENDANTS  DURING THE
        CLASS PERIOD – WAS NOT TIMELY COMPLETED .................................................... 12

VI.     THE    SUPPLY    CONTRACT,    IF    SIGNED,    WAS    ESSENTIALLY
        UNENFORCEABLE ...................................................................................... 13

VII.    MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS .......... 13

VIII.   UNDISCLOSED RISKS MATERIALIZE AND THE TRUTH ABOUT THE SUPPLY
        CONTRACT  EMERGES  THROUGH  A  SERIES  OF  PARTIAL,  YET  STILL
        MISLEADING, DISCLOSURES ......................................................................... 25

IX.     ADDITIONAL SCIENTER ALLEGATIONS ............................................................ 33

X.      LOSS CAUSATION ..................................................................................... 34

XI.     PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE .............. 36

XII.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ...................................... 37

XIII.   CLASS ACTION ALLEGATIONS .................................................................... 38

XIV.    CAUSES OF ACTION .................................................................................. 40

XV.     PRAYER FOR RELIEF ................................................................................. 42

XVI.    DEMAND FOR TRIAL BY JURY .................................................................... 43

5

6

7

8

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    Lead Plaintiff John Costabile ("Plaintiff" or "Lead Plaintiff"), individually and on behalf

2    of all others similarly situated, by Plaintiff's undersigned attorneys, alleges the following based

3    upon personal knowledge as to Plaintiff's own acts, and upon information and belief as to all other

4    matters based on the investigation conducted by and through Plaintiff's attorneys, which included,

5    among other things, a review of Securities and Exchange Commission ("SEC") filings by Natus

6    Medical Incorporated ("Natus Medical" or the "Company"), as well as media and analyst reports

7    about the Company and conference call transcripts. Plaintiff believes that substantial additional

8    evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for

10   discovery.

11   **I.       NATURE AND BACKGROUND OF THE ACTION**

12       1.       This is a securities class action on behalf of all purchasers of the common stock of

13   Natus Medical (NASDAQ: "BABY") between October 16, 2015 and April 3, 2016, inclusive (the

14   "Class Period"), alleging violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934

15   (the "Exchange Act").

16       2.       Defendant Natus Medical designs, manufactures and markets newborn care and

17   neurology healthcare products and services worldwide.

18       3.       On October 16, 2015, Defendants[1] announced that Natus Medical, through its

19   wholly-owned Argentinian subsidiary, Medix I.C.S.A. ("Medix"), had entered into a three-year,

20   $232.5 million supply contract (the "Supply Contract") "to provide medical equipment, supplies

21   and services" to the Ministry of Health of Venezuela (the "Ministry of Health"). Defendants

22   further announced that "[p]repayments totaling approximately $69 million [under the Supply

23   Contract] are expected by the first quarter of 2016."

24       4.       Analysts immediately took note of the apparent significance of the Supply Contract

25   as announced by Defendants. An analyst report published by Roth Capital Partners ("Roth") on

26   October 16, 2015 observed that "[t]his is a significant development that will provide material

28   [1] As alleged herein, "Defendants" includes: Natus Medical; Natus Medical's Chief Executive Officer ("CEO"), James B. Hawkins ("Hawkins"); and Natus Medical's Chief Financial Officer ("CFO"), Jonathan A. Kennedy ("Kennedy").

upside versus current estimates,..." concluding "we are buyers on this development."

5.    A report by William Blair & Co. ("William Blair"), also published on October 16, 2015, similarly noted the apparent materiality of the Supply Contract, as it was described by Defendants, to the Company's bottom line:

> The company intends to offer some forecasting details on the earnings call next Wednesday to provide guidance on the pacing of top- and-bottom line contribution,…. Running some math on the details provided Friday suggests that there will be material upside to our current estimates from this deal. For example, if we assume a roughly even distribution of business over the three years of the agreement, this deal could contribute roughly 20% upside to the top line and 16% upside to the bottom line in 2016 (we assume the company would pay the 34% corporate tax rate in Venezuela).

6.    On October 21, 2015, as Defendants had indicated to analysts they would do, Defendants provided additional detail regarding the impact of the Supply Contract on the Company's revenue forecasts. Citing the Supply Contract, Defendants increased Natus Medical's revenue and earnings guidance for both the fourth quarter of 2015 and the fiscal year ending December 31, 2015. In a Form 8-K and press release dated October 21, 2015, Defendants stated:

> For the fourth quarter of 2015, the Company increased its revenue guidance to $102.0 million to $105.0 million and guided non-GAAP earnings per share of $0.47 to $0.49. Full year 2015 earnings guidance was increased with expected non-GAAP earnings per share of $1.51 to $1.53. Full year 2015 revenue guidance also increased to $378 million to $381 million compared to previous guidance of $376 million to $378 million.

7.    During a conference call held the same day, Natus Medical's CEO, James Hawkins, explained that under the Supply Contract, "we are to receive three payments totaling $69 million by the end of the first quarter of 2016." Commenting that "the large order from Venezuela, uniquely positions Natus for an exciting future," Hawkins presented the Supply Contract as a substantial win for the Company, explaining: "I think we had mentioned a few different times that it was a possibility, even when we acquired Medix five years ago, this was certainly something that we had thought as a possibility. And here it's happened really bigger than we thought." Hawkins further explained that "after this contract expires, we do believe there will be a continuing relationship for supplies, other products going forward. So, yes, this contract was a

long time in the making, and we're veryexcited to have it and very pleased about it."

8.   Also during the October 21, 2015 conference call, in response to an analyst's question regarding potential currency exchange risks under the Supply Contract, Natus Medical's CFO, Jonathan Kennedy, assured analysts and investors alike that any such risk was "minimal" because the Supply Contract supposedly denominated payment to be made in dollars.

9.   Following Defendants' descriptions of the Supply Contract and the Company's increased revenue forecasts, a Roth analyst report published on October 22, 2015 commented, "[a]s for Venezuela, we view the contract as a significant win for Natus as it should provide substantial revenue and earnings growth for the next three years at minimum."

10.   Indeed, Defendants touted the Company's supposed securing of the Supply Contract as a major win. Speaking at the Jefferies Autumn Global Healthcare Conference on November 19, 2015, Defendant Hawkins cited the "major contract, [a] supply agreement, with Venezuela where [Natus's] Argentine subsidiary received a $232 million agreement to supply medical products and services to Venezuela over a three-year period" as one of the reasons for the positive trend in revenue and earnings, stating "with Venezuela we are going to have rate growth." Hawkins further stated, "[i]t is a very exciting piece of business. We will be paid up front as we go on this business. We are looking to get our first payment in by the end of the year, and those payments would continue throughout the life of the contract."

11.   Similarly, during the Piper Jaffray Healthcare Conference held on December 1, 2015, Defendants again reiterated the supposed benefits of the Supply Contract. Defendant Hawkins stated that "we have a very large order that we received from Venezuela totaling $232.5 million for newborn and obstetric equipment[,] along with supplies and service for over 50 hospitals in Venezuela." Hawkins further stated, "[w]e expect to get our first $23 million payment in the weeks ahead and then we'll be prepaid on all of this as we go forward on a rolling basis. It's quite a big order for us and we are very excited to not only have it ourselves, but also for the babies and mothers in Venezuela."

12.     On December 17, 2016, Natus Medical shares reached a Class Period – and all-time – high closing price of $50.48 per share. On December 18, 2015, Natus Medical reached its Class Period – and all-time – high intra-day trading price of $50.86 per share.

13.     Unbeknownst to investors, however, the Supply Contract was not as Defendants had publicly portrayed it. Specifically, while touting the Supply Contract in November and December 2015, Defendants did not disclose that the Venezuelan government had *already* failed to make tens of millions of dollars in prepayments to Natus Medical, as were required under the Supply Contract to have been paid as follows: (i) $24,413,410.95 due in October 2015; (ii) $22,669,595.89 due in November 2015; and (iii) $22,669,595.89 due in December 2015, for a total pre-payment of $69,752,602.73 due by the end of 2015. None of these scheduled payments was timely made.

14.     Additionally, Natus Medical had no means of effectively enforcing its rights under the Supply Contract, as Venezuela – already experiencing significant political and economic turmoil at the time – was the exclusive forum for dispute resolution and the Venezuelan government was the other party to the contract. Natus Medical's receipt of payments pursuant to the Supply Contract also was contingent on the outcome of Venezuelan elections, which had the potential to be volatile and introduce uncertainty into the Ministry of Health's ability and willingness to comply with the terms of the Supply Contract. As a confidential witness ("CW") who was employed as the Purchasing Coordinator at the Ministry of Health between February 2016 and July 2016 ("CW1") explained, "the minister leaves and everything that he does that isn't invoiced gets lost – if the money is not committed. One thing is a promise to do a contract and other thing is a contract." Overall, the Supply Contract did not have the economic benefits or certitude that Defendants had represented.

15.     Further, there is no evidence that the Supply Contract was actually ever executed, or otherwise effective or enforceable. The Supply Contract, as Defendants attached it as Exhibit 10.12 to the Company's 2015 Form 10-K filed with the SEC on February 29, 2016 (the "2015 Form 10-K"), is *unsigned*. Indeed, according to information provided by CW1, it appears that the

Ministry of Health had not actually signed the Supply Contract, and thus had not finally agreed to its terms. As such, in addition to the significant barrier to enforcement posed by the designated forum for dispute resolution, Defendants had no way of enforcing the Supply Contract, which appears not to have been finally agreed to in the first place.

16.     Defendants were thus aware of facts tending to seriously undermine their statements regarding the Supply Contract and financial guidance, and showing that their statements lacked a reasonable basis when made, including that pre-payments supposedly due under the Supply Contract already were months late, and the Supply Contract, if it was ever even executed, would be difficult, if not impossible, to enforce. As a result of the foregoing, Defendants knew or recklessly disregarded that Natus Medical was not on track to achieve the increased fourth quarter and year-end 2015 revenue guidance provided by Defendants.

