UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOHN COSTABILE,

          Plaintiff,

    v.

NATUS MEDICAL INCORPORATED, et al.,

          Defendants.

Case No. 17-cv-00458-JSW

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

Re: Dkt. No. 29

       Now before the Court for consideration is the motion filed by Natus Medical Incorporated ("Natus Medical"), James B. Hawkins, and Jonathan A. Kennedy (collectively, "Defendants") seeking to dismiss this securities class action. The Court has considered the parties' papers, relevant legal authority, and the record in this case, and the Court finds the motion suitable for disposition without oral argument. *See* N.D. Civ. L.R. 7-1(b). For the reasons set forth below, the Court HEREBY GRANTS Defendants' motion to dismiss, but will afford Plaintiff leave to amend.

## BACKGROUND

       Plaintiff John Costabile alleges that he purchased Natus Medical common stock at "artificially inflated" prices due to alleged misrepresentations and omissions made by Defendants regarding a supply contract between a Natus Medical subsidiary and the Venezuelan Ministry of Health.[1] Plaintiff seeks to represent a class of all individuals who purchased or acquired Natus Medical stock during the Class Period (defined as October 16, 2015 and April 3, 2016). (Dkt. No.

---

[1] Though not in the FAC, in the documentation supporting Plaintiff's motion to become lead plaintiff in this action, Plaintiff represented he purchased 2,000 shares on March 15, 2016 and eventually sold those shares on April 8, 2016. (Dkt. No. 14-3.)

25, First Amended Complaint ("FAC") ¶¶ 1, 122.)

**A. Natus Medical and the Supply Contract with the Venezuelan Ministry of Health.**

Natus Medical is a company which designs, manufactures, and markets newborn care and neurology healthcare products and services worldwide. (*Id.* ¶ 2.) On October 16, 2015, Defendant James Hawkins, Natus Medical's CEO, and Defendant Jonathan Kennedy, the CFO, announced that Natus Medical, through its wholly-owned Argentinian subsidiary Medix I.C.S.A. ("Medix"), had entered into a three-year, $232.5 million supply contract to provide medical equipment, supplies, and services to the Ministry of Health of Venezuela ("Supply Contract"). (*Id.* ¶ 3.) In the announcement, Defendants represented that $69 million in prepayments under the Supply Contract were expected by the first quarter of 2016. (*Id.* ¶¶ 3, 50.)

The announcement of the Supply Contract was received as a significant development by analysts. (*See, e.g.*, *id.* ¶¶ 4-5.) On October 21, 2015, Defendants issued a press release which, quoting Hawkins, provided details regarding the impact of the Supply Contract on Natus Medical's revenue forecasts. Specifically, after citing the Supply Contract, Defendant Hawkins noted how Natus Medical had increased its revenue guidance for the fourth quarter of 2015 by $3 million and its non-GAAP earnings per share from $ 0.47 to $0.49. (*Id.* ¶ 53.) Hawkins also indicated that Defendants were "increasingly confident that we can achieve and potentially exceed our long term operating margin goal of 20% in 2016." (*Id.*)

That same day, Defendants held a conference call with analysts to discuss Natus Medical's earnings. A number of representations were made during this call. For example as with the prior press releases, Defendants represented that the Supply Contract would have a positive impact on Natus Medical's revenue, with payments from the agreement being anticipated by the first quarter of 2016. (*Id.* ¶ 55.) For instance, Hawkins told analysts:

> Last Friday we announced that Medix . . . signed a three-year agreement with the Ministry of Health of Venezuela for $232.5 million to supply Venezuela with neonatal and obstetric equipment supplies and services. As stated in our filing, we are to receive three payments totaling $69 million by the end of the first quarter of 2016. Prepayments are to continue throughout the contract period as we fulfill our requirements. We expect to commence on this contract in our fourth quarter, but revenue is expected to be minimal in the fourth quarter.

(*Id.*)  Later in the call, an analyst asked Hawins to provide additional information on how the Supply Contract would contribute to Natus Medical's revenue and earnings in 2016.  Hawkins answered by again referring to anticipated payments being received in the fourth quarter of 2015 and first quarter of 2016:

> We expect to receive some payments here by the end of the year, to start those three payments totaling the $69 million.  And then to— most likely those would extend into the first quarter of next year . . . As we—way this contract is, we're going to be prepaid throughout the entire contract.

(*Id.* ¶ 57.)  Hawkins further indicated that Natus Medical had, conservatively, included a "couple of million dollars" in its fourth quarter 2015 guidance attributable to the Supply Contract.  (*Id.*¶ 59.)

In addition, during the conference call Kennedy made the point of highlighting that the Supply Contract was not the first contractual arrangement between the Ministry of Health and Medix.  Kennedy instead referenced how the Supply Contract represented a "continuation of an ongoing relationship."  (*Id.*¶ 61.)   Specifically, Kennedy addressed how, around 2010, Medix had completed an almost $100 million deal with Venezuela, thus demonstrating the "ongoing relationship between Medix and other South American countries."  (*Id.*)

Finally, analysts during the call asked about the currency exchange risk inherent in the Supply Contract.  (*Id.* ¶ 63.)  Kennedy asserted that the risk was "minimal" because Natus Medical was protected by the fact that the Supply Contract was "denominated in dollars, and our payment is a dollar-denominated payment."  (*Id.*)

The representations by Hawkins and Kennedy continued into November and December 2015 at various healthcare conferences.  On November 19, 2015, during his opening remarks to a conference, Hawkins expressed "pride" at Natus Medical's financials and lauded the "major" $232 million Supply Contract.  (*Id.* ¶ 65.)  Hawkins not only touted the ultimate value of the Supply Contract, but emphasized that Natus Medical was to "be paid up front as we go on this business" with the first payment expected "by the end of the year, and .. . . continu[ing] throughout the life of the contract."  (*Id.*)

At least one analyst at the conference asked how confident Hawkins was regarding

Venezuela's ability to perform on the Supply Contract over the entire three-year term. (*Id.* ¶ 67.)

Hawkins responded to this question by acknowledging that there is "always a potential risk with

any contract." (*Id.*) He then sought to downplay this risk by pointing to Medix's prior contractual

relationship with Venezuela:

> Yes, so, always a potential risk with any contract. The one thing I would say with this one, before we bought our subsidiary, which is located in Buenos Aires, which is who received this order, a company called Medix, they had received an $82 million order maybe seven years ago and it came through just fine. The money showed up as expected, and it did happen.
>
> So we have pretty good confidence that it should happen. We have been told the money is set aside, and we are looking to get our first payment here by the end of December.

(*Id.*)

At a similar December 1, 2015 healthcare conference, Hawkins again lauded the "very

large order that [Natus Medical] received from Venezuela totaling $ 232.5 million." (*Id.* ¶ 71.)

As he had in October and November, he again asserted that Natus Medical was anticipating

receiving revenue under the Supply Contract before the end of 2015:

> We look to some of these revenues to start in December. We expect to get our first $23 million payment in the weeks ahead and then we'll be prepaid on all of this as we go forward on a rolling basis. It's quite a big order for us and we are very excited to not only have it ourselves, but also for the babies and mothers in Venezuela.

(*Id.*) Later, in response to a request from an analyst for additional details, Hawkins again pointed

to the imminent commencement of payments and its impact on Natus Medical's financials:

> The money . . . that we are receiving for this purchase is all in US dollars. And there always is some potential currency risk as we transfer those dollars into Argentine pesos to do the purchasing and delivering of product. But overall, over this three-year period, we are convinced it's going to be a good piece of business for us.
>
> It will have average corporate margins of 18% to 20%. And although the gross profits won't be near that, but the bottom line operating margin should be the same. So we are quite encouraged. We're expecting to get payment here in the next few weeks and looking for this to kick off . . . .