17.     These previously undisclosed facts and risks were first *partially* revealed to the market on January 11, 2016, when Defendants issued a press release revealing that the Company expected to fall short of its increased fourth quarter and fiscal year 2015 guidance. Defendants disclosed that the Company now only expected to report fourth quarter revenues of approximately $100 million, compared to its prior guidance of $102 million to $105 million, and fiscal year 2015 revenues of $375.9 million, compared to its prior of $378 million to $381 million. Defendants explained that "[t]he guidance provided by the Company in October for the fourth quarter of 2015 included expected revenue of approximately $4 million under the new Venezuelan Ministry of Health contract," but "[t]he Company was not able to ship product on the anticipated schedule because the prepayment under the contract was delayed." Defendants further explained that "[t]he Company believes the delay was most likely due to a combination of important national elections that occurred in Argentina in November and Venezuela in December, Argentina's currency devaluation in December[,] as well as national Christmas holidays." As a result, Defendants stated that "[t]he Company now expect[ed] to receive prepayment and begin shipments in the first quarter of 2016," and that the first quarter 2016 "guidance include[d] $5 million of revenue from Venezuela and $60 million of revenue for [fiscal year 2016] guidance."

18.     On this revelation of a purported "delay" in the payments from the Ministry of Health, the price of Natus Medical common stock declined, falling from its close of $43.20 per share on January 8, 2016 to close at $38.25 per share on January 11, 2016, a decline of almost $5.00 per share, or 11%, on usually high trading of approximately 1.4 million shares, or more than four times the average daily volume over the preceding ten trading days. However, due to Defendants' mischaracterization of the Ministry of Health's failure to perform as a mere temporary "delay," their reckless reassurances that the payments and product shipments would begin shortly in the first quarter of 2016, their continued inclusion of revenue from the Supply Contract in the Company's revenue guidance, and Defendants' concealment of the true terms and risks under the Supply Contract, including but not limited to the fact that the Ministry of Health had already defaulted on *three* separately scheduled payments, the price of Natus Medical stock remained artificially inflated.

19.     Indeed, on January 26, 2016, The Motley Fool noted Defendants' preliminary announcement of the fourth quarter 2015 revenue miss, and cited Defendants' explanation for the miss as follows: "[m]anagement blamed the miss on their expectations for $4 million in sales under Natus' new contract with the Venezuelan Ministry of Health that didn't materialize. Apparently, the government never made the prepayment for the contract, so Natus Medical didn't ship any product." Based on Defendants' false reassurances, however, the article concluded on a positive note, "[f]ortunately, the issue seems to be worked out, so Natus has $5 million of revenue baked into its guidance for the current quarter [the first quarter of 2016] and $60 million for the full year [2016]."

20.     On January 27, 2016, Defendants issued a press release announcing final fourth quarter and fiscal year-end 2015 results, and reaffirming that the revenue shortfall in the fourth quarter of 2015 was the result of a purported "delay" in receiving prepayments under the Supply Contract, and that Natus Medical's guidance depended, at least in part, on revenues from the Supply Contract. The press release also referred to unspecified "risks associated with [the Company's] Venezuela contract[.]" Despite the supposed "delay" in payment, Defendant Hawkins

reassured investors during a conference call the same day that "the funding is there" and that it was "set aside" just waiting to be paid to the Company.

21.     Following this news, and despite Defendant Hawkins' reassurances, numerous analysts expressed skepticism that the Supply Contract would convey the economic benefits that Defendants had previously reported. For example, on January 27, 2016, William Blair reported that they were removing revenue from the Supply Contract from their modeling, explaining:

> As the company alluded to in its prerelease, the top line fell short of original guidance by about $4 million due to a delay with the implementation of a recently signed contract with the Venezuelan Ministry of Health. If not for a favorable tax rate, this … would have caused an EPS miss in the quarter.
>
> Regarding Venezuela, management remains optimistic the contract will be executed fairly. ***However, it seems clear that the timing of payments and ability to actually record revenue from the prepayments is still uncertain and we remain skeptical that the full $60 million of revenue attributable to the Venezuela contract in 2016 will materialize this year.*** As a result, we continue to strongly advise investors to focus exclusively on the impressive performance in the base business.
>
> The company also reiterated first-quarter guidance (revenue of $96.5 million-$97.5 million and adjusted EPS of $0.34-0.35) and 2016 guidance ($445 million-$450 million in revenues and $1.84-$1.88 in EPS), both of which include contribution from Venezuela. ***Excluding Venezuela, guidance appears to call for 2%-4% revenue growth and EPS of around $1.67 or $1.68***.

(emphasis added).

22.     On this news, the price of Natus Medical stock fell once again, from its close of $37.15 per share on January 27, 2016 to close at $34.71 per share on January 28, 2016, a decline of $2.44 per share, on abnormally high trading volume.

23.     On February 29, 2016, Natus Medical filed its Annual Report on Form 10-K for the fiscal year ending December 31, 2015 (the "2015 Form 10-K"). The 2015 Form 10-K disclosed that, "[f]ollowing the announcement of [the Ministry of Health] contract, there ha[d] been elections in both Venezuela and Argentina leading to significant political changes in those countries" and "it [had been] reported that Venezuela [was] experiencing a highly inflationary economy and recessionary economic conditions," stating that "[t]hese developments may impact

the likelihood of the Venezuelan Ministry of Health's following through with orders under the agreement, and Medix [Natus Medical's Argentinian subsidiary] ha[d] not yet received any prepayments under the agreement and no products or services ha[d] been shipped or provided."

24.     For the first time, Defendants made the Supply Contract itself public, attaching a copy to the 2015 Form 10-K as Exhibit 10.12. The Supply Contract, as attached, was unsigned. The Supply Contract further revealed that the approximately $69 million in prepayments by the Ministry of Health had been due by the end of 2015, such that approximately $24 million was due in October 2015, approximately $23 million was due in November 2015, and another approximately $23 million was due in December 2015.

25.     As revealed by the Supply Contract, and as previously unbeknownst to investors, the prepayments under the Supply Contract actually had been in default for months. The Company was not experiencing a mere one-time "delay" in payment early in  the first quarter of 2016, as Defendants had repeatedly represented. As to Natus Medical's ability to legally enforce the terms of the Supply Contract, the contract provided that it was governed solely by Venezuelan law, meaning that the Venezuelan government could unilaterally renege on all aspects of the agreement. The Venezuelan government could also, presumably, renege on a supposed contract that appears to never have been signed in the first place.

26.     On this news, the price of Natus Medical stock once again declined, falling from its close of $37.21 per share on February 26, 2016 to close at $36.32 per share on February 29, 2016. Because the full extent of the risks underlying the Supply Contract remained concealed from the market, however, the Company's stock price continued to remain artificially inflated.

27.     Finally, on April 4, 2016, Defendants issued a press release announcing the Company's preliminary first quarter 2016 results. The release disclosed that "[r]evenue for the first quarter of 2016 is expected to be approximately $87.5 million versus previous guidance of $91.5 million to $92.5 million, excluding revenue from the Venezuela Ministry of Health contract." The release specifically disclosed that Natus Medical did not have "'any revenue associated with the Venezuela Ministry of Health contract as [it] did not receive any prepayments

during the quarter.'" On this news and materialization of the risk, the price of Natus Medical stock declined precipitously, falling from its close of $39.64 per share on April 1, 2016 to close at $31.84 per share on April 4, 2016, a decline of $7.80 per share, or nearly 20%, on unusually high trading volume of more than 2.7 million shares, or more than eight times the average daily trading volume over the preceding ten trading days.

28.     When the Company finally released its first quarter 2016 results on April 20, 2016, Defendants slashed the Company's fiscal year 2016 guidance, finally publicly conceding that they could "no longer include revenue or earnings from the agreement in . . . guidance until there is more clarity" on Venezuela's performance under the agreement.

29.     As a result of Defendants' false and misleading statements as alleged herein, Natus Medical stock traded at artificially inflated prices during the Class Period, reaching $50.86 per share in intraday trading on December 18, 2015 – an all-time high. As a result of the above-recounted revelations hitting the market, the Company's shares were hammered by massive sales as the truth was revealed, causing a total price drop of approximately $19 per share, marking a 37% decline, from the Class Period high.

30.     While public shareholder equity was hammered, Hawkins and Kennedy cashed in before the truth about the Supply Contract was revealed, unloading their personally held stock to the unsuspecting public at artificially inflated prices during the Class Period. Together, Hawkins and Kennedy collectively sold more than $10.7 million worth of Natus Medical stock in the days and weeks immediately following their false and misleading announcements regarding the Supply Contract.

## II.     JURISDICTION AND VENUE

31.     The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5. Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.

32.     Venue is proper in this district pursuant to §27 of the Exchange Act. The acts and transactions giving rise to the violations of law complained of occurred and Natus Medical's

1  headquarters are located in this District.

2  **III.    PARTIES**

3          33.    Lead Plaintiff John Costabile, as set forth in the Certification previously filed and

4  incorporated herein by reference, acquired Natus Medical common stock at artificially inflated

5  prices during the Class Period and was damaged upon the revelation of the alleged corrective

6  disclosures and materialization of the previously undisclosed risks.

7          34.    Defendant Natus Medical, based in Pleasanton, California, designs, manufactures,

8  and markets newborn care and neurology healthcare products and services worldwide. During the

10  Class Period, shares of Natus Medical traded in an efficient market on the NASDAQ under the

11  ticker symbol "BABY."

12         35.    Defendant Hawkins has served as the CEO of Natus Medical and a member of its

13  Board of Directors since April 2004 and throughout the Class Period. Hawkins also served as the

14  President of Natus Medical from April 2004 through January 2011, and from June 2013

15  throughout the Class Period.