(*Id.* ¶ 73.)

In summary, throughout the fourth quarter of 2016, Defendants represented that the Supply

4

United States District Court
Northern District of California

Contract was a done deal that would have a significant positive impact on Natus Medical's revenue, starting in the fourth quarter of 2015. As alleged in the FAC, the market responded favorably to this news, and on December 17, 2015, Natus Medical shares reached an all-time high closing price of $50.48 per share. (*Id.* ¶ 12.)

**B.      The Alleged Undisclosed Truth.**

Plaintiff, however, alleges that the above representations regarding the existence of the Supply Contract and its potential impact on Natus Medical's revenue were false and misleading for a number of reasons.

First, and most fundamentally, Plaintiff contends that that there was no enforceable contract at all. Plaintiff relies on a confidential witness ("CW1") who served as the Venezuelan Ministry of Health's Purchasing Coordinator between February 2016 and July 2016. (*Id.* ¶ 40.) In this role, CW1 was responsible for "preparing price quotes, handling and maintaining information regarding payments due under contracts for purchases and services, and tracking receipt of goods and services." (*Id.* ¶¶ 40.) Plaintiff alleges that CW1 has represented that the Supply Contract was "substantially negotiated" leading up to the fourth quarter of 2015, but not actually executed. (*Id.* ¶ 43.) As a result, Plaintiff asserts there was, in fact, no Supply Contract in the fourth quarter of 2015 or first quarter of 2016, thus rendering all of Defendant's statements about that contract (and its potential impact on revenue) misleading. Specifically, he asserts that because the Supply Contract was not executed, no prepayments were scheduled or owed in the fourth quarter of 2015 or first quarter of 2016, contrary to Defendants representations. (*Id.* ¶ 42.)

Second, even if the Supply Contract had been executed, Plaintiff contends that Defendants did not disclose to investors that the Ministry of Health failed to make required payments. As detailed above, Defendants repeatedly asserted that they expected the Ministry of Health to begin making prepayments by the first quarter of 2016. Plaintiff contends that these representations were misleading, however, because the terms of the Supply Contract required the Ministry of Health to make prepayments in October, November, and December 2015. (*Id.* ¶ 13.) None of these prepayments were timely made. In fact, Plaintiff alleges that by December 1, 2015—when Defendants were still touting the imminent receipt of the pre-payments—the Ministry of Health

United States District Court
Northern District of California

was $47 million in default under the terms of the Supply Contract as the October and November payments had not been made. (*Id.* ¶ 72.)

Third, Plaintiff alleges that Defendants failed to disclose that the Supply Contract left Natus Medical with no effective means to enforce its rights under the agreement. Plaintiff relies on the fact that the Supply Contract provided that any questions of interpretation, application, and performance of the contract would be governed by the laws of Venezuela with the City of Caracas being the "special domicile" for such enforcement. (*Id.* ¶ 47.) According to Plaintiff, this left Defendants with "no means of effectively enforcing their rights under the Supply Contract" because they would be forced to litigate in a Venezuelan court against the Venezuelan government. (*Id.* ¶ 48.) In support of this contention, Plaintiff points to the allegedly "turbulent legal, political, and economic systems in Venezuela" and the Venezuelan government's alleged intrusion into the independence of the judicial system. (*Id.*)

Compounding this issue, Plaintiff contends that contracts with the government of Venezuela were often disregarded when ministers were replaced. CW1, for example, asserts that "Here things happen in a different way. The minister leaves and everything that he does that isn't invoiced gets lost — if the money is not committed. One thing is a promise to do a contract and another thing is a contract." (*Id.* ¶ 49.) Given this reality, Plaintiff contends that Defendants either were aware, or should have been aware, that imminent elections in Venezuela meant that there was a significant risk that the unsigned Supply Contract would never come to fruition. (*Id.*)

Fourth, Plaintiff asserts that it was misleading for Defendants to bolster public perception of the Supply Contract by referencing the prior agreement prior between Venezuela and Medix. While acknowledging that Medix and the Venezuelan Ministry did have a prior agreement in 2011, Plaintiff contends that the prior agreement did not match Defendants' rosy description. Again relying on CW1, Plaintiff alleges that the prior agreement "failed to come to completion and was cancelled or suspended when the final amounts owing under the contract were not paid to Medix by the Ministry of Health." (*Id.* ¶ 44.) Another confidential witness ("CW2"), who worked as Natus Medical's Director of Operations in Argentina from 2011 to 2013, supports CW1's description, stating that the prior agreement "was always in the air. Medix was always

trying to close it" and that there had been a "history of difficulties with payments with Venezuela." (*Id.* ¶ 46.)

Fifth, Plaintiff alleges that Defendants misrepresented to investors that the Supply Contract called on the Ministry of Health to make payments in dollars. (*Id.* ¶ 63.) In fact, Plaintiff contends that the Supply Contract calls for payments to be made in "Argentinian Pesos at the current exchange rate for the effective day of payment." (*Id.* ¶ 64.)

**C.     Problems with the Supply Contract Materialize.**

Plaintiff alleges that the truth about the Supply Contract—withheld from investors during the fourth quarter of 2015—began to come to light in January 2016.

On January 11, 2016, Natus Medical filed a Form 8-K which announced that the company had failed to meet its revenue guidance for the fourth quarter of 2015. The attached press release, signed by Kennedy, blamed this on the fact that the prior guidance had "included expected revenue of approximately $4 million under the new Venezuelan Ministry of Health contract" but the expected prepayment had been "delayed." (*Id.* ¶ 75.) Instead, Kennedy revealed the company "now expects to receive prepayment and begin shipments in the first quarter of 2016." (*Id.*) He stated that $5 million of revenue from the Supply Contract was included in the new revenue guidance for the first quarter of 2016 and $60 million for the full year guidance.

Similarly, on January 27, 2016, another Form 8-K was filed which again blamed the fourth quarter 2015 shortfall on a "delay" in prepayments under the Supply Contract and this time made a general reference to unspecified "risks associated with our Venezuela contract." (*Id.* ¶ 80.) Similar representations were made during a conference call that same day. (*Id.* ¶¶ 82.) During that call, and in response to a question from an analyst, Hawkins expressed "confid[ence] that this business will happen" and stated it was "safe to assume guidance implies about $0.20 in earnings from Venezuela this year." (*Id.* ¶ 84.) Kennedy similarly assured analysts regarding economic benefit of the Supply Contract, by stating "[i]f I had a gun to my head and had to predict, it's probably in the mid-40%s for a gross profit margin." (*Id.* ¶ 86.)

Plaintiff contends that these partial disclosures of a "delay" and references to unspecified "risks" were themselves misleading as they failed to disclose known fundamental risks and issues

with the Supply Contract. (*Id.* ¶¶ 77, 87.) For instance, Defendants continued to not disclose the fact that three pre-payments had been missed during the fourth quarter of 2015. (*Id.*)

Analysts expressed reservation about the prospects of the Supply Contract and at least some analysts removed the Supply Contract from their guidance. (*See id.* ¶ 88.) Consequently, shares of Natus Medical declined. On January 11, 2016, Natus Medical closed at $38.25, down from $43.20, after a day of unusually high trading volume. (*Id.* ¶ 76.) On January 27, 2016, following the second Form 8-K and conference call, Natus Medical closed at $34.71, down from $37.15, again on abnormally high trading volume. (*Id.* ¶ 89.)