16         36.    Defendant Kennedy has served as the Senior Vice President and CFO of Natus

17  Medical since April 2013 and throughout the Class Period.

18         37.    Defendants Hawkins and Kennedy are sometimes together referred to herein as the

19  "Individual Defendants."

20         38.    During the Class Period, the Individual Defendants ran Natus Medical as "hands-

21  on" managers overseeing Natus Medical's operations and finances,[2] and they made the material

22  false and misleading statements described herein. The Individual Defendants had intimate

23  knowledge about core aspects of Natus Medical's financial and business operations, including its

24  major contracts and revenue sources, such as the Supply Contract. Indeed, the Individual

25  Defendants commented repeatedly on the status of payments purportedly due under the Supply

26  

27  [2] *See* http://investor.natus.com/management-team (last visited on July 14, 2017) (representing that
   Defendant Hawkins had "highly relevant leadership experience in the medical technology
28  industry" and a "unique perspective on [the Company's] operations due to his position as [its]
   Chief Executive Officer[;]" while Defendant Kennedy had financial expertise, including as a
   Certified Public Accountant).

Contract, and were intimately involved in deciding which disclosures would be made by Natus Medical. Indeed, the Individual Defendants made various public statements on behalf Natus Medical during the Class Period and participated in all Class Period investor conferences, wherein they represented to investors that they were knowledgeable on the topics about which they spoke.

## IV.   PARTIES WITH KNOWLEDGE REPORT THAT THE SUPPLY CONTRACT WAS NOT EXECUTED BY THE MINISTRY OF HEALTH

39.     The document Defendants attached to the Company's 2015 Form 10-K, filed with the SEC on February 29, 2016, and described as the "Agreement For the Acquisition of Medical Devices between Medix ICSA and the Ministry of Health of the Republic of Venezuela dated October 15, 2016" (*i.e.*, the Supply Contract) is unsigned. A true and correct copy of the Supply Contract, as attached to the 2015 Form 10-K at Exhibit 10.12, is attached hereto as Exhibit A. As set forth herein, CW1 confirms that the Supply Contract was not executed by the Ministry of Health.

40.     CW1 was the Ministry of Health's Purchasing Coordinator during the Class Period, from February 2016 until July 2016. As Purchasing Coordinator, CW1 was responsible for preparing price quotes, handling and maintaining information regarding payments due under contracts for purchases and services, and tracking receipt of goods and services, among other responsibilities.

41.     As Purchasing Coordinator, CW1 also had oversight responsibility for purchasing department buyers and members of the Ministry of  Health's Commission on Purchasing and Supplies. According to CW1, the Commission on Purchasing and Supplies advised the Health Minister and made recommendations on purchasing decisions, including, for example, appropriate pricing and selection of suppliers. The Health Minister, however, retained ultimate authority for negotiating final prices and other material contract terms, and for executing contracts.

42.     According to CW1, Medix/Natus Medical did not have a contract with the Ministry of Health during the fourth quarter of 2015 or the first quarter of 2016. As such, according to CW1, no payments were scheduled as due or owing by the Ministry of Health to Medix during the

1   fourth quarter of 2015 or the first quarter of 2016.

2       43.   According to CW1, and based on information provided to CW1 by the Purchasing

3   Coordinator who immediately preceded him, as well as two other individuals who were

4   Purchasing Department buyers and members of the Commission on Purchasing and Supplies

5   during the fourth quarter of 2015 – all individuals for whom CW1 had oversight responsibility

6   when CW1 assumed the role of Purchasing Coordinator in the first quarter of 2016 – while the

7   Supply Contract was substantially negotiated leading up to the fourth quarter of 2015, it was not

8   actually executed by the Ministry of Health.

10  **V.   PARTIES WITH KNOWLEDGE REPORT A HISTORY OF PROBLEMS WITH**
    **VENEZUELAN CONTRACTS, INCLUDING THAT THE COMPANY'S**
11  **PREVIOUS CONTRACT WITH VENEZUELA – TOUTED BY DEFENDANTS**
    **DURING THE CLASS PERIOD – WAS NOT TIMELY COMPLETED**
12
        44.   CW1 also reported that CW1 learned in connection with CW1's role as Purchasing
13
    Coordinator that a previous contract between the Ministry of Health and Medix from in or around
14
    2011, a contract which *was* actually executed, failed to come to completion and was cancelled or
15
    suspended when the final amounts owing under the contract were not paid to Medix by the
16
    Ministry of Health.
17
        45.   Similarly, CW2, who was Natus Medical's Director of Operations in Argentina
18
    from January 2011 through February 2013, confirms that this prior contract between the Ministry
19
    of Health and Medix was in flux during CW2's tenure at Natus Medical, explaining that: "The
20
    contract with Venezuela was always in the air. Medix was always trying to close it." Even after
21
    the contract was eventually executed, CW2 reported that "there were issues with the last part of
22
    the payment," and "a history of difficulties with payments with Venezuela."
23
        46.   CW3, a Regional Sales Manager for Natus Medical in Latin America from 2005 to
24
    July 2015, recalled that "payment of this contract was done one or two months before I left the
25
    company," and the payment was therefore "very late – a very late payment. One or two years
26
    late."
27

28

## VI.    THE SUPPLY CONTRACT, IF SIGNED, WAS ESSENTIALLY UNENFORCEABLE

47.    The Supply Contract states that: "all aspects relative to the interpretation, application, performance and compliance of this agreement, shall be ruled by the Laws of the Bolivarian Republic of Venezuela and the [parties] have chosen the City of Caracas as their special domicile for such effects[.]" *See* 2015 Form 10-K Exhibit 10.12 (the Supply Contract), at p. 23.

48.    Under these terms, Defendants had no means of effectively enforcing their rights under the Supply Contract since Venezuela was the exclusive forum for dispute resolution and the Venezuelan government was a party to the contract. This is particularly true in light of the turbulent legal, political, and economic systems in Venezuela. For example, the International Commission of Jurists ("ICJ") identified "key deficiencies in the Venezuelan legal system, which threaten the rule of law," and issued a 2014 report documenting "failures by the authorities, as well as interference, intimidation, arbitrary suspensions and other pressures, that have undermined the independence and impartiality of the country's judges and prosecutors, and the ability of lawyers to be effective and independent in upholding people's rights."[3]

49.    Additionally, in Venezuela, contracts tentatively agreed to by one minister were unlikely to be honored by his or her successor. As CW1 – the Ministry of Health's Purchasing Coordinator during the Class Period, from February 2016 until July 2016 – explained: "Here things happen in a different way. The minister leaves and everything that he does that isn't invoiced gets lost – if the money is not committed. One thing is a promise to do a contract and another thing is a contract." Thus, with elections around the corner and an unsigned contract in the fourth quarter of 2015, Defendants knew or recklessly disregarded the significant risk that fulfillment of the Supply Contract would never come to fruition.

## VII.    MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS

50.    The Class Period starts on October 16, 2015, when Natus Medical filed a Current

---

[3]  *See* ICJ, VENEZUELA: WEAK LEGAL SYSTEM THREATENS DEMOCRACY, *available at* https://www.icj.org/venezuela-weak-legal-system-threatens-democracy-and-human-rights-reforms-urgently-needed-new-report-says/ (last visited July 14, 2017).

Report on Form 8-K with the SEC, signed by Defendant Kennedy, attaching a press release which announced that on October 15, 2015, the Company had, through its Medix subsidiary, "entered into a supply agreement with the Ministry of Health of Venezuela ('Ministry of Health') to provide medical equipment, supplies and services over a three-year period, including certain third party products." The press release purported to describe the terms of the Supply Agreement, stating in relevant part:

> Under the terms of the Supply Agreement, products and services will be delivered pursuant to prepayments made by the Ministry of Health. ***Prepayments totaling approximately $69 million are expected by the first quarter of 2016***. Payments will be received in Argentine Pesos based on the current exchange rate of the U.S. dollar and the Argentine Peso at the time of payment. The agreement may be cancelled at any time by the Ministry of Health except for the amount of any prepayments. If fully performed, the total sales under the agreement would aggregate $232.5 million.

(emphasis added).

51.     The above-quoted statements from the October 16, 2015 Form 8-K and press release were materially false or misleading because Defendants misrepresented and failed to disclose that: (i) pursuant to the terms of the Supply Contract, three independent pre-payments were separately due in October, November, and December 2015, not, as Defendants had vaguely represented, "the first quarter of 2016[;]" (ii) the Ministry of Health apparently did not sign the Supply Contract in October 2015, and thus, did not give its final agreement to the contract's terms or agree to make any payments under the contract; and (iii) even if the Supply Contract were signed, Defendants had no means of effectively enforcing the Company's rights under the Supply Contract since Venezuela was the exclusive forum for dispute resolution and the Venezuelan government was a party to the contract.

52.     Additionally, Defendants' misleading description of the pre-payment terms of the Supply Contract violated Item 1.01 of the Instructions to SEC Form 8-K and the SEC's interpretive releases mandate, which requires the disclosure of the material terms of any "Material

Definitive Agreement" entered into by issuers within four business days.[4] These rules also state that the SEC "encourage[s] companies to file the [contract as an] exhibit with the Form 8-K when feasible, particularly when no confidential treatment is requested."[5] Contrary to this directive, Defendants failed to make the Supply Contract available to investors until February 29, 2016, when it was attached as Exhibit 10.12 to the Company's 2015 Form 10-K, and only after the prepayments supposedly due under the Supply Contract were months in default.  *See* ¶ 92, *infra*.