On February 29, 2016, Natus Medical filed its 2015 Form 10-K. Significantly, attached to the Form 10-K was an (unsigned) copy of the Supply Contract—the first time the Supply Contract had been publicly released. (*Id.* ¶ 92.) This revealed (1) the fact that approximately $70 million in prepayments had been missed in the fourth quarter of 2015, and (2) the allegedly problematic forum and venue selection clause. (*Id.* ¶¶ 92, 93.) Additionally, in the Form 10-K, Defendants disclosed that recent elections in Venezuela and Argentina had resulted in "significant political changes." (*Id.* ¶ 91.) Defendants warned that this, combined with a "highly inflationary economy and recessionary economic conditions," could "impact the likelihood of the Venezuelan Ministry of Health's following through with orders under the agreement." (*Id.*) Defendants further disclosed that Medix had "not yet received any prepayments under the agreement" and that in the absence of prepayments, Natus Medical would not receive "any benefit" from the Supply Contract." (*Id.*)

In the wake of these disclosures, the price of Natus Medical shares again declined, closing at $36.32 on February 29, 2016, down from $37.21. (*Id.* ¶ 95.)

During a March 14, 2016 investor call, Hawkins finally conceded that analysts could discount the expected revenues from the Supply Contract but continued to maintain that the company "really believe[s] this is going to happen." (*Id.* ¶ 97.) He acknowledged that the country of Venezuela was "quote, in the toilet" and that "trying to handicap exactly when, with all the changes going on in both governments, Ministry of Health, oil prices, it has made it very difficult." (*Id.*)

Approximately three weeks later, on April 4, 2016, Natus Medical issued a press release releasing its preliminary first quarter 2016 revenue results.  (*Id.* ¶ 99.)  The press release stated that Natus Medical had failed to meet its prior revenue guidance and that Natus Medical did not have "any revenue associated with the Venezuela Ministry of Health contract as [it] did not receive any prepayments during the quarter."  (*Id.*)  In the wake of this press release, Natus Medical shares fell to $31.84 per share, down from a previous close of $39.64 — a loss of nearly 20% on unusually high trading volume.  (*Id.* ¶ 100.)

On April 20, 2016, Natus Medical released its final first quarter 2016 results.  These results demonstrated that Defendants had slashed Natus Medical's fiscal year 2016 guidance.  In the guidance, Defendants conceded that they could "no longer include revenue or earnings from the agreement in . . . guidance until there is more clarity" on the Ministry of Health's performance under the agreement.  (*Id.* ¶ 101.)

**D.     Claims Asserted in this Action.**

The first amended complaint in this action was filed on July 14, 2017.  Plaintiff alleges that Defendants' allegedly false or misleading statements violated (1) section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act'), 15 U.S.C. § 78j(b), and Securities Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5; and (2) section 20(a) of the Exchange Act, 15 U.S.C. § 78t.  (*Id.* ¶¶ 130, 138.)  Defendants have moved to dismiss these claims for failure to state a claim under Federal Rules of Civil Procedure 9(b) and 12(b)(6).  (Dkt. No. 29, Motion, at 1.)

APPLICABLE LEGAL STANDARD

A motion to dismiss is proper under Rule 12(b)(6) where the pleadings fail to state a claim upon which relief can be granted.  The complaint is construed in the light most favorable to the non-moving party, and all material allegations in the complaint are taken to be true.  *Sanders v. Kennedy*, 794 F.2d 478, 481 (9th Cir. 1986).  The Court may consider the facts alleged in the complaint, documents attached to the complaint, documents relied upon but not attached to the complaint when the authenticity of those documents is not questioned, and other matters of which the Court can take judicial notice.  *Zucco Partners LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th

Cir. 2009)

Under Rule 8(a), a plaintiff need only provide a "short and plain statement of the claim showing that the pleader is entitled to relief." Even under this liberal pleading standard, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Pursuant to *Twombly*, a plaintiff must not merely allege conduct that is conceivable but must instead allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While this standard does not impose a "probability requirement," it nonetheless "asks for more than a sheer possibility that a defendant has acted unlawfully. . . . When a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.*

A heightened pleading standard, however, applies in this case. Plaintiff is alleging that Defendants engaged in a pattern of fraudulent or misleading representations in violation of the Exchange Act and Rule 10b-5. Accordingly, Plaintiff's FAC must meet both the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *See Zucco Partners*, 552 F.3d at 990,

Under Rule 9(b), a plaintiff alleging fraud must allege "with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). In the securities context, the PSLRA requires that a "complaint 'plead with particularity both falsity and scienter.'" *Zucco Partners*, 552 F.3d at 990 (quoting *Gompper v. VISX*, 298 F.3d 893, 895 (9th Cir. 2002). Accordingly, a securities plaintiff alleging material misstatements or omissions must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-

4(b)(1). To adequately plead scienter, the PSLRA requires that the plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2).

## DISCUSSION

Section 10(b) of the Exchange Act provides, in relevant part, that it is unlawful "to use or employ in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5, promulgated under the authority of section 10(b), makes it unlawful for any person, engaged in interstate commerce, to: (a) employ any device, scheme or artifice to defraud; (b) to make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5.

To state a claim under section 10(b) and Rule 10b-5, a plaintiff must allege: (1) a misrepresentation or omission; (2) of material fact; (3) made with scienter; (4) on which the plaintiff justifiably relied; (5) that proximately caused the allege loss. *See Binder v. Gillespie*, 184 F.3d 1059, 1063 (9th Cir. 1999). Where, as here, a plaintiff alleges a "control person" claim under section 20(a) claim which is based on an underlying violation of section 10(b), the pleading requirements are identical for both claims. *See, e.g.*, *In re Ramp Networks, Inc. Sec.*, 201 F. Supp. 2d 1051, 1063 (N.D. Cal. 2002); *see also City of Dearborn Heights Act 345 Police & Fire Retirement Sys. v. Align Tech., Inc.*, 856 F.3d 605, 623 (9th Cir. 2017) ("Plaintiff has not sufficiently alleged violations of Section 10(b) and Rule 10b-5. And, without 'a primary violation of federal securities law,' Plaintiff cannot establish control person liability." (citation omitted)).

**A.      Whether Plaintiff Has Alleged Actionable Misrepresentations or Omissions.**

Under Rule 9(b) and the PSLRA, a plaintiff must "identify[] the statements at issue and set[] forth what is false or misleading about the statement and why the statements were false or

11

misleading at the time they were made." *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012). Notably, this requirement applies to *each* challenged representation or omission. *See, e.g.*, *Doll v. Stars Holding Co.*, No. 05-cv-01132 MMC, 2005 WL 2811767, at *3 (N.D. Cal. Oct. 27, 2005) (noting plaintiffs must "specify the reasons why each such statement or omission is false or misleading"). For purposes of Rule 10b-5, a statement is misleading "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1109 (9th Cir. 2010) (quoting *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008)). While a statement is not misleading simply because it is incomplete, it is also the case that a "statement that is literally true can be misleading and thus actionable under the securities laws." *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).

Additionally, the false or misleading statement must also be "material." *Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 922 (N.D Cal. 2017). "A false or misleading statement or omission is material if there is a 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). While materiality should ordinarily be left to the trier of fact, "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *Reese v. Malone*, 747 F.3d 557, 568 (9th Cir. 2014), *overruled on other grounds by Align Tech., Inc.*, 856 F.3d 605.

### 1. Representations Relating to the Existence of the Contract.

Plaintiff contends, in essence, that *every* challenged representation made during the Class Period is false or misleading for one simple reason: The Supply Contract was not signed and, as a result, there was no agreement between Natus Medical/Medix in the fourth quarter of 2015. (*See* FAC ¶¶ 39, 42.) Because of this, Plaintiff argues that it was misleading for Defendants to announce the Supply Contract to investors, tout its potential benefits to Natus Medical, and include it in Natus Medical's revenue guidance. Plaintiff, however, has failed to adequately allege that the Supply Contract was unexecuted.