53.     On October 21, 2015, Natus Medical filed a Current Report on Form 8-K with the SEC, signed by Defendant Kennedy, attaching a press release and announcing the Company's third quarter 2015 results. Defendants increased the Company's fourth quarter and full-year 2015 revenue guidance based on the Supply Contract, and Defendant Hawkins was quoted as commenting positively on the Supply Contract, stating in relevant part:

> I am most satisfied that we achieved a 20% non-GAAP operating profit margin during the quarter and am now confident that we will exceed our full year non-GAAP operating margin goal of 18%. ***We are increasingly confident that we can achieve and potentially exceed our long term operating margin goal of 20% in 2016 … In addition to our record performance during the quarter, we recently secured a $232.5 million, three-year agreement between our Argentina subsidiary, Medix, and the Venezuelan Ministry of Health.*** This agreement will provide over fifty hospitals with a broad range of obstetric and neonatal devices, supplies and services including more than $50 million of Medix and Natus equipment and supplies.
>
> *       *       *
>
> ***For the fourth quarter of 2015, the Company increased its revenue guidance to $102.0 million to $105.0 million and guided non-GAAP earnings per share of $0.47 to $0.49.***
>
> ***Full year 2015 earnings guidance was increased with expected non-GAAP earnings per share of $1.51 to $1.53. Full year 2015 revenue guidance also increased to $378 million to $381 million compared to previous guidance of $376 million to $378 million.***

(emphasis added).

---

[4] *See* Form 8-K, Item 1.01 of General Instructions, Information to be Included in the Report, at p.4; *see also* Final Rule: Additional Form 8-K Disclosure Requirements and Acceleration of Filing Date, 69 F.R. 15594, at 15597 (Mar. 25, 2004).

[5] *See* Final Rule, 69 F.R., at 15597, *supra* n. 4.

54.     The above-quoted statements from the October 21, 2015 Form 8-K and press release were materially false or misleading because Defendants misrepresented and failed to disclose that: (i) the Ministry of Health apparently did not sign the Supply Contract in October 2015, and thus, did not give its final agreement to the contract's terms or agree to make any payments under the contract; and (ii) even if the Supply Contract were signed, Defendants had no means of effectively enforcing the Company's rights under the Supply Contract since Venezuela was the exclusive forum for dispute resolution and the Venezuelan government was a party to the contract. As a result of the foregoing, there existed facts tending to seriously undermine the Company's financial guidance, which was based, at least in part, on revenues supposedly expected from the Supply Contract.

55.     On October 21, 2015, Defendants also held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Defendants reiterated that the Supply Contract would positively impact the Company's financial results, with Defendant Hawkins stating in relevant part:

> Last Friday we announced that Medix, our Argentine subsidiary, signed a three-year agreement with the Ministry of Health of Venezuela for $232.5 million to supply Venezuela with neonatal and obstetric equipment supplies and services. ***As stated in our filing, we are to receive three payments totaling $69 million by the end of the first quarter of 2016. Prepayments are to continue throughout the contract period as we fulfill our requirements***. We expect to commence on this contract in our fourth quarter, but revenue is expected to be minimal in the fourth quarter.

(emphasis added).

56.     The above-quoted statements from the October 21, 2015 conference call were materially false or misleading because Defendants misrepresented and failed to disclose that: (i) pursuant to the terms of the Supply Contract, three independent pre-payments were separately due in October, November, and December 2015, not, as Defendant Hawkins had represented, "*by the end of the first quarter of 2016*[;]" (ii) the Ministry of Health apparently did not sign the Supply Contract in October 2015, and thus, did not give its final agreement to the contract's terms or

agree to make any payments under the contract; and (iii) even if the Supply Contract were signed, Defendants had no means of effectively enforcing the Company's rights under the Supply Contract since Venezuela was the exclusive forum for dispute resolution and the Venezuelan government was a party to the contract.

57.     Defendant Hawkins further misrepresented the Supply Contract in response to analyst questioning during the October 21, 2015 conference call. For example:

> Roth Capital Partners: I wanted to start on the Venezuelan contract; hoping you could provide a little bit more color just on how we should think about that contract contributing next year, both in terms of revenues and earnings, and the cadence of when those prepayments expected by the first quarter will be recognized as revenues throughout 2016.

> Defendant Hawkins: [I]t will probably be fairly even throughout the three years … **We expect to receive some payments here by the end of the year, to start those three payments totaling the $69 million. And then to – most likely those would extend into the first quarter of next year** … As we – way this contract is, we're **going to be prepaid throughout the entire contract**. So we'll ship after we get prepaid. We'll get more prepayments, and it will have that kind of cadence.

(emphasis added).

58.     The above-quoted statements from the October 21, 2015 conference call were materially false or misleading because Defendant Hawkins misrepresented and failed to disclose that: (i) pursuant to the terms of the Supply Contract, three individual pre-payments were separately due in October, November, and December 2015, not, as Hawkins had represented, "some payments…by the end of the year" and "extend[ing] into the first quarter of next year[;]" (ii) the Ministry of Health apparently did not sign the Supply Contract in October 2015, and thus, did not give its final agreement to the contract's terms or agree to make any payments under the contract; and (iii) even if the Supply Contract were signed, Defendants had no means of effectively enforcing the Company's rights under the Supply Contract since Venezuela was the exclusive forum for dispute resolution and the Venezuelan government was a party to the contract.

59.     Also during the October 21, 2015 conference call, Defendant Hawkins confirmed that revenue from the Supply Contract had factored into the Company's fourth quarter 2015

guidance, stating that "we put in a couple million dollars in there," but claiming that this estimate and the forecasted economic impact of the Supply Contract was "*conservative*," and that "*[i]t's sort of a practice of ours anyway. We'd rather be on the conservative side*, and if we do better, great." (emphasis added).

60.    The above-quoted statements from the October 21, 2015 conference call were materially false and misleading because Defendant Hawkins misrepresented and failed to disclose that: (i) far from conservatively forecasting revenue, Defendants had included revenue from a contract that was, apparently, not even signed; and (ii) even if the Supply Contract were signed, Defendants had no means of effectively enforcing their rights under the Supply Contract since Venezuela was the exclusive forum for dispute resolution and the Venezuelan government was a party to the contract. As a result of the foregoing, there existed facts tending to seriously undermine the Company's financial guidance.

61.    Continuing to tout the economic benefits of the Supply Contract, Defendant Kennedy stated:

> *The other comment to make about this, this isn't the first contract with Venezuela that Medix has entered into. So this is a continuation of an ongoing relationship. While it's lumpy, it comes over the course of several years. The orders are typically very large, and stretch out over many years. So when we acquired Medix in 2010, they had just completed, I want to say, about a $100 million deal with Venezuela.* So there is an ongoing relationship between Medix and other South American countries that is valuable.

(emphasis added).

62.    The above-quoted statements from the October 21, 2015 conference call were materially false or misleading because Defendants misrepresented and failed to disclose that the prior $100 million deal with Venezuela did not successfully reach completion; rather, that contract had been suspended or cancelled before its fulfillment when the final amounts owed under the contract were not timely paid by the Ministry of Health. *See* ¶¶ 44-46, *supra*.

63.    Finally, during the October 21, 2015 conference call, in response to an analyst question regarding currency exchange risk, Defendant Kennedy assured investors that the currency

risk of dealing with a South American buyer was supposedly "minimal," because:

> *The thing that's the most protective on us here is that we do get – the contract is denominated in dollars, and our payment is a dollar-denominated payment*. So over time, we will be recognizing – we're taking prepayments in a constant currency. Once we convert the currency into pesos to pay our vendors and employees, then we will take the currency risk, to the extent that that peso stays on our balance sheet.

> *But our intent would be to time that to go equally timed, so that as we're collecting pesos we're paying pesos, and it minimizes the currency risk. But there is some risk, although I'd call it minimal*.

(emphasis added).

64.     The above-quoted statements from the October 21, 2015 conference call ensuring that payment was to be made in dollars were materially false or misleading because Defendants misrepresented and failed to disclose that payment under the Supply Contract was, in fact, "payable in Argentinian Pesos at the current exchange rate for the effective day of payment" (*see* Exhibit 10.12, the Supply Contract, at Clause Fourth: Of the Form of Payment"), thereby introducing currency exchange risk into any payments made under the Supply Contract.

65.     On November 19, 2015, Defendant Hawkins presented for Natus Medical at the Jefferies Autumn Global Healthcare Conference. Opening his remarks, Defendant Hawkins reiterated the guidance provided on October 21, 2015, stating: "[t]o look at our financials, which we are very proud of, we've been able to show very consistent revenue growth over the last few years. *And we have guided to almost $380 million mid guidance this year*." (emphasis added). Further, expressly lauding the supposedly lucrative Supply Contract, Defendant Hawkins stated:

> *We also recently announced a major contract, supply agreement, with Venezuela where our Argentine subsidiary received a $232 million agreement to supply medical products and services to Venezuela over a three-year period*. Not only is this for our products, but a variety of newborn care and obstetric products to service over 50 hospitals in Venezuela.

> You can see that the Natus products represent about $50 million and the other products that we will be bringing in and then also the service, warranty, installation and all that is for the rest of the contract. It is a very exciting piece of business. *We will be paid up front as we go on this business.*

*We are looking to get our first payment in by the end of the year, and those payments would continue throughout the life of the contract*.

(emphasis added).

66.     The above-quoted statements from the November 19, 2015 Jefferies Autumn Global Healthcare Conference were materially false and misleading because Defendant Hawkins misrepresented and failed to disclose that: (i) pursuant to the terms of the Supply Contract, three independent pre-payments were separately due in October, November, and December 2015, not, as Defendant Hawkins had represented, the "first payment [] by the end of the year[;]"; (ii) while Hawkins promised that the Company would be "paid up front" under the contract, he failed to disclose that the Ministry of Health was *already* late on its first pre-payment under the terms of the Supply Contract, and the cut-off for the second pre-payment was swiftly approaching; (iii) it was exceedingly unlikely that "payments would continue throughout the life of the contract" given that the Ministry of Health apparently had not signed the Supply Contract, and thus, had not finally agreed to its terms or agreed to make any payments; and (iv) even if the Supply Contract were signed, Defendants had no means of effectively enforcing their rights under the Supply Contract since Venezuela was the exclusive forum for dispute resolution and the Venezuelan government was a party to the contract.