12

Plaintiff relies extensively on the allegations of CW1 to support this contention. As detailed above, CW1 is alleged to have been the "Purchasing Coordinator" for the Venezuelan Ministry of Health beginning in the first quarter of 2016. (*Id.* ¶ 43.) According to the FAC, as Purchasing Coordinator, CW1:

> (1) was "responsible for preparing price quotes, handling and maintaining information regarding payments due under contracts for purchases and services, and tracking receipt of goods and services[.]" (*Id.* ¶ 40)
>
> (2) had "oversight responsibility for purchasing department buyers and members of the Ministry of Health's Commission on Purchasing and Supplies." (*Id* ¶ 41.) This Commission, in turn, "advised the Health Minister and made recommendations on purchasing decisions, including . . . appropriate pricing and selection of suppliers." (*Id.*) The Health Minister, however, had "ultimate authority for negotiating final prices and other material contract terms, and for executing contracts." (*Id.*)

Plaintiff alleges that CW1 "confirms that the Supply Contract was not executed by the Ministry of Health." (*Id.* ¶ 39.)

The PSLRA's particularity pleading requirements do not foreclose Plaintiff's reliance on confidential witnesses. However, the PSLRA does require that such sources be described "'with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged'" and that the complaint contain "'adequate corroborating details.'" *In re Daou Systems, Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005) (quoting *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1233 (9th Cir. 2004)).

On this record, Plaintiff's reliance on CW1 is inadequate for two reasons. First, CW1 was "Purchasing Coordinator" for the Ministry of Health beginning in the first quarter of 2016—*after* the Supply Contract was purportedly executed. This is significant because Plaintiff's allegations regarding the responsibilities of the Purchasing Coordinator do not plausibly suggest that an individual in that role would have personal knowledge about whether a contract was (or was not) signed months before that individual assumed the role. At most, it appears that CW1 would have personal knowledge about whether the Ministry of Health was performing under the Supply Contract in early 2016. For example, CW1 would likely be in a position to state whether Supply Contract payments were being prepared by the Ministry of Health during this time.

The second issue is closely related to the first. Perhaps recognizing that CW1 was not the Purchasing Coordinator at the relevant time, Plaintiff alleges:

> According to CW1, *and based on information provided to CW1* by the Purchasing Coordinator who immediately preceded him, as well as two other individuals who were Purchasing Department buyers and members of the Commission on Purchasing and Supplies during the fourth quarter of 2015 . . . while the Supply Contract was substantially negotiated leading up to the fourth quarter of 2015, it was not actually executed by the Ministry of Health.

(FAC ¶ 43 (emphasis added).) It thus appears that CW1's knowledge about whether the Supply Contract was or was not executed came from hearsay statements by third parties. While reliance on hearsay does not disqualify a confidential witness's statements from consideration, the Court must "examine [the] confidential witness's hearsay report to determine if it is 'sufficiently reliable, plausible, or coherent.'" *Digimarc*, 552 F.3d at 997 n.4. Plaintiff has not provided enough information from which the Court can conduct this inquiry. Plaintiff has not alleged what CW1 was told by the prior Purchasing Director or the Purchasing Department buyers. In addition, he has not provided any context surrounding when, why, or how these individuals provided CW1 with information regarding the Supply Contract. Instead, he simply states the conclusion that the "information provided" to CW1 demonstrates the Supply Contract was not executed. Such a conclusory assertion, without any supporting context, makes it impossible for the Court to determine if the statements are sufficiently "reliable, plausible, or coherent." *Compare Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016) ("Here, the statements reported by the COO were specific in time, context, and details, and involved important communications from a chief executive officer to the Board. They are sufficiently reliable for pleading purposes.").

In sum, Plaintiff has not plead sufficient facts to "support the probability" that CW1 possesses information regarding whether the Supply Contract was executed. *In re Daou Systems, Inc.*, 411 F.3d at 1015. The Court, however, will afford Plaintiff leave to amend these allegations. Plaintiff must include specific allegations relating to what the prior Purchasing Coordinator and Purchasing Department buyers told CW1 and the context in which these discussions occurred. In addition, Plaintiff should include additional allegations regarding the role of the Purchasing Coordinator and Commission on Purchasing and Supplies in the Ministry of Health generally and

in the negotiation of contracts more specifically. On the current allegations, Plaintiff has established a probability that an individual in the role of Purchasing Coordinator would be in a position to know whether the Supply Contract was being *implemented*. This, however, is a distinct question from whether an individual in that position would know whether the Supply Contract was even *executed*.

Having found that Plaintiff fails to adequately allege that the Supply Contract unexecuted, the Court makes the following two observations. First, if Plaintiff is able to adequately allege that the Supply Contract was unexecuted in the fourth quarter 2015, that will have major implications for how the Court views the other challenged statements. For the remainder of this order, the Court will examine the challenged statements as though the Supply Contract was executed (insofar as Plaintiff has, as of now, failed to adequately allege the contrary). However, in any subsequent motion to dismiss, it would be useful for the Court if Defendants included alternative arguments, addressing whether each challenged representation would be false or misleading both if the Supply Contract had been executed and if it had not.

Second, the Court finds it necessary to address an issue resulting from the parties' briefing. As discussed above, Plaintiff's counsel has drafted a FAC that takes the position the Supply Contract was not executed in the fourth quarter of 2015. The filing of this FAC contains certain implicit representations by counsel regarding the existence of a sufficient basis for those allegations. *See* Fed. R. Civ. P. 11(b). In support of the reply brief (and directly responding to an argument made in Plaintiff's opposition brief), Defendants' counsel has attached what purports to be a copy of the Supply Contract executed in October 2015. (*See* Dkt. No. 22-1.) Defense counsel has sworn, under penalty of perjury, that the attached document is a "true and correct copy of the signed agreement." (Dkt. No. 37.) The Court has not addressed this purportedly signed copy of the Supply Contract because, even assuming it is properly presented to the Court at the pleading stage, the Court cannot now adjudicate the disputed question of whether the Supply Contract was actually executed. The Court notes, however, that it is cognizant of the fact that counsel have made diametrically opposed representations to the Court. The Court therefore finds it necessary to remind all counsel of (1) their professional obligations relating to the presentation

15

of facts and arguments before the Court, and (2) the need to conduct a sufficient investigation into their respective positions before they make any further representation to the Court. *See* Fed. R. Civ. P. 11; *see also* Cal. R. Prof. Conduct 5-200.

## 2. Defendants' Representations Regarding the Prepayments.

Many of the challenged statements on which Plaintiff relies involve the prepayments under the Supply Contract. The Supply Contract called for the Ministry of Health to make a prepayment of $69,262,000.00. (Dkt. No. 29-2, Supply Contract, cl. 4(a).)[2] This prepayment was to be made in three installments: (1) $24,413,410.95 due October 2015; (2) $22,669,595.89 due November 2015; and (3) $22,669,595.89 due December 2015. (*Id.*) Plaintiff argues that Defendants repeatedly misrepresented when the prepayments were due and then failed to disclose when the Ministry of Health defaulted on these payments. Plaintiff challenges four specific statement related to the prepayments:

> (1) October 15, 2015, Form 8-K: "Prepayments totaling approximately $69 million are expected by the first quarter of 2016." (FAC ¶ 50.)