67.     During the November 19, 2015 Jefferies Autumn Global Healthcare Conference, Defendant Hawkins responded to a Jefferies analyst who directly questioned the likelihood of payment under the Supply Contract, stating:

> Jefferies: So, when you receive this $200 million plus contract *how certain are you that [Venezuela is] going to be able to perform against that contract and that you will actually receive those monies over the next three years?*

> Hawkins: Yes, so, always a potential risk with any contract. The one thing I would say with this one, before we bought our subsidiary, which is located in Buenos Aires, which is who received this order, a company called Medix, *they had received an $82 million order maybe seven years ago and it came through just fine. The money showed up as expected, and it did happen.*

> *So, we have pretty good confidence that it should happen. We have been told the money is set aside, and we are looking to get our first payment here by the end of December*.

(emphasis added).

68.     The above-quoted statements from the November 19, 2015 Jefferies Autumn Global Healthcare Conference were materially false and misleading because Defendant Hawkins misrepresented and failed to disclose that: (i) pursuant to the terms of the Supply Contract, three independent pre-payments were separately due in October, November, and December 2015, not, as Defendant Hawkins had represented, the "first payment [] by the end of December[;]"; (ii) the Ministry of Health was *already* late on its first pre-payment under the terms of the Supply Contract, and the deadline for the second pre-payment was swiftly approaching; (iii) it was exceedingly unlikely that the "money [was] set aside" given that the Ministry of Health apparently had not signed the Supply Contract, and thus, had not finally agreed to its terms; and (iv) even if the Supply Contract were signed, Defendants had no means of effectively enforcing their rights under the Supply Contract since Venezuela was the exclusive forum for dispute resolution and the Venezuelan government was a party to the contract. Further, Defendant Hawkins misled investors by touting that Medix had received an $82 million order approximately seven years prior that "came through just fine." Instead, Venezuela had a history of reneging on contracts with Medix, as evidenced by the fact that the previous contract, touted by Defendants as establishing a good history of dealing to support their optimism that the Supply Contract would be paid, was in fact suspended or cancelled due to the Ministry of Health's failure to timely make payment. *See* ¶¶ 44-46, *supra*.

69.     During the November 19, 2015 Jefferies Autumn Global Healthcare Conference, Defendant Hawkins continued to represent that the Supply Contract would positively impact the Company's financial results, stating: "with Venezuela we are going to have rate growth … So, we are quite happy overall of just keeping to what we are doing and ***growing the business and growing earnings***." (emphasis added).

70.     The above-quoted statements from the November 19, 2015 Jefferies Autumn Global Healthcare Conference were materially false and misleading because Defendant Hawkins misrepresented and failed to disclose that: (i) pursuant to the terms of the Supply Contract, pre-

payments were due in October, November, and December 2015; (ii) the Ministry of Health was *already* late on its first pre-payment under the terms of the Supply Contract, and the deadline for the second pre-payment was swiftly approaching; (iii) the Ministry of Health apparently had not signed the Supply Contract, and thus, had not finally agreed to its terms; (iv) even if the Supply Contract were signed, Defendants had no means of effectively enforcing their rights under the Supply Contract since Venezuela was the exclusive forum for dispute resolution and the Venezuelan government was a party to the contract; and (v) as a result of the foregoing, there existed facts tending to seriously undermine the Company's expectation of "growing earnings" as a result of the Supply Contract.

71.     On December 1, 2015, Defendant Hawkins presented for Natus Medical at the Piper Jaffray Healthcare Conference, during which he opened his remarks by stating: "[y]ou can see that our revenues have been growing nicely, ***and we've guided this year to $378 million to $381 million***." (emphasis added). Defendant Hawkins proceeded to, again, laud the allegedly lucrative and financially important Supply Contract, stating:

> Another announcement that we recently made: ***we have a very large order that we received from Venezuela totaling $232.5 million*** for newborn and obstetric equipment along with supplies and service for over 50 hospitals in Venezuela. This is an order that will be over three years. We have a Venezuelan partner that will be responsible for doing all the installation, training, and service and we're going to be the ones selling our products along with purchasing other products.
>
> As you can see from the graph here, approximately $51 million is products that Natus manufacturers, with the remainder being other people's products. And that also then breaks down into equipment, supplies, and services, as you can see in the bar chart.
>
> ***We look for some of these revenues to start in December. We expect to get our first $23 million payment in the weeks ahead and then we'll be prepaid on all of this as we go forward on a rolling basis. It's quite a big order for us and we are very excited to not only have it ourselves, but also for the babies and mothers in Venezuela***.

72.     The above-quoted statements from the December 1, 2015 Piper Jaffray Healthcare Conference were materially false and misleading because: (i) pursuant to the terms of the Supply

Contract, three independent pre-payments were separately due in October, November, and December 2015, not, as Defendants had represented, the "first $23 million payment in the weeks ahead"; (ii) the Ministry of Health was *already* late on both its first and second pre-payments under the terms of the Supply Contract, to the tune of an approximately $47 million default (*i.e.*, payments representing over 20% of the entire value of the Supply Contract were already late when Hawkins was promising the "first" payment would be shortly forthcoming); (iii) the Ministry of Health apparently had not signed the Supply Contract, and thus, had not finally agreed to its terms; (iv) even if the Supply Contract were signed, Defendants had no means of effectively enforcing their rights under the Supply Contract since Venezuela was the exclusive forum for dispute resolution and the Venezuelan government was a party to the contract; and (v) as a result of the foregoing, there existed facts tending to seriously undermine the Company's financial guidance.

73.     Later, during the Q&A session of the December 1, 2015 Piper Jaffray Healthcare Conference, Defendant Hawkins gave "a little more color" on the Supply Contract "and certainty of revenue," without disclosing the fact that the Venezuelan government had ***already*** failed to make  in prepayments under the Supply Contract and that the Company had no means of enforcing the Supply Contract. Similarly, instead of disclosing the fact that the Supply Contract was contingent on political and economic circumstances in Venezuela, Defendant Hawkins claimed that Venezuela was following through on a "commitment" to make the required payments, stating in pertinent part as follows:

> Sure. The question was for those that are listening on the Venezuela contract, a little more color on that and the certainty of revenue. How are we going to get paid and all of that.

> Well, certainly, it's a very interesting situation. The order has come through our Argentinean subsidiary, which is one of the largest, if not the largest, medical device company in Argentina. Argentina has a very strong relationship with Venezuela that Argentina historically has had a commitment: whenever they buy oil outside of Argentina, they buy it from Venezuela. And Venezuela has said whenever we buy medical devices, when appropriate, we'll buy them through Argentina.

And with that, there's been this balance of trade situation that Argentina has bought a lot more oil than Venezuela has bought medical devices. So it's now such that *Venezuela is now exercising this commitment to fund the medical device purchases*.

The money is being [sic] that we are receiving for this purchase is all in US dollars. And there always is some potential currency risk as we transfer those dollars into Argentine pesos to do the purchasing and delivering of product. *But overall, over this three-year period, we are convinced it's going to be a good piece of business for us*.

*It will have average corporate margins of 18% to 20%*. And although the gross profits won't be near that, but the bottom line operating margin should be the same. So we are quite encouraged. *We're expecting to get payment here in the next few weeks and looking for this to kick off, Bill*.

(emphasis added).

74.     The above-quoted statements from the December 1, 2015 Piper Jaffray Healthcare Conference were materially false and misleading because: (i) pursuant to the terms of the Supply Contract, pre-payments were due in October, November, and December 2015, not, as Defendants had represented, payment "in the next few weeks[;]" (ii) the Ministry of Health was *already* late on both its first and second pre-payments under the terms of the Supply Contract, and the deadline for its third and final pre-payment was swiftly approaching; (iii) it was exceedingly unlikely that the "Venezuela [was] now exercising this commitment to fund the medical device purchases" given that the Ministry of Health apparently had not signed the Supply Contract, and thus, had not finally agreed to its terms; and (iv) even if the Supply Contract were signed, Defendants had no means of effectively enforcing their rights under the Supply Contract since Venezuela was the exclusive forum for dispute resolution and the Venezuelan government was a party to the contract. Further, Defendants misled investors by touting a relationship between Venezuela and Argentina, where Medix is located, when Venezuela had previously failed to pay amounts owed to Medix under a similar contract, resulting in the suspension and cancellation of that contract. *See* ¶¶ 44-46, *supra*.

**VIII.   UNDISCLOSED RISKS MATERIALIZE AND THE TRUTH ABOUT THE SUPPLY CONTRACT EMERGES THROUGH A SERIES OF PARTIAL, YET STILL MISLEADING, DISCLOSURES**

75.     On January 11, 2016, Natus Medical filed a Current Report on Form 8-K with the SEC, signed by Defendant Kennedy, attaching a press release announcing its first quarter and fiscal year 2016 financial guidance, which revealed that Venezuela had not made *any* expected payments under the Supply Contract due to a purported "delay," which caused Natus Medical to miss its earnings guidance:

> For the full year 2016, the Company expects to report revenue of $445 million to $450 million and non-GAAP earnings per share of $1.84 to $1.88. For the first quarter of 2016, the Company expects to report revenue of $96.5 million to $97.5 million and non-GAAP earnings per share of $0.34 to $0.35, an increase of 10% to 13% over the first quarter of 2015 non-GAAP earnings per share of $0.31.

> The Company expects to report revenue of approximately $100.0 million for the fourth quarter of 2015, compared to prior guidance of $102.0 million to $105.0 million and full year 2015 revenue of $375.9 million compared to prior guidance of $378.0 million to $381.0 million. ***The guidance provided by the Company in October for the fourth quarter of 2015 included expected revenue of approximately $4 million under the new Venezuelan Ministry of Health contract. The Company was not able to ship product on the anticipated schedule because the prepayment under the contract was delayed.*** The Company believes the delay was most likely due to a combination of important national elections that occurred in Argentina in November and Venezuela in December, Argentina's currency devaluation in December as well as national Christmas holidays. ***The Company now expects to receive prepayment and begin shipments in the first quarter of 2016***. The first quarter 2016 guidance includes $5 million of revenue from Venezuela and $60 million of revenue for the full year guidance.