> (2) October 21, 2015, Conference Call Statement by Hawkins: "We expect to receive some payments here by the end of the year, to start those three payments totaling the $69 million. And then to – most likely those would extend into the first quarter of next year." (FAC ¶ 57.)

> (3) November 19, 2015, Healthcare Conference Statement by Hawkins: "We are looking to get our first payment in by the end of the year, and those payments would continue throughout the life of the contract." (FAC ¶ 65.)

> (4) December 1, 2015, Healthcare Conference Statement by Hawkins: "We look for some of these revenues to start in December. We expect to get our first $23 million payment in the weeks ahead and then we'll be prepaid on all of this as we go forward on a rolling basis." (FAC ¶ 71.)

The Court concludes that Plaintiff has sufficiently alleged that the October 21, November 19, and December 1 statements were false and misleading.

As to the October 15, 2015 statement, however, the Court finds that Plaintiff has failed to

---

[2] Defendant's unopposed request for the Court to take judicial notice of various SEC filings that are referenced in the FAC is GRANTED.

allege a false or misleading statement. Plaintiff claims that this statement "failed to disclose that . . . three independent pre-payments were separately due in October, November, and December 2015." (FAC ¶ 51.) However, Plaintiff does not dispute that this statement was true, at least technically. Under the terms of the Supply Contract, the $69 million prepayment would be received "by the first quarter of 2016." The simple fact that the press release statement could have included more detail regarding the timing of the prepayments, without more, does not render the statement misleading. *See, e.g.*, *In re Tut Sys., Inc. Sec. Litig.*, No. 01-cv-02659, 2002 WL 35462358 (N.D. Cal. Aug. 15, 2002) ("Plaintiffs fault Defendants for failing to provide more details regarding the extent of the reserves that would need to be booked . . . . However, Defendants' failure to disclose more specific information at an earlier date does not amount to fraud."); *see also Brody*, 280 F.3d at 1006 ("Rule 10b-5 . . . in terms prohibit[s] *only* misleading and untrue statements, not statements that are incomplete."). Plaintiff has not explained how Defendants' failure to provide more granular detail regarding the timing of the prepayments created an "impression of a state of affairs that differ[ed] in a *material* way from the one that actually exists." *Id.* (emphasis added). If Plaintiff wishes to rely on this statement, he will need to provide additional factual allegations to demonstrate why this statement, which appears consistent with the terms of the Supply Contract, was nonetheless materially false or misleading.

For the October 21, 2015 statement, Plaintiff is correct that the statement was arguably misleading. Whereas Hawkins represented that the $69 million prepayment would "start" in 2015 and likely continue into 2016, he failed to disclose that the terms of the Supply Contract called for the entire $69 million prepayment to be received by the end of 2015. The Court finds Plaintiff has plausibly alleged that Hawkins' statement was false or misleading. As to materiality, the Court finds, for purposes of the pleading stage, that a reasonable investor would view the true, shorter, payment schedule under the Supply Contract as "significantly alter[ing] the 'total mix' of information made available." *Bodri*, 252 F. Supp. 3d at 922

For similar reasons, the Court finds that Plaintiff has adequately alleged that Hawkins' November and December 2015 statements regarding the first prepayment were materially false or misleading. Hawkins represented to investors in November and December that Defendants

expected to receive the Supply Contract's first prepayment by the end of the year. These statements effectively represented that the Supply Contract simply called for the first prepayment to be received by the end of 2015. As already discussed, however, Hawkins' statement omitted the fact that the Ministry of Health was required to make prepayments in October, November, and December 2015. This omission was significant because at the time Hawkins made his November and December statements, the Ministry of Health had defaulted on its first and second prepayments, respectively. Taking all inferences in Plaintiff's favor, Hawkins' statement was more than just incomplete; rather, it created an "impression of [the Supply Contract] that differ[ed] . . . from the one that actually exist[ed]." *In re Cutera*, 610 F.3d at 1109. The Court has no problem concluding for purposes of the pleading stage that investors would have found the Ministry of Health's default to be material. Accordingly, the Court finds that Plaintiff has adequately alleged that Hawkins made materially misleading statements by effectively hiding the Supply Contract's prepayment schedule, and thus the Ministry of Health's default, from investors.

Defendant argues, however, that these statements were "forward looking" and are therefore immunized under the PSLRA's safe harbor provision. Under the safe harbor, a "defendant will not be liable for a false or misleading statement if it is forward-looking and *either* is accompanied by cautionary language *or* is made without actual knowledge that it is false or misleading." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017). A "forward looking" statement is "'any statement regarding (1) financial projection, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions underlying or related to any of these.'" *In re Leapfrog Enter., Inc. Sec. Litig.*, 200 F. Supp. 3d 987, 1004 (N.D. Cal. 2016) (quoting *Bartlet v. Affymax, Inc.*, No. 13-cv-01025-WHO, 2014 WL 231551, at *13 (N.D. Cal. Jan. 21, 2014)). Significantly, the Ninth Circuit has recognized that the safe harbor is inapplicable to misleading statements of current or past facts:

> [T]he safe harbor is not designed to protect companies and their officials when they knowingly make a materially false or misleading statement about current or past facts. Nor is the safe harbor designed to protect them when they make a materially false or misleading statement about current or past facts, and combine that statement with a forward-looking statement.

*See In re Quality Sys., Inc.*, 865 F.3d at 1142.

The Court finds that Defendant Hawkins' statements regarding the prepayments are not "forward looking" statements for purposes of the PSLRA safe harbor. The Court acknowledges that each of the three statements discussed above contain a forward looking component, namely that Defendants "expected" to receive the first prepayment by the end of the year. Notably, however, Hawkins' stated "expectation" related directly to a term of the Supply Contract, and both the Supply Contract and its terms were existing, present facts. Further, Hawkins' statement was made in the context of a larger statement about the formation of the Supply Contract and its total value, again, both statements of present fact. Given this context, and the nature of Hawkins' statements, the Court concludes that the challenged statements included implicit representations that the stated "expectation" was consistent with the Supply Contract's term. On the facts alleged, this implicit representation was, at best, misleading given the Supply Contract's prepayment schedule and (for the November and December statements) the Ministry of Health's default. Accordingly, by announcing that he expected the first prepayment installment by the end of the year, without qualification or elaboration, Hawkins made an omission of present fact. *See In re Celera Corp. Sec. Litig.*, No. 5:10-cv-02604 EJD, 2013 WL 4726097, at *2 (N.D. Cal. Sept. 3, 2013) ("[T]he failure to alert investors to the reimbursement problem was not forward-looking; rather, it was an omission of a historical fact."); *see also In re CV Therapeutics, Inc.*, No. 03-CV-03709-SI, 2004 WL 1753251, at *10 (N.D. Cal. Aug. 5, 2004) ("[W]hen the defendants possessed and failed to disclose detailed information about the FDA's serious reservations concerning Raxena's safety and efficacy, they failed to disclose historical facts. The fact that defendants used those inadequately disclosed historical facts to support unsound projections does not shield their alleged misrepresentations as forward-looking statements.").

### 3. Kennedy's Representation Regarding Currency Exchange Risk

During the October 21, 2015 conference call, Defendant Kennedy allegedly asserted that the Supply Contract presented a "minimal" currency exchange risk because the Supply Contract's payments were "denominated in dollars, and our payment is a dollar-denominated payment." (FAC ¶ 63.) Plaintiff asserts this was misleading to investors because the Supply Contract, in fact,

required that payments be made in "Argentinian Pesos at the current exchange rate for the effective date of payment." (Supply Contract, cl. 4.)