(emphasis added).

76.     On this revelation, the price of Natus Medical common stock declined, falling from its close of $43.20 per share on January 8, 2016 to close at $38.25 per share on January 11, 2016, a decline of almost $5, or 11%, on usually high trading of approximately 1.4 million shares, or more than four times the average daily volume over the preceding ten trading days.

77.     Notwithstanding the partial disclosure and partial materialization of risk, Defendants' statements in the January 11, 2016 Form 8-K and press release, including their mischaracterization of the Ministry of Health's failure to perform as a mere "delay," were

materially false and misleading because: (i) pursuant to the terms of the Supply Contract, three independent pre-payments were separately due in October, November, and December 2015, and thus, more than just the first pre-payment—which Defendants represented they now "expect[ed] to receive … in the first quarter of 2016"—was delayed; (ii) the Ministry of Health was actually late on *all* three of its pre-payments under the terms of the Supply Contract; (iii) the Ministry of Health apparently had not signed the Supply Contract, and thus, had not finally agreed to its terms; (iv) even if the Supply Contract were signed, Defendants had no means of effectively enforcing their rights under the Supply Contract since Venezuela was the exclusive forum for dispute resolution and the Venezuelan government was a party to the contract; and (v) as a result of the foregoing, there existed facts tending to seriously undermine the Company's financial guidance, which continued to include $5 million of revenue from the Supply Contract in first quarter 2016 guidance and $60 million of revenue from the Supply Contract in full year guidance. As a result of the foregoing, the stock price remained artificially inflated.

78.     Analysts believed, and repeated, Defendants' false narrative. For instance, Roth Capital Partners' "Company Note" issued on January 12, 2016, referred to a "delay with [the Company's] Venezuela contract" and stated that, "[w]hile Venezuela remains an uncertainty, *management is confident shipments will begin in 1Q*." (emphasis added).

79.     Similarly, on January 20, 2016, Roth published a "FLASH NOTE" entitled "BABY 4Q Preview: Preannouncement Should Leave Little Surprise," in which Roth stated that it received the following additional reassurances from Natus Medical's management:

- Based on our discussions, management remains confident the contract should begin this quarter after political elections in Argentina and Venezuela, along with the Argentinian currency devaluation, all of which occurred in 4Q, caused the delay.

- Management has assumed it will receive Venezuelan prepayments by the end of February and begin shipping on the contract thereafter, which would allow Natus to record ~$5 million of revenues in 1Q and remain on track with the $60 million revenue assumption imbedded in its 2016 guidance.

80.     Next, On January 27, 2016, Natus Medical filed a Current Report on Form 8-K with the SEC, signed by Defendant Kennedy, attaching a press release reaffirming that the revenue shortfall in the fourth quarter of 2015 was a result of the purported "delay" in receiving prepayments under the Supply Contract, and that Natus Medical's guidance depended on revenues from the Supply Contract. The release also disclosed unspecified "risks associated with our Venezuela contract."

81.     The above-quoted statements in the January 27, 2016 Form 8-K and press release, including Defendants' mischaracterization of the Ministry of Health's failure to perform as a mere "delay," were materially false and misleading because: (i) pursuant to the terms of the Supply Contract, three independent pre-payments were separately due in October, November, and December 2015, and thus, the Ministry of Health was actually late on *all* three of its pre-payments under the terms of the Supply Contract; (ii) the Ministry of Health apparently had not signed the Supply Contract, and thus, had not finally agreed to its terms; (iii) even if the Supply Contract were signed, Defendants had no means of effectively enforcing their rights under the Supply Contract since Venezuela was the exclusive forum for dispute resolution and the Venezuelan government was a party to the contract; and (iv) as a result of the foregoing, there existed facts tending to seriously undermine the Company's financial guidance, which continued to included revenue from the Supply Contract. As a result of the foregoing, the stock price remained artificially inflated.

82.     Also on January 27, 2016, Natus Medical held a conference call with analysts and investors to discuss the press release, during which Defendant Hawkins acknowledged that, "[a]s previously announced, the guidance … provided in October 2015 included expected revenue of approximately $4 million under the new $232 million Venezuela Ministry of Health contract to supply neonatal and obstetric equipment," but claimed that the Company "did not ship product on the anticipated schedule because the prepayment under the contract was delayed." Later in the call, Defendant Hawkins confirmed that "[t]he first-quarter revenue guidance include[d] approximately $5 million from the Venezuela contract" and that the "[f]ull-year revenue guidance include[d]

approximately $60 million from the Venezuela contract." Defendant Hawkins concluded his opening remarks by continuing to emphasize the importance of the Supply Contract, again stating: "***the large order from Venezuela uniquely positions Natus for an exciting future***." (emphasis added).

83.     The above-quoted statements from the January 27, 2016 conference call, including Defendants' mischaracterization of the Ministry of Health's failure to perform as a mere "delay" and the Company's continued inclusion of revenue from the Supply Contract in its financial guidance, were materially false and misleading for the same reasons as set forth in ¶ 81, *supra*.

84.     Later, when asked by an analyst during the January 27, 2016 conference call, "[w]hat gives you confidence that that contract will begin this quarter," Defendant Hawkins reiterated that he was "***very confident that this business will happen***" (emphasis added). Similarly, Defendant Hawkins responded "yes" to an analyst who questioned whether it was "***safe to assume guidance implies about $0.20 in earnings from Venezuela this year***" (emphasis added); later representing that the Company "look[ed] to grow, ***hopefully, faster than we've guided***, and also earnings" (emphasis added).

85.     The above-quoted statements from the January 27, 2016 conference call were materially false and misleading because: (i) pursuant to the terms of the Supply Contract, three independent pre-payments were separately due in October, November, and December 2015; (ii) the Ministry of Health was therefore late on *all* three of its pre-payments under the terms of the Supply Contract, and Defendants had no reasonable basis to assert that they were "very confident that this business will happen[;]" (iii)  the Ministry of Health apparently had not signed the Supply Contract, and thus, had not finally agreed to its terms; (iv) even if the Supply Contract were signed, Defendants had no means of effectively enforcing their rights under the Supply Contract since Venezuela was the exclusive forum for dispute resolution and the Venezuelan government was a party to the contract; and (v) as a result of the foregoing, there existed facts tending to seriously undermine the Company's financial guidance, which included revenue from the Supply Contract, as well as  Defendants' hope that Natus Medical would grow even "faster than we've

1    guided." As a result of the foregoing, the stock price remained artificially inflated.

2          86.    Defendant Kennedy provided similar assurances as to the economic benefits of the

3    Supply Contract, when, during the January 27, 2016 conference call, he responded to an analyst's

4    question by stating: "***The operating piece we can pretty much predict. If I had a gun to my head***

5    ***and had to predict, it's probably in the mid-40%s for a gross profit margin, and Jim said just***

6    ***under 20% for the operating***." (emphasis added).

7          87.    The above-quoted statement from the January 27, 2016 conference call was

8    materially false and misleading because: (i) pursuant to the terms of the Supply Contract, three

9    independent pre-payments were separately due in October, November, and December 2015, and

10   Ministry of Health was therefore late on *all* three of its pre-payments; (ii) the Ministry of Health

11   apparently  had not signed the Supply Contract, and thus, had not finally agreed to its terms; (iii)

12   even if the Supply Contract were signed, Defendants had no means of effectively enforcing their

13   rights under the Supply Contract since Venezuela was the exclusive forum for dispute resolution

14   and the Venezuelan government was a party to the contract; and (iv) as a result of the foregoing,

15   there existed facts tending to seriously undermine Defendants' prediction that the Supply Contract

16   would be "in the mid-40%s for a gross profit margin" and "just under 20% for the operating." As a

17   result of the foregoing, the stock price remained artificially inflated.

18          88.    Despite Defendants' numerous assurances, following the release of the Form 8-K

19   and the conference call, numerous analysts expressed skepticism that the Supply Contract would

20   convey the economic benefits that Defendants had previously reported. For instance, stock

21   research analysts from William Blair stated in their January 27, 2016 research report that while

22   they still held out hope the Ministry of Health prepayments would come in, they were removing

23   them from their modeling, stating:

> As the company alluded to in its prerelease, the top line fell short of original
> guidance by about $4 million due to a delay with the implementation of a recently
> signed contract with the Venezuelan Ministry of Health. . . .
>
> Regarding Venezuela, management remains optimistic the contract will be
> executed fairly. ***However, it seems clear that the timing of payments and ability to***

*actually record revenue from the prepayments is still uncertain and we remain skeptical that the full $60 million of revenue attributable to the Venezuela contract in 2016 will materialize this year. As a result, we continue to strongly advise investors to focus exclusively on the impressive performance in the base business.*

The company also reiterated first-quarter guidance (revenue of $96.5 million-$97.5 million and adjusted EPS of $0.34-0.35) and 2016 guidance ($445 million-$450 million in revenues and $1.84-$1.88 in EPS), both of which include contribution from Venezuela. *Excluding Venezuela, guidance appears to call for 2%-4% revenue growth and EPS of around $1.67 or $1.68.*

(emphasis added).

89.     On this news, the price of Natus Medical stock fell once again, from its close of $37.15 per share on January 27, 2016 to close at $34.71 per share on January 28, 2016, a decline of $2.44 per share, on abnormally high trading volume.

90.     However, as a result of the false and misleading statements set forth in ¶¶ 80, 82, 84, 86, *supra*, the stock price remained artificially inflated.