First, Plaintiff has abandoned this theory by failing to respond to Defendants' arguments regarding it in his opposition to the motion to dismiss. *See Homsy v. Bank of Am., N.A.*, No. 13-cv-01608 LB., 2013 WL 2422781, at *5 (N.D. Cal. June 3, 2013) ("[W]here a plaintiff simply fails to address a particular claim in its opposition to a motion to dismiss that claim, courts generally dismiss it with prejudice."). Second, on the merits, Plaintiff has failed to allege how Kennedy's statement was false or misleading. In fact, the very terms of the Supply Contract suggest that Kennedy's statement was accurate. The Supply Contract provides:

> The payment by [the Ministry of Health] to [Medix] shall be made through Debt Representative Securities (VRD) in US Dollars and payable in Argentinian Pesos at the current exchange rate for the effective day of payment . . . .

(Supply Contract, cl. 4.) The precise payments are then defined in American dollars. For example, the entire prepayment is defined as a payment of $69,752,602. (*Id.*) Under the terms of the Supply Contract, the number of Argentinian pesos needed to satisfy the $69,752,602 amount would depend on the exchange rate at the time of payment, but the underlying dollar value of the payment would not change. In light of these facts, Plaintiff has failed to allege facts showing that Kennedy's representations regarding the currency exchange risk were false or misleading.

**4. Representations Regarding Medix's Prior Ministry of Health Contract.**

In the FAC, Plaintiff alleges that Defendants improperly sought to bolster investors' perception of the Supply Contract by misrepresenting Medix's prior agreement with the Ministry of Health. Plaintiff alleges Defendants did this on two separate occasions:

> (1) October 21, 2015, Conference Call Statement by Kennedy: "[T]his isn't the first contract with Venezuela that Medix has entered into. So this is a continuation of an ongoing relationship. . . . So when we acquired Medix in 2010, they had just completed, I want to say, about a $100 million deal with Venezuela." (FAC ¶ 61.)

> (2) November 19, 2015 Healthcare Conference Statement by Hawkins: "Yes, so, always a potential risk with any contract. The one thing I would say with this one, before we bought our subsidiary, which is located in Buenos Aires, which is who received

this order, a company called Medix, they had received an $82 million order maybe seven years ago and it came through just fine. The money showed up as expected and it did happen." (FAC ¶ 67.)

According to Plaintiff, the prior contractual agreement between Medix and the Ministry of Health does not match the "rosy" picture painted by Defendants.

Plaintiff relies primarily on three confidential witnesses to support this assertion. CW1, discussed above in connection with the assertion that the Supply Contract was unexecuted, states that she "learned" that the previous contract "failed to come to completion and was cancelled or suspended when the final amounts owing under the contract were not paid to Medix by the Ministry of Health." (FAC ¶ 44.) CW2, who is alleged to be Natus Medical's former Medical Director of Operations in Argentina, states that the "contract with Venezuela was always in the air. Medix was always trying to close it." (*Id.* ¶ 45.) CW2 also reports a "history of difficulties with payments with Venezuela." (*Id.*) Finally, CW3, Natus Medical's former Latin American Regional Sales Manager, similarly reports that "payment of the contract was done one or two months before I left the company" and that the last payment was a "very late payment. One or two years late." (*Id.* ¶ 46.)

Plaintiff, however, fails to provide sufficient detail to support an inference that Defendants' account was materially misleading. As to CW1, he is alleged to have been the Ministry of Health's Purchasing Coordinator starting in February 2016. (FAC ¶ 40.) The prior contract, however, was entered into in 2010. Plaintiff does not allege facts explaining how CW1 has personal knowledge about the details of a contract which was allegedly executed and performed years before she assumed his role with the Ministry of Health. Instead, Plaintiff simply alleges CW1 "learned" of this fact from an undisclosed source at an undisclosed time. This is insufficient. *Cf. Digimarc*, 552 F.3d at 997 n.4 ("[A] hearsay statement, while not automatically precluded . . . may indicate that a confidential witnesses' report is not sufficiently reliable, plausible, or coherent to warrant further consideration . . . ."). Further, CW2's statement vaguely refers to a "history of difficulties' regarding payments with the Ministry of Health, without providing any detail regarding the nature or pervasiveness of those difficulties. Finally, although CW3's account of a "one to two years late" payment is in tension with Defendant Hawkins'

21

representation that the money "came through just fine" or "showed up as expected" (FAC ¶ 67), the prior contract apparently involved multiple payments worth close to $100 million. Without more detailed allegations regarding the circumstances into this late payment, or the alleged "history of difficulties," the Court is unable to determine whether Defendants' representations regarding the prior contract were false or misleading (let alone in a material sense).

### 5. Defendant's Fourth Quarter/Full Year 2015 Guidance Adjustment.

Plaintiff next contends that Defendants misled investors by including revenue from the Supply Contract in Natus Medical's fourth quarter and full year 2015 revenue guidance. On October 21, 2015, Defendants filed a Form 8-K with the SEC which increased the fourth quarter revenue guidance from $102.0 million to $105.0 million and full-year guidance from $378 million to $381 million. (FAC ¶ 53.) In a quote, Defendant Hawkins attributed this increased guidance, in part, to the Supply Contract: "In addition to our record performance during the quarter, we recently secured a $235 million, three-year agreement between our Argentina subsidiary Medix, and the Venezuelan Ministry of Health." (*Id.*)

In the FAC, Plaintiff argues that factoring the Supply Contract into Natus Medical's revenue guidance was false and misleading for two reasons: (1) the Supply Contract was not executed and (2) even if executed, the Supply Contract's Venezuelan choice of law provision rendered Natus Medical without any means of effectively enforcing its rights under that agreement. The Court has already disposed of the first of these theories above. The second fares no better. The Court begins by noting that Plaintiff has again abandoned this theory by failing to defend (or even reference) it in his opposition to the motion to dismiss. *See Homsy*, 2013 WL 2422781, at *5 ("[W]here a plaintiff simply fails to address a particular claim in its opposition to a motion to dismiss that claim, courts generally dismiss it with prejudice.").

Second, even addressing the theory on its merits, Plaintiff has failed to support it with sufficient factual allegations. The FAC relies entirely on a single quotation from a 2014 report by the "International Commission of Jurists" suggesting that the "failures by the authorities, as well as interference, intimidation, arbitrary suspensions and other pressures" have "undermined independence and impartiality of the country's judges and prosecutors." (FAC ¶ 48.) This single

quote, devoid of context, does not support Plaintiff's expansive conclusion that any party who enters into a contract with the government of Venezeula and chooses the Venezuelan courts as the forum for resolving disputes is effectively left without a remedy for enforcing its rights. Accordingly, if Plaintiff intends to proceed with this theory, he will have to include additional factual allegations which give rise to an inference that the Supply Contract's choice of forum provision rendered Defendants' representations about that agreement false or misleading.

In addition to the October 21, 2015 statement announcing the increased revenue guidance, Plaintiff also challenges Defendants' subsequent touting of that increased guidance during November and December. During the healthcare conferences held during these months, Defendant Hawkins allegedly reiterated the increased guidance (FAC ¶¶ 65, 71) and lauded the Supply Contract as one reason for this. (*Id.*) Plaintiff has adequately alleged that these statements were materially misleading. As discussed above, at the time Defendant Hawkins made these statements, the Ministry of Health had defaulted on its prepayments under the Supply Contract, thus undercutting the basis for that guidance. Defendant Hawkins, however, did not disclose this fact to investors, thus rendering his statements misleading. The Court further rejects Defendants' contention that these statements are protected by the PSLRA's safe harbor. As with the related representations, discussed above, that prepayments were "expected" by the end of the year, the Court finds that Plaintiff has adequately alleged that Defendants made an omission of present fact by failing to disclose this default. *See In re CV Therapeutics, Inc.*, 2004 WL 1753251, at *10; *see also Loftus v. Primero Mining Corp.*, 230 F. Supp. 3d 1209 (C.D. Cal. 2017) ("[B]ecause Plaintiffs allege that the way in which Primero's representations about future tax projections were misleading was by omitting already-existing historical facts, the Court finds that these representations are not protected by the safe harbor provisions.").