91.     On February 29, 2016, Natus Medical filed the 2015 Form 10-K, disclosing that, "[f]ollowing the announcement of [the Ministry of Health] contract, there ha[d] been elections in both Venezuela and Argentina leading to significant political changes in those countries" and "it [had been] reported that Venezuela [was] experiencing a highly inflationary economy and recessionary economic conditions," stating that "[t]hese developments may impact the likelihood of the Venezuelan Ministry of Health's following through with orders under the agreement, and Medix ha[d] not yet received any prepayments under the agreement and no products or services ha[d] been shipped or provided." The 2015 Form 10-K stated that if "the Venezuelan Ministry of Health does not make the required prepayments to initiate deliveries under the Medix agreement, we will not receive any benefit from it."

92.     For the first time, the Company attached a copy of the Supply Contract as Exhibit 10.12 to the 2015 Form 10-K, which disclosed that the $69 million in prepayments by the Ministry of Health were due by the end of 2015, including more than *$24 million that was due in October 2015, approximately $23 million that was due in November, and another approximately $23*

1    ***million that was due in December 2015***, and thus, the pre-payments had been past due for

2    months, not simply since the first quarter of 2016 as Defendants had previously misrepresented.

3        93.    Moreover, as to Defendants' ability to legally enforce the terms of the Supply

4    Contract, the Supply Contract provided that "all aspects relative to the interpretation, application,

5    performance and compliance of this Agreement, shall be ruled by the Laws of the Bolivarian

6    Republic of Venezuela and the [parties] have chosen the City of Caracas as their special domicile

7    for such effects[.]" This choice of law provision rendered the Supply Contract essentially

8    unenforceable by Natus Medical against the Venezuelan government, which was itself a party to

10   the contract. *See* ¶¶ 47-49, *supra*.

11       94.    Additionally, the Supply Contract attached as Exhibit 10.12 to the 2015 Form 10-K

12   is unsigned, and CW1 confirms that the Supply Contract was not executed by the Ministry of

13   Health. *See* ¶¶ 39-43, *supra*. Accordingly, Defendants could not enforce a contract that never

14   existed in the first place.

15       95.    On this news, the price of Natus Medical stock once again declined, falling from its

16   close of $37.21 per share on February 26, 2016 to close at $36.32 per share on February 29, 2016.

17       96.    However, despite the disclosures in ¶¶ 91-93, *supra*, the full extent of the risks

18   underlying the Supply Contract remained concealed from the market, and  the Company's stock

19   price continued to remain artificially inflated.

20       97.    Next, on a March 14, 2016, the Individual Defendants presented at the Roth

21   investor conference call. During the call, Defendant Hawkins finally conceded that analysts could

22   discount the expected revenues from the Supply Contract, but nevertheless continued to maintain

23   that "***we really believe this is going to happen***." (emphasis added). However, instead of the

24   misleading confidence and certainty that he had previously conveyed regarding the Supply

25   Contract, Hawkins at least acknowledged that "trying to handicap exactly when, with all the

26   changes going on in both governments, Ministry of Health, oil prices, it has made it very

27   difficult." Later in the call, he characterized Venezuela as being, "quote, in the toilet," and stated

28   that the Company had "an agent there that is the number one distributor and supplier of product in

1    Venezuela who we rely upon to really give us this feedback."

2        98.     Nevertheless, the above-quoted statements were materially false and misleading

3    because: (i) the Ministry of Health was months late on *all* three of its pre-payments under the

4    terms of the Supply Contract, to the tune of an approximately $69 million default (*i.e.*, nearly 30%

5    of the entire value of the Supply Contract); (ii) the Ministry of Health apparently had not signed

6    the Supply Contract, and thus, had not finally agreed to its terms; (iii) even if the Supply Contract

7    were signed, Defendants had no means of effectively enforcing their rights under the Supply

8    Contract since Venezuela was the exclusive forum for dispute resolution and the Venezuelan

10    government was a party to the contract; and (iv) as a result of the foregoing, Defendants lacked a

11    reasonable basis to assert that "we really believe this is going to happen." As such, the stock price

12    remained artificially inflated.

13        99.     Finally, on April 4, 2016, Natus Medical issued a press release pre-announcing its

14    preliminary first quarter 2016 results. The release disclosed that "[r]evenue for the first quarter of

15    2016 [was] expected to be approximately $87.5 million versus previous guidance of $91.5 million

16    to $92.5 million, excluding revenue from the Venezuela Ministry of Health contract." The release

17    revealed that Natus Medical did not have "'any revenue associated with the Venezuela Ministry of

18    Health contract as [it] did not receive any prepayments during the quarter.'"

19        100.    On this news, the price of Natus Medical stock declined precipitously, falling from

20    its close of $39.64 per share on April 1, 2016 to close at $31.84 per share on April 4, 2016, a

21    decline of $7.80 per share, or nearly 20%, on unusually high trading volume of more than 2.7

22    million shares, or more than eight times the average daily trading volume over the preceding ten

23    trading days.

24        101.    When the Company released its first quarter 2016 results on April 20, 2016,

25    Defendants slashed the Company's fiscal year 2016 guidance, finally publicly conceding that they

26    could "no longer include revenue or earnings from the agreement in … guidance until there is

27    more clarity" on Venezuela's performance under the agreement.

28

## IX.    ADDITIONAL SCIENTER ALLEGATIONS

102.    As alleged herein, Defendants acted with scienter in that Defendants knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly or recklessly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Natus Medical, their control over, and/or receipt or modification of Natus Medical's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Natus Medical and the Supply Contract at issue, participated in the fraudulent scheme alleged herein.

103.    Meanwhile, Defendants' false and misleading statements artificially inflated the price of Natus Medical stock, which reached all-time highs of over $50 per share during the Class Period. While the price of Natus Medical stock was artificially inflated, both Hawkins and Kennedy cashed in, selling hundreds of thousands of shares of their personally held Natus Medical stock at fraud-inflated prices, and together receiving more than $10.7 million in gross proceeds.

104.    Defendant Kennedy's stock sales were suspicious in timing and amount:

| DEFENDANT KENNEDY | DATE | SHARES SOLD | PRICE | GROSS PROCEEDS |
|---|---|---|---|---|
| Kennedy | 10/27/15 | 10,496 | $45.75 | $480,192 |
| Kennedy | 10/28/15 | 18,462 | $45.70 | $843,713 |
| Totals | | 22,958 | | $1,323,905 |

105.    The gross proceeds from Defendant Kennedy's stock sales during the approximately six month Class Period are more than three times greater than the gross proceeds from his stock sales during the six months preceding the Class Period. Additionally, these sales were made shortly after the announcement of the Supply Contract and the filing of the October 21, 2015 Form 8-K and accompanying press release, and the October 21, 2015 conference call, during

which Defendants made false and misleading statements regarding the Supply Contract and financial guidance.

106.   Defendant Hawkins' stock sales were also suspicious in timing and amount:

| DEFENDANT HAWKINS | DATE | SHARES SOLD | PRICE | GROSS PROCEEDS |
|---|---|---|---|---|
| Hawkins | 10/28/15 | 56,189 | $45.89 | $2,578,513 |
| Hawkins | 10/29/15 | 6,162 | $45.89 | $282,774 |
| Hawkins | 10/30/15 | 37,649 | $45.53 | $1,714,159 |
| Hawkins | 11/10/15 | 15,731 | $48.12 | $756,976 |
| Hawkins | 11/12/15 | 26,758 | $47.32 | $1,266,189 |
| Hawkins | 11/25/15 | 14,103 | $48.86 | $689,073 |
| Hawkins | 11/27/15 | 43,408 | $49.17 | $2,134,371 |
| Totals | | 22,958 | | $9,422,055 |

107.   The gross proceeds from Defendant Hawkins' stock sales during the approximate six month Class Period are more than double the gross proceeds from his stock sales during the six months preceding the Class Period. Additionally, these sales were made shortly after the announcement of the Supply Contract and while the stock price was artificially inflated by Defendants' numerous false and misleading statements regarding the Supply Contract and the Company's financial guidance, and when the stock price was near an all-time high of over $50 per share.

108.   In addition to these lucrative stock sales, both Individual Defendants also enjoyed performance-based bonuses. According to the Company's proxy statement filed on April 22, 2016, "[b]eginning with 2012, [Natus Medical's] annual bonus plan has been tied to earnings and revenue goals and key business objectives." As a result of Defendants' false and misleading statements during the Class Period, Individual Defendants were able to achieve their consolidated revenue and consolidated adjusted pre-tax earnings per share ("EPS") targets for the year 2015, and thus, both Individual Defendants received greater than the target inventive plan compensation.

## X.   LOSS CAUSATION

109.   Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

110.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and other Class members. During the Class Period, Plaintiff and other Class members purchased or acquired Natus Medical securities at artificially inflated prices in reliance on Defendants' material misrepresentations and/or omissions. The price of those securities declined significantly when information was disclosed to the market for the first time during the Class Period, revealing those material misrepresentations and/or omissions.

111.   Prior to January 11 2016, Defendants had concealed material risks and misled investors regarding the Ministry of Health's pre-payments under the Supply Contract and the impact of these pre-payments on Natus Medical's financial guidance. These concealed risks partially materialized when, on January 11, 2016, Natus Medical filed a Current Report on Form 8-K, attaching a press release, which announced that the Ministry of Health's payment would be delayed and that the Company "now expects to receive prepayment and begin shipments in the first quarter of 2016." In reaction to this news, the price of Natus Medical common stock declined, falling from its close of $43.20 per share on January 8, 2016 to close at $38.25 per share on January 11, 2016, a decline of almost $5, or 11%, on usually high trading of approximately 1.4 million shares, or more than four times the average daily volume over the preceding ten trading days.

112.   Defendants continued to conceal material risks and mislead investors regarding the Ministry of Health's pre-payments under the Supply Contract and the impact of these pre-payments on Natus Medical's financial guidance, until, on January 27, 2016, these risks partially materialized when, following the release of Natus Medical's Form 8-K, attaching a press release, and the Company's conference call, numerous analysts expressed skepticism that the Supply Contract would convey the economic benefits that Defendants had previously reported. In reaction to this news, the price of Natus Medical stock fell once again, from its close of $37.15 per share on January 27, 2016 to close at $34.71 per share on January 28, 2016, a decline of $2.44 per share, on abnormally high trading volume.