### 6. Defendants' 2016 Representations.

Finally, Plaintiff alleges that Defendants continued to make materially false or misleading statements into 2016, after the truth about the Ministry of Health's default on the prepayments came to light. Plaintiff, however, has failed to allege facts giving rise to an inference that these statements were materially false or misleading.

First, Plaintiff challenges a number of statements made by Defendants in January 2016 that Natus Medical's 2015 revenue shortfall was due to a "delay" in the Supply Contract's prepayment. (*See* FAC ¶¶ 75, 80, 82.) This statement was literally true and it disclosed to investors the fact that the prepayment—which Defendants had previously announced was expected by the end of 2015— had not been received. In both the FAC and the opposition, Plaintiff argues that Defendant failed to disclose that the "Ministry of Health was actually late on *all* three of its pre-payments under the terms of the Supply Contract." (FAC ¶ 77.) Plaintiff, however, does not explain why it was materially false or misleading for Defendants to refer to a "delay" in the Supply Contract's prepayment as opposed to providing the more granular detail Plaintiff now contends should have been given. *See, e.g.*, *Brody*, 280 F.3d at 1006 ("Rule 10b-5 . . . in terms prohibit[s] *only* misleading and untrue statements, not statements that are incomplete.").

Second, Plaintiff contends that Defendants' inclusion of Supply Contract revenue in Natus Medical's 1Q and full year 2016 revenue guidance was false or misleading. In various January filings and conference calls, Defendants announced that the first quarter and full year 2016 revenue guidance would include $5.0 million and $60.0 million, respectively, from the Supply Contract. (*See* FAC ¶ 75, *see also* Dkt. No. 29- 14.) In arguing that this was misleading, Plaintiff relies entirely on the prior failure of the Ministry of Health to make the prepayment installments. As just discussed, however, the fact that the prepayment had not been received as initially expected was disclosed to investors. Plaintiff alleges no facts, known to Defendants but unknown to investors, which would give rise to an inference that it was misleading for Defendants to include Supply Contract revenue in the guidance figures. The Court also notes that the Supply Contract provided for a three year term; the missed prepayments did not constitute the entire, or even a majority, of that agreement.[3]

Third, Plaintiff challenges a March 14, 2016 conference call statement by Defendant Hawkins. Specifically, Plaintiff alleges it was false or misleading for Hawkins to state "[W]e

---

[3] The Court also believes that Defendants have a strong argument that the 2016 guidance would be protected by the PSLRA's safe harbor. Because the Court concludes Plaintiff has failed to allege sufficient facts showing this revenue guidance was false or misleading when made, however, the Court need not address this question at this time.

really believe this is going to happen" (referring to the Supply Contract) after noting that analysts could discount the expected revenues from the Supply Contract. (FAC ¶ 97.) The Court finds this statement to be non-actionable puffery. *See, e.g.*, *In re Cutera*, 610 F.3d at 1111 ("This mildly optimistic, subjective assessment hardly amounts to a securities violation. Indeed, professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives." (internal quotation marks omitted)); *see also Robb v. Fitbit Inc.*, 216 F. Supp. 3d 1017, 1028 (N.D. Cal. 2016) ("[S]tatements that merely express confidence in a company's business and outlook are vague assertions of corporate optimism and are not actionable under federal securities laws.").

### 7. Summary.

For the reasons just stated, the Court does finds that Plaintiff has sufficiently alleged that the November and December 2015 statements regarding (1) the anticipated timing for receipt of the prepayment under the Supply Contract, and (2) restatement of increased revenue guidance were materially false or misleading. Plaintiff, however, has failed to allege sufficient facts showing that the various other statements he challenges in the FAC were materially false or misleading within the meaning of the PSLRA. The Court, however, will afford Plaintiff leave to file a second amended complaint to plead additional facts giving rise to an inference that Defendants' other statements were, in fact, false or misleading. If Plaintiff intends to abandon his arguments that certain statements or omissions were misleading (for example, the choice of forum provision or the "exchange risk" statement), he shall not replead those in the second amended complaint.

### B. Plaintiff Has Failed to Raise a Strong Inference of Scienter.

The Court has found that Plaintiff's FAC sufficiently alleges that certain statements made by Defendant Hawkins in November and December 2015 were false or misleading. The PSLRA requires that Plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" in making those statements. 15 U.S.C. § 78u-4(b)(2)(A).

The Ninth Circuit has explained that the "required state of mind" is "a mental state that not

only covers 'intent to deceive, manipulate, or defraud,' but also 'deliberate recklessness.'" *In re Quality Sys.*, 865 F.3d at 1144 (quoting *Schueneman v. Arena Pharms.*, 840 F.3d 698, 705 (9th Cir. 2016)). To determine whether Plaintiff has adequately plead a "strong inference" of scienter, the Court must ask: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the influence of scienter as least as strong as any opposing inference?" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). This requires a dual inquiry. First, the Court must "determine whether any of the plaintiff's allegations, standing alone, is sufficient to create a strong inference of scienter." *In re NVIDIA Corp. Securities Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014). Second, if no allegation is alone sufficient, the Court then "consider[s] the allegations holistically to determine whether they create a strong inference of scienter taken together." (*Id.*)

Plaintiff first argues that the fact that the Supply Contract was not executed provides strong evidence of scienter. This argument fails because Plaintiff has not adequately alleged that the Supply Contract was unexecuted. Plaintiff relies almost exclusively on CW1's statements to support his conclusion that the Supply Contract was unexecuted. As detailed above, however, Plaintiff has failed to allege sufficient facts from which it can be inferred that CW1's based his statements on his own personal knowledge or other reliable sources. As such, Plaintiff's contention that the Supply Contract was unexecuted does not give rise to a strong inference of scienter. *See, e.g.*, *Zucco Partners*, 552 F.3d at 996 ("Some of the confidential witnesses were simply not positioned to know the information alleged, many report only unreliable hearsay, and others allege conclusory assertions of scienter. These allegations are not sufficient to raise a strong inference of scienter because they demonstrate that the confidential witnesses are not reliable.").

Plaintiff also contends that Defendants' "subtl[y] shifting" representations regarding the Supply Contract's prepayment terms supports a finding of scienter. The Court has found that Plaintiff has adequately alleged that Hawkins' November and December 2015 statements that the prepayment was "expected" by the end of 2015 were misleading due to his failure to disclose the Ministry of Health's default. Plaintiff, however, has failed to allege any facts supporting an

inference that Hawkins was deliberately reckless in making this statement or intended to mislead investors. *See In re Quality Sys.*, 865 F.3d at 1144. Given the nature of these allegedly misleading statements, the Court cannot strongly infer scienter simply from the fact the statements were made. Even as alleged by Plaintiff, they are not direct falsehoods which conflict with a clear provision of the Supply Contract. Rather, they are statements regarding Hawkins' "expectations" which, taking all inferences in Plaintiff's favor, implicitly created a misleading impression about the Supply Contract's prepayment schedule. While Plaintiff claims that Hawkins' statements reflect a "deliberate effort to conceal the true state of affairs," the statements are also subject to a competing inference that they were intended to be nothing more than Hawkins' then-held belief about when payments actually would be received, and that any misleading implication was inadvertent or the result of an oversight. *See, e.g.*, *Zucco Partners*, 552 F.3d at 991 (plaintiff must plead a "highly unreasonable omission, involving not merely simple, or even inexcusable negligence" (citation omitted)). In sum, these challenged statements may give rise to a possible (or even reasonable) inference of scienter, but the Court finds that they do not give rise to the necessary strong inference based on the facts alleged.[4]

Finally, in the FAC, Plaintiff relies on Hawkins' and Kennedy's stock purchases to establish scienter. "'Unusual' or 'suspicious' stock sales by corporate insiders may constitute circumstantial evidence of scienter. . . ." *In re Quality Systems*, 865 F.3d at 1146 (citation omitted). To determine whether a stock sale is suspicious, the Court considers, *inter alia*, three factors: "(1) the amount and percentage of shares sold; (2) timing of the sales; and (3) consistency with prior trading history.'" *Id.* (quoting *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004)). The Ninth Circuit has explained that stock sales by a company's insiders are "'suspicious only when [they are] dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'" *Align Tech*, 856 F.3d at 621 (quoting *Zucco Partners*, 552 F.3d at 1005).