113.   Next, on February 29, 2016, certain material risks regarding the Ministry of

1  Health's pre-payments under the Supply Contract and the impact of these pre-payments on Natus

2  Medical's financial guidance were partially revealed when the Company filed its 2015 Form 10-K,

3  attaching the Supply Contract, which revealed that three separate pre-payments had been due in

4  2015 and warned that if the Ministry of Health "does not make the required prepayments to initiate

5  deliveries under the Medix agreement, [Natus Medical] will not receive any benefit from it." On

6  this news, the price of Natus Medical stock once again declined, falling from its close of $37.21

7  per share on February 26, 2016 to close at $36.32 per share on February 29, 2016.

8      114.    Finally, on April 4, 2016, the material risks regarding the Ministry of Health's pre-

10  payments under the Supply Contract and the impact of these pre-payments on Natus Medical's

11  financial guidance were fully revealed when Natus Medical issued a press release announcing that

12  the Company "did not receive any prepayments during the quarter" and that revenue from the

13  Supply Contract had been excluded from the Company's financial guidance. On this news, the

14  price of Natus Medical stock declined precipitously, falling from its close of $39.64 per share on

15  April 1, 2016 to close at $31.84 per share on April 4, 2016, a decline of $7.80 per share, or nearly

16  20%, on unusually high trading volume of more than 2.7 million shares, or more than eight times

17  the average daily trading volume over the preceding ten trading days.

18  **XI.    PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE**

19      115.    At all relevant times, the market for Natus Medical common stock was an efficient

20  market for the following reasons, among others:

21          a.    Natus Medical stock met the requirements for listing, and was listed and
22                actively traded on the NASDAQ, a highly efficient and automated market;

23          b.    According to the Company's Form 10-Q filed on November 3, 2016, the
                  Company had more than 32.9 million shares outstanding as of October 28,
24                2016. During the Class Period, on average, 330,000 shares of Natus
                  Medical stock were traded on a daily basis, demonstrating a very active and
25                broad market for Natus Medical stock and permitting a very strong
                  presumption of an efficient market;
26
27          c.    Natus Medical was qualified to file a less comprehensive Form S-3
                  registration statement with the SEC that is reserved, by definition, to well-
28                established and largely capitalized issuers for whom less scrutiny is
                  required;

d.      As a regulated issuer, Natus Medical filed periodic public reports with the SEC;

e.      Natus Medical regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services, the Internet and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

f.      Natus Medical was followed by many securities analysts who wrote reports that were distributed to the sales force and certain customers of their respective firms during the Class Period and each of these reports was publicly available and entered the public marketplace; and

g.      unexpected material news about Natus Medical was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

116.    As a result of the foregoing, the market for Natus Medical common stock promptly digested current information regarding Natus Medical from publicly available sources and reflected such information in Natus Medical's stock price. Under these circumstances, all purchasers of Natus Medical common stock during the Class Period suffered similar injury through their purchase of Natus Medical common stock at artificially inflated prices, and a presumption of reliance applies.

117.    In addition, Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 496 U.S. 128 (1972), because the claims asserted herein are predicated in part on material omissions of fact that Defendants had a duty to disclose.

## XII.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

118.    The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to the false or misleading statements pleaded in this Complaint.

119.    The statements complained of herein were not forward-looking statements, nor were they identified as such when made. Rather, the statements at issue herein – including statements about the payment schedule under the Supply Contract, as well as statements about the Ministry of Health's compliance with the Supply Contract – were statements of historical fact or

1   statements of purportedly current facts and conditions at the time the statements were made.

2      120.   To the extent that any of the false and misleading statements alleged herein can be

3   construed as forward-looking, those statements were not accompanied by meaningful cautionary

4   language identifying important factors that could cause actual results to differ materially from

5   those in the statements. Such factors include, among others, that the Ministry of Health was late on

6   its pre-payments throughout 2015, the Supply Contract was never signed, and even if the Supply

7   Contract were signed, Defendants had no means of effectively enforcing the Company's rights

8   under the Supply Contract since Venezuela was the exclusive forum for dispute resolution and the

10  Venezuelan government was a party to the contract. Given these then-existing facts which were

11  not adequately disclosed, any generalized risk disclosures were insufficient to insulate Defendants

12  from liability for their materially false and misleading statements.

13     121.   Alternatively, Defendants are also liable for any forward-looking statements

14  because the speaker knew or recklessly disregarded that the statements were false or misleading

15  when made, or the statement was approved by an Individual Defendant who knew or recklessly

16  disregarded that the statement was false when made.

17  **XIII.   CLASS ACTION ALLEGATIONS**

18     122.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

19  Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

20  otherwise acquired Natus Medical common stock during the Class Period (the "Class"); and were

21  damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are

22  Defendants herein, the officers and directors of the Company, at all relevant times, members of

23  their immediate families and their legal representatives, heirs, successors or assigns and any entity

24  in which Defendants have or had a controlling interest.

25     123.   The members of the Class are so numerous that joinder of all members is

26  impracticable. Throughout the Class Period, Natus Medical common stock was actively traded on

27  the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and

28  can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or

thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Natus Medical or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

124.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

125.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

126.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Natus Medical;

- whether the Individual Defendants caused Natus Medical to issue false and misleading statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

- whether the prices of Natus Medical common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

127.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.

128.    There will be no difficulty in the management of this action as a class action.

## XIV.   CAUSES OF ACTION

### COUNT I

**For Violation of §10(b) of the Exchange Act
and Rule 10b-5 Against All Defendants**

129.    Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

130.    Throughout the Class Period, Defendants, in pursuit of their scheme and continuous course of conduct to inflate the market price of Natus Medical common stock, had the ultimate authority for making, and knowingly or recklessly made, materially false or misleading statements or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

131.    During the Class Period, Defendants, and each of them, carried out a plan, scheme, and course of conduct using the instrumentalities of interstate commerce and the mails, which was intended to and, throughout the Class Period did: (a) artificially inflate and maintain the market price of Natus Medical common stock; (b) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (c) cause Plaintiff and other members of the Class to purchase Natus Medical common stock at inflated prices; and (d) cause them losses when the truth was revealed over time. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein, in violation of §10(b) of the Exchange Act and Rule 10b-5, 17 C.F.R. §240.10b-5.

132.    In addition to the duties of full disclosure imposed on Defendants as a result of their affirmative false and misleading statements to the investing public, defendants had a duty to promptly disseminate truthful information with respect to Natus Medical's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so

that market price of the Company's common stock would be based on truthful, complete and accurate information.

133.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were either known or readily available to them.

134.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts as set forth above, the market price of Natus Medical common stock was artificially inflated during the Class Period. In ignorance of the fact that the market price of Natus Medical common stock was artificially inflated, and relying upon the integrity of the market in which the shares traded, Plaintiff and other members of the Class purchased Natus Medical stock during the Class Period at artificially high prices and, when the truth was revealed, were damaged thereby.

135.    Had Plaintiff and the other members of the Class and the marketplace known of the true facts, which were knowingly or recklessly concealed by defendants, Plaintiff and the other members of the Class would not have purchased their Natus Medical shares during the Class Period, or if they had purchased such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

136.    By virtue of the foregoing, defendants Natus Medical and the Individual Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10-5.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against All Defendants

137.    Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

138.    The Individual Defendants had control over Natus Medical and made the materially false and misleading statements and omissions on behalf of Natus Medical within the meaning of

§20(a) of the Exchange Act as alleged herein. By virtue of their share ownership, executive and board positions and stock ownership, and their culpable participation, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which plaintiff contends were false and misleading. The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

139.   In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein. Natus Medical had the power to control and influence, and did control and influence, the Individual Defendants and all of its employees.

140.   By reason of such wrongful conduct, Natus Medical and the Individual Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## XV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.   Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.   Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.   Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

1    D.    Awarding such other and further relief as the Court may deem just and proper.

2  **XVI.   DEMAND FOR TRIAL BY JURY**

3    Plaintiff hereby demands a trial by jury.

4

5  DATED:  July 14, 2017                  GLANCY PRONGAY & MURRAY LLP

6

7                                         By:    _s/ Kara M. Wolke_

8                                         Robert V. Prongay
                                          Kara M. Wolke
10                                        Alexa Mullarky
                                          1925 Century Park East, Suite 2100
11                                        Los Angeles, California 90067
                                          Telephone:  (310) 201-9150
12                                        Facsimile:  (310) 201-9160
13                                        Email:  info@glancylaw.com

14                                        *Attorneys for Lead Plaintiff John Costabile*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old.  On July 14, 2017, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on July 14, 2017, at Los Angeles, California.

*s/ Kara M. Wolke*
Kara M. Wolke

# Mailing Information for a Case 4:17-cv-00458-JSW Costablie v. Natus Medical Incorporated et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Mary K. Blasy**
  mblasy@rgrdlaw.com

- **Brian Edward Cochran**
  bcochran@rgrdlaw.com

- **Jennifer Ann Ebling**
  jebling@fenwick.com,rchang@fenwick.com

- **Frank James Johnson**
  frankj@johnsonandweaver.com,paralegal@johnsonandweaver.com,michaelf@johnsonandweaver.com,ceciliar@johnsonandweaver.com

- **Kevin Peter Muck**
  kmuck@fenwick.com,kayoung@fenwick.com,lkelleybourne@fenwick.com

- **Lesley F. Portnoy**
  LPortnoy@glancylaw.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com

- **Samuel H. Rudman**
  srudman@rgrdlaw.com

- **Phong L. Tran**
  phongt@johnsonandweaver.com,paralegal@johnsonandweaver.com

- **David Conrad Walton**
  davew@rgrdlaw.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,jillk@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Kara M Wolke**
  kwolke@glancylaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)