---

[4] For similar reasons, Plaintiff's reliance on Hawkins' statement that "[w]e have been told the money is set aside" (and related statements) is unavailing. Plaintiff pleads no facts which give rise to a strong inference (as opposed to speculation) that the statements were made with the requisite state of mind.

Plaintiff alleges that in October 2015, Kennedy sold 28,958 shares of Natus Medical stock, worth a total of $1,323,905. (FAC ¶ 104.) During October and November 2015, Hawkins sold 200,000 shares worth a total of $9,422,055. (*Id.* ¶ 106.) This is around the time that Natus Medical's share price allegedly reached its all-time high and after Defendants had announced the Supply Contract. (*See id.* ¶ 12.) However, "[e]ven assuming Defendants sold their stocks at a price that was close to the stock's all-time high, 'this alone is not sufficient for scienter purposes.'" *Fadia v. FireEye, Inc.*, 14-cv-05204-EJD, 2016 WL 6679806, at *16 (N.D. Cal. Nov. 14, 2016) (quoting *In re Tut Sys., Inc.*, 2002 WL 35462358, at *11).

The FAC argues that the suspiciousness of Defendants' fourth quarter 2015 sales is highlighted by the fact that Defendants' gross proceeds from the sale "are more than three times greater than the gross proceeds from [Defendants'] stock sales during the six months preceding the Class Period." (FAC ¶ 103.) In fact, comparing the purportedly suspicious sales to Defendants' trading history over a longer period of time suggests the fourth quarter 2015 stock sales were not "dramatically out of line" with Defendants' prior practices. During the fourth quarter of 2014 (one year prior to the announcement of the Supply Contract), Defendant Hawkins sold 270,000 shares of Natus Medical stock, while Defendant Kennedy sold 45,833 shares. (Dkt. No. 29-21; 29-22.) [5] Both figures are significantly higher than the number of shares these Defendants sold as part of their allegedly "suspicious" stock transactions. Further, during the fourth quarter of 2013, Hawkins sold 206,878 shares of Natus Medical stock, further reinforcing the inference that it was not unusual for him to make large fourth quarter sales of Natus Medical stock. (*See* Dkt. No. 29-21, at 2.)

In the face of this prior trading history, Plaintiff contends that the fourth quarter 2015 sales

---

[5] Defendants have submitted copies of the SEC Form 4 filed by both Defendants in the fourth quarter of 2014 and (for Defendant Hawkins) fourth quarter of 2013 to show the Defendants' stock sales during this time. Even though these documents (or the information contained therein) were not directly referenced in the FAC, the Court may consider them. Plaintiff does not challenge the authenticity of these documents. Further, Plaintiff's scienter allegations in the FAC rely extensively on Defendants' allegedly suspicious trading patterns, information which is disclosed to the public through the Form 4. Under these circumstances, the Court may take judicial notice of the Form 4. *See, e.g.*, *In re Solarcity Corp. Securities Litig.*, 274 F. Supp. 3d 972, 988 (N.D. Cal. 2017); *City of Royal Oak Retirement Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1059 (N.D. Cal. 2012)

United States District Court
Northern District of California

are still suspicious because the *gross proceeds* realized from the sale far exceeded those of prior sales. Plaintiff, however, does not cite any case for the authority that courts should look to the realized proceeds of a sale, and the Court has located none. Instead, the relevant authority directs the Court to examine "the amount and percentage of shares sold." *In re Quality Systems*, 865 F.3d at 1146. As stated above, the number of shares sold by these Defendants during the fourth quarter of 2015 does not appear suspicious in light of Defendants' trading history. Further, Plaintiff has not plead any facts regarding the percentage of their holdings Hawkins and Kennedy sold during the fourth quarter 2015, so the Court cannot compare this to the Defendants' prior sales. On this record, the Court finds that the evidence of Defendants' prior trading history undermines any inference of scienter that may otherwise have arisen from Defendants' fourth quarter 2015 stock sales.[6] *See, e.g.*, *Kovtun v. VIVUS, Inc.*, No. 10-cv-4957-PJH, 2012 WL 4477647, at *21 (N.D. Cal. Sept. 27, 2012); *In re Tibco Software, Inc.*, No. 05-cv-2146-SBA, 2006 WL 1469654, at *21 (N.D. Cal. May 25, 2006).

In light of the above, the Court finds that Plaintiff has failed to plead facts giving rise to a "strong" inference of scienter.[7] Specifically, the Court believes Plaintiff has not demonstrated that the "malicious inference is at least as compelling as any opposing innocent inference." *Zucco Partners*, 552 F.3d at 1006. Accordingly, Defendants' motion to dismiss Plaintiff's section 10(b) claim is granted and the claim will be dismissed. The Court will, however, afford Plaintiff leave to amend to plead additional facts relevant to the question of scienter.[8]

**C. Because the Section 10(b) Claim Fails, the Section 20(a) Claim Also Fails.**

Because Plaintiff has failed to adequately allege a violation of Section 10(b), his section 20(a) claim necessarily fails. *See, e.g.*, *Align Tech.*, 856 F.3d at 623 ("Plaintiff has not sufficiently

---

[6] This ruling is obviously without prejudice to Plaintiff alleging additional facts in his amended complaint which would suggest that, notwithstanding Defendant Hawkins' and Defendant Kennedy's prior fourth quarter stock sales, the fourth quarter 2015 sales were suspicious.

[7] The Court does not address, because it need not at this stage, Defendant's argument that Natus Medical's repurchase of stock between October 2015 and March 2016 negates a finding of scienter.

[8] Because the Court has found that Plaintiff has failed to adequately allege scienter, it need not address the parties' loss causation arguments.

alleged violations of Section 10(b) and Rule 10b-5. And, without 'a primary violation of federal securities law,' Plaintiff cannot establish control person liability." (citation omitted)). Accordingly, Defendants' motion to dismiss this claim is granted, but Plaintiff will be afforded leave to amend.

## CONCLUSION

For the reasons stated above, the Court finds that while Plaintiff has alleged that certain statements made in November and December 2015 were false or misleading, he has failed to allege that Defendants made those statements with the requisite state of mind. As a result, Defendant's motion to dismiss is GRANTED and Plaintiff's Section 10(b) and Section 20(a) claims are DISMISSED. The Court, however, affords Plaintiff leave to amend the FAC so he may attempt to cure the deficiencies identified by this Order.

Plaintiff shall file his second amended complaint by **Friday, April 6, 2018**.

**IT IS SO ORDERED.**

Dated: February 26, 2018

JEFFREY S. WHITE
United States District Judge