1   **GLANCY PRONGAY & MURRAY LLP**
ROBERT V. PRONGAY (#270796)
2   KARA M. WOLKE (#241521)
ALEXA MULLARKY (#307932)
3   1925 Century Park East, Suite 2100
Los Angeles, California 90067
4   Telephone:  (310) 201-9150
Facsimile:   (310) 201-9160
5   Email:  info@glancylaw.com
6
7   *Attorneys for Lead Plaintiff John Costabile*
8
   **UNITED STATES DISTRICT COURT**
   **NORTHERN DISTRICT OF CALIFORNIA**
10
11
   JOHN  COSTABILE,  Individually  and  On
12   Behalf of All Others Similarly Situated,

13                              Plaintiff,

14          v.

15   NATUS   MEDICAL   INCORPORATED,
   JAMES B. HAWKINS and JONATHAN A.
16   KENNEDY,

17                              Defendants.

18

19

| Case No.: 4:17-cv-00458-JSW |

CLASS ACTION

**SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

**DEMAND FOR JURY TRIAL**

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.     NATURE AND BACKGROUND OF THE ACTION ....................................................... 1

II.    JURISDICTION AND VENUE ............................................................................................ 8

III.   PARTIES ............................................................................................................................ 9

IV.   FACTUAL BACKGROUND ........................................................................................... 10

      A.    Defendants Announce The $232.5 Million Supply Contract, Immediately Increase The Company's 2015 Revenue Guidance Based On The Same, And Repeatedly Tout The Supply Contract During The Class Period ......................... 10

      B.    Defendants' Disclosure Duties Regarding The Supply Contract ........................... 12

      C.    Defendants Try To Convince The Market That The Supply Contract Is  Reliable Based On Medix's History With Venezuela, But Misrepresent And  Conceal Major Prior Problems With Venezuela ............................................................................ 12

      D.    The Ministry Fails To Perform Under The Supply Contract, As Defendants Conceal and Misrepresent the Extent of the Default ............................................. 14

V.    MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS ........ 188

VI.   UNDISCLOSED RISKS BEGIN TO MATERIALIZE AND THE TRUTH ABOUT THE SUPPLY CONTRACT EMERGES THROUGH A SERIES OF PARTIAL, YET STILL MISLEADING, DISCLOSURES ...................................................................................... 22

VII.  ADDITIONAL SCIENTER ALLEGATIONS .................................................................. 28

VIII. LOSS CAUSATION .......................................................................................................... 30

IX.   PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ............. 32

X.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ....................................... 33

XI.   CLASS ACTION ALLEGATIONS ................................................................................... 34

XII.  CAUSES OF ACTION ...................................................................................................... 36

XIII. PRAYER FOR RELIEF ..................................................................................................... 38

XIV. DEMAND FOR TRIAL BY JURY ................................................................................... 39

Lead Plaintiff John Costabile ("Plaintiff" or "Lead Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Natus Medical Incorporated ("Natus Medical" or the "Company"), as well as media and analyst reports about the Company and conference call transcripts. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.       NATURE AND BACKGROUND OF THE ACTION

1.       This is a securities class action on behalf of all purchasers of the common stock of Natus Medical (NASDAQ: "BABY") between October 21, 2015 and April 3, 2016, inclusive (the "Class Period"), alleging violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2.       Defendant Natus Medical designs, manufactures and markets newborn care and neurology healthcare products and services worldwide.

3.       On October 16, 2015, Defendants[1] announced that Natus Medical, through its wholly-owned Argentinian subsidiary, Medix I.C.S.A. ("Medix"), had entered into a three-year, $232.5 million supply contract (the "Supply Contract" or "Contract") "to provide medical equipment, supplies and services" to the Ministry of Health of Venezuela (the "Ministry of Health" or "Ministry").

4.       Analysts immediately took note of the apparent significance and materiality of the Supply Contract. An analyst report published by Roth Capital Partners ("Roth") on October 16, 2015 observed that "[t]his is a significant development that will provide material upside versus

---

[1] As alleged herein, "Defendants" includes: Natus Medical; Natus Medical's Chief Executive Officer ("CEO"), James B. Hawkins ("Hawkins"); and Natus Medical's Chief Financial Officer ("CFO"), Jonathan A. Kennedy ("Kennedy").

1  current estimates,..." concluding "we are buyers on this development."

2       5.     A report by William Blair & Co. ("William Blair"), also published on October 16,

3  2015, similarly noted the apparent materiality of the Supply Contract, as it was described by

4  Defendants, to the Company's bottom line:

5       The company intends to offer some forecasting details on the earnings call next
     Wednesday to provide guidance on the pacing of top- and-bottom line

6       contribution,…. Running some math on the details provided Friday suggests that
     there will be material upside to our current estimates from this deal. For example,

7       if we assume a roughly even distribution of business over the three years of the
     agreement, this deal could contribute roughly 20% upside to the top line and 16%

8       upside to the bottom line in 2016 (we assume the company would pay the 34%

10      corporate tax rate in Venezuela).

11      6.     On October 21, 2015, as Defendants had indicated to analysts they would do,

12 Defendants provided additional detail regarding the impact of the Supply Contract on the

13 Company's revenue forecasts. Citing the Supply Contract, Defendants increased Natus Medical's

14 revenue and earnings guidance for both the fourth quarter of 2015 and the fiscal year ending

15 December 31, 2015. In a Form 8-K and press release dated October 21, 2015, Defendants stated:

16      For the fourth quarter of 2015, the Company increased its revenue guidance to
     $102.0 million to $105.0 million and guided non-GAAP earnings per share of

17      $0.47 to $0.49.

18      Full year 2015 earnings guidance was increased with expected non-GAAP

19      earnings per share of $1.51 to $1.53. Full year 2015 revenue guidance also
     increased to $378 million to $381 million compared to previous guidance of $376

20      million to $378 million.

21      7.     During a conference call held the same day, Natus Medical's CEO, James

22 Hawkins, explained that under the Supply Contract, "*we are to receive three payments totaling*

23 *$69 million by the end of the first quarter of 2016*." Commenting that "the large order from

24 Venezuela, uniquely positions Natus for an exciting future," Hawkins presented the Supply

25 Contract as a substantial win for the Company, explaining: "I think we had mentioned a few

26 different times that it was a possibility, even when we acquired Medix five years ago, this was

27 certainly something that we had thought as a possibility. And here it's happened really bigger than

28

1  we thought." Hawkins further explained that "after this contract expires, we do believe there will

2  be a continuing relationship for supplies, other products going forward. So, yes, this contract was a

3  long time in the making, and we're very excited to have it and very pleased about it."

4        8.     Following Defendants' descriptions of the Supply Contract and the Company's

5  increased revenue forecasts, a Roth analyst report published on October 22, 2015 commented,

6  "[a]s for Venezuela, we view the contract as a significant win for Natus as it should provide

7  substantial revenue and earnings growth for the next three years at minimum."

8        9.     Throughout the Class Period, Defendants continued to tout the Supply Contract as a

10  major win. Speaking at the Jefferies Autumn Global Healthcare Conference on November 19,

11  2015, Defendant Hawkins cited the "major contract, [a] supply agreement, with Venezuela where

12  [Natus's] Argentine subsidiary received a $232 million agreement to supply medical products and

13  services to Venezuela over a three-year period" as one of the reasons for the positive trend in

14  revenue and earnings, stating "with Venezuela we are going to have rate growth." Hawkins further

15  stated, "[i]t is a very exciting piece of business. We will be paid up front as we go on this business.

16  *We are looking to get our first payment in by the end of the year*, and those payments would

17  continue throughout the life of the contract."

18        10.    Similarly, during the Piper Jaffray Healthcare Conference held on December 1,

19  2015, Defendants again reiterated the supposed benefits of the Supply Contract. Defendant

20  Hawkins stated that "we have a very large order that we received from Venezuela totaling $232.5

21  million for newborn and obstetric equipment[,] along with supplies and service for over 50

22  hospitals in Venezuela." Hawkins further stated, "*[w]e expect to get our first $23 million payment*

23  *in the weeks ahead* and then we'll be prepaid on all of this as we go forward on a rolling basis.

24  It's quite a big order for us and we are very excited to not only have it ourselves, but also for the

25  babies and mothers in Venezuela."

26        11.    On December 3, 2015, Natus Medical reached its Class Period – and all-time –

27  high intra-day trading price of $51.05 per share.  On December 17, 2015, Natus Medical shares

28  reached a Class Period – and all-time – high closing price of $50.48 per share.

12.     Defendants' next public statement on the Supply Contract came on January 11, 2016, when Defendants issued a press release revealing that the Company expected to fall short of its increased fourth quarter and fiscal year 2015 guidance. Defendants disclosed that the Company now only expected to report fourth quarter revenues of approximately $100 million, compared to its prior guidance of $102 million to $105 million, and fiscal year 2015 revenues of $375.9 million, compared to its prior of $378 million to $381 million. Defendants explained that "[t]he guidance provided by the Company in October for the fourth quarter of 2015 included expected revenue of approximately $4 million under the new Venezuelan Ministry of Health contract," but "[t]he Company was not able to ship product on the anticipated schedule because ***the prepayment under the contract was delayed***." Defendants further explained that "[t]he Company believes the delay was most likely due to a combination of important national elections that occurred in Argentina in November and Venezuela in December, Argentina's currency devaluation in December[,] as well as national Christmas holidays." As a result, Defendants stated that "[t]he Company now expect[ed] to receive prepayment and begin shipments in the first quarter of 2016," and that the first quarter 2016 "guidance include[d] $5 million of revenue from Venezuela and $60 million of revenue for [fiscal year 2016] guidance."

13.     On this news of the revenue miss due to a purported "delay" of "the prepayment" from the Ministry of Health, the price of Natus Medical common stock declined, falling from its close of $43.20 per share on January 8, 2016 to close at $38.25 per share on January 11, 2016, a decline of $4.95 per share, over 11%, on usually high trading of approximately 1.4 million shares – more than four times the average daily volume over the preceding ten trading days. However, due to Defendants' mischaracterization of the Ministry of Health's failure to perform as a mere one-time "delay," their reckless reassurances that the payments and product shipments would begin shortly in the first quarter of 2016, their continued inclusion of revenue from the Supply Contract in the Company's 2016 revenue guidance, and Defendants' concealment of the true terms and risks under the Supply Contract –  including the fact that the Ministry of Health had already defaulted on *three* separately scheduled payments totaling *$69 million*, as opposed to just *one*

"delayed" payment of *$23 million* (*see* ¶18, *infra*) – the price of Natus Medical stock remained artificially inflated.

14.     Indeed, on January 26, 2016, The Motley Fool noted Defendants' preliminary announcement of the fourth quarter 2015 revenue miss, and cited Defendants' explanation for the miss as follows: "[m]anagement blamed the miss on their expectations for $4 million in sales under Natus' new contract with the Venezuelan Ministry of Health that didn't materialize. Apparently, the government never made the prepayment for the contract, so Natus Medical didn't ship any product." Based on Defendants' material omissions and misleading reassurances, however, the article concluded on a positive note, "*[f]ortunately, the issue seems to be worked out, so Natus has $5 million of revenue baked into its guidance for the current quarter [the first quarter of 2016] and $60 million for the full year [2016].*"

15.     Then, on January 27, 2016, Defendants issued a press release announcing final fourth quarter and fiscal year-end 2015 results, and reaffirming that the revenue shortfall in the fourth quarter of 2015 was the result of a purported "delay" in receiving prepayment under the Supply Contract, and that Natus Medical's guidance depended, at least in part, on revenues from the Supply Contract. The press release also referred to unspecified "risks associated with [the Company's] Venezuela contract," although it included no meaningful description of what those risks were.  Despite the supposed "delay" in payment, Defendant Hawkins reassured investors during a conference call the same day that "the funding is there" and that it was "set aside" ready to be paid to the Company.

16.     Following this news, and despite Defendant Hawkins' reassurances, analysts expressed skepticism that the Supply Contract would convey the economic benefits that Defendants had represented. For example, on January 27, 2016, William Blair reported that they were removing revenue from the Supply Contract from their modeling, explaining:

> As the company alluded to in its prerelease, the top line fell short of original guidance by about $4 million due to a delay with the implementation of a recently signed contract with the Venezuelan Ministry of Health. If not for a favorable tax rate, this … would have caused an EPS miss in the quarter.

Regarding Venezuela, management remains optimistic the contract will be executed fairly. *However, it seems clear that the timing of payments and ability to actually record revenue from the prepayments is still uncertain and we remain skeptical that the full $60 million of revenue attributable to the Venezuela contract in 2016 will materialize this year.* As a result, we continue to strongly advise investors to focus exclusively on the impressive performance in the base business.

The company also reiterated first-quarter guidance (revenue of $96.5 million-$97.5 million and adjusted EPS of $0.34-0.35) and 2016 guidance ($445 million-$450 million in revenues and $1.84-$1.88 in EPS), both of which include contribution from Venezuela. *Excluding Venezuela, guidance appears to call for 2%-4% revenue growth and EPS of around $1.67 or $1.68*.

(emphasis added).

17.     On this news and partial materialization of the risk, the price of Natus Medical stock fell once again, from its close of $37.15 per share on January 27, 2016 to close at $34.71 per share on January 28, 2016, a decline of $2.44 per share, on abnormally high trading volume.

18.     On February 29, 2016, Natus Medical filed its Annual Report on Form 10-K for the fiscal year ending December 31, 2015 (the "2015 Form 10-K"). For the first time, Defendants made the Supply Contract itself public, attaching a copy to the 2015 Form 10-K as Exhibit 10.12. The Supply Contract further revealed that *all of* the approximately $69 million in prepayments by the Ministry of Health had in fact been due *before the end of 2015* – not, as Hawkins had previously misrepresented, only one payment of $23 million by the end of the year with the remaining balance of the $69 million prepayment to come the first quarter of 2016. The Contract also revealed that an additional payment of $2,373,344.16 had been due no later than January 15, 2016. The Supply Contract set forth the payment schedule as follows:

- The first 30% of the value of the Contract ($69,752,602.73) was to be paid as a prepayment advance in three parts: (i) $24,413,410.95 due in October 2015; (ii) $22,669,595.89 due in November 2015; and (iii) $22,669,595.89 due in December 2015. *See* Contract, at pp. 6-8.

- The remaining 70% of the value of the Contract was to be paid following

completion of the advance payment, over a period of three years, as follows: (i) $21,360,097.50 for preventive and corrective maintenance was to be paid in nine (9) equal installments over the 36-month duration of the Contract (for nine (9) payments of $2,373,344.16) due no later than the 15th day following the beginning of each 4-month period; and (ii) $132,734,137.38 for the supply of devices and consumables, was to be paid in partial payments on the 30th day after shipments were made by Medix/Natus.  *See* Contract, at pp. 8-9.[2]

19.     None of the foregoing required payments were made.

20.     Defendants' misrepresentations of the Supply Contract's payment terms, as well as their omissions and misrepresentations of the Ministry's default, materially misled investors during the Class Period.

21.     As previously unbeknownst to investors, the Supply Contract actually had been in default for months during the Class Period, with three separate payments owed under the Contract having been missed and already past due by January 1, 2016, an additional payment of $2.373 million missed on January 15, 2016. The Company was not experiencing a mere one-time "delay" in just the first payment owed due to elections, currency devaluation and/or Christmas, as Defendants had represented in January 2016.  Prior to the disclosure of the Supply Contract, Defendants materially misled investors by effectively hiding the Supply Contract's prepayment schedule, and thus the true fact and extent of the Ministry of Health's default, from investors.

22.     On this news, the price of Natus Medical stock once again declined, falling from its close of $37.21 per share on February 26, 2016 to close at $36.32 per share on February 29, 2016. Because the full extent of the risks underlying the Supply Contract remained concealed from the

---

[2] The Contract is attached as Exhibit A hereto.  The amounts described at pp. 6-9 of the Contract total approximately $223.8 million.  Page 5 of the Contract includes a more detailed breakdown of the equipment and services covered, and the dollar amount associated with each, which reflects a total Contract value of $232,508.675.75.  While this appears to reveal a discrepancy within the Contract as to its total value, whether the amount was $232.5 million or $223.8 million is not material to this Complaint or Plaintiffs' case.  Plaintiffs will defer to the $232.5 million figure cited by Defendants during the Class Period.

1   market, however, the Company's stock price remained artificially inflated. Indeed, as late as
2   March 14, 2016, Defendants Hawkins continued to assure investors that "*we really believe this is*
3   *going to happen*." (emphasis added).

4        23.    Finally, on April 4, 2016, Defendants issued a press release announcing the
5   Company's preliminary first quarter 2016 results. The release disclosed that "[r]evenue for the
6   first quarter of 2016 is expected to be approximately $87.5 million versus previous guidance of
7   $91.5 million to $92.5 million, excluding revenue from the Venezuela Ministry of Health
8   contract." The release disclosed that Natus Medical did not have "'any revenue associated with the
10  Venezuela Ministry of Health contract as [it] did not receive any prepayments during the
11  quarter.'" On this news and materialization of the risk, the price of Natus Medical stock declined
12  precipitously, falling from its close of $39.64 per share on April 1, 2016 to close at $31.84 per
13  share on April 4, 2016, a decline of $7.80 per share, or nearly 20%, on unusually high trading
14  volume of more than 2.7 million shares, or more than eight times the average daily trading volume
15  over the preceding ten trading days.

16       24.    When the Company finally released its first quarter 2016 results on April 20, 2016,
17  Defendants slashed the Company's fiscal year 2016 guidance, and conceded that they could "no
18  longer include revenue or earnings from the agreement in . . . guidance until there is more clarity"
19  on the Ministry's performance under the agreement.

20       25.    As a result of Defendants' false and misleading statements as alleged herein, Natus
21  Medical stock traded at artificially inflated prices during the Class Period, reaching $51.05 per
22  share in intraday trading on December 3, 2015 – an all-time high. As a result of the above-
23  recounted revelations hitting the market, the Company's shares were hammered by massive sales
24  as the truth was revealed, causing a total price drop of over $16 per share.

25  **II.    JURISDICTION AND VENUE**

26       26.    The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15
27  U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5. Jurisdiction is conferred by
28  §27 of the Exchange Act, 15 U.S.C. §78aa.

27.     Venue is proper in this district pursuant to §27 of the Exchange Act. The acts and transactions giving rise to the violations of law complained of occurred and Natus Medical's headquarters are located in this District.

**III.    PARTIES**

28.     Lead Plaintiff John Costabile, as set forth in the Certification previously filed and incorporated herein by reference, acquired Natus Medical common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures and materialization of the previously undisclosed risks.

29.     Defendant Natus Medical, based in Pleasanton, California, designs, manufactures, and markets newborn care and neurology healthcare products and services worldwide. During the Class Period, shares of Natus Medical traded in an efficient market on the NASDAQ under the ticker symbol "BABY."

30.     Defendant Hawkins has served as the CEO of Natus Medical and a member of its Board of Directors since April 2004 and throughout the Class Period. Hawkins also served as the President of Natus Medical from April 2004 through January 2011, and from June 2013 throughout the Class Period.

31.     Defendant Kennedy has served as the Senior Vice President and CFO of Natus Medical since April 2013 and throughout the Class Period.

32.     Defendants Hawkins and Kennedy are sometimes together referred to herein as the "Individual Defendants."

33.     During the Class Period, the Individual Defendants ran Natus Medical as "hands-on" managers overseeing Natus Medical's operations and finances,[3] and they made the material false and misleading statements described herein. The Individual Defendants had intimate

---

[3] *See* http://investor.natus.com/management-team (last visited on April 6, 2018) (representing that Defendant Hawkins had "highly relevant leadership experience in the medical technology industry" and a "unique perspective on [the Company's] operations due to his position as [its] Chief Executive Officer[;]" while Defendant Kennedy had financial expertise, including as a Certified Public Accountant).

knowledge about core aspects of Natus Medical's financial and business operations, including its major contracts and revenue sources, such as the Supply Contract. Indeed, the Individual Defendants commented repeatedly on the status of payments purportedly due under the Supply Contract, and were intimately involved in deciding which disclosures would be made by Natus Medical. Indeed, the Individual Defendants made various public statements on behalf Natus Medical during the Class Period and participated in all Class Period investor conferences, wherein they represented to investors that they were knowledgeable on the topics about which they spoke.

## IV.   FACTUAL BACKGROUND

### A.   Defendants Announce The $232.5 Million Supply Contract, Immediately Increase The Company's 2015 Revenue Guidance Based On The Same, And Repeatedly Tout The Supply Contract During The Class Period

34.     On October 16, 2015, Natus Medical filed a Current Report on Form 8-K with the SEC, signed by Defendant Kennedy, attaching a press release which announced that on October 15, 2015, the Company had, through its Medix subsidiary, "entered into a supply agreement with the Ministry of Health of Venezuela ('Ministry of Health') to provide medical equipment, supplies and services over a three-year period, including certain third party products." The press release described the terms of the Supply Agreement, in relevant part, as follows:

> Under the terms of the Supply Agreement, products and services will be delivered pursuant to prepayments made by the Ministry of Health. ***Prepayments totaling approximately $69 million are expected by the first quarter of 2016***. Payments will be received in Argentine Pesos based on the current exchange rate of the U.S. dollar and the Argentine Peso at the time of payment. The agreement may be cancelled at any time by the Ministry of Health except for the amount of any prepayments. If fully performed, ***the total sales under the agreement would aggregate $232.5 million.***

(emphasis added).

35.     On October 21, 2015, Natus Medical filed a Current Report on Form 8-K with the SEC, signed by Defendant Kennedy, attaching a press release and announcing the Company's third quarter 2015 results. Defendants increased the Company's fourth quarter and full-year 2015 revenue guidance based on the Supply Contract, and Defendant Hawkins was quoted as

commenting positively on the Supply Contract, stating in relevant part:

> I am most satisfied that we achieved a 20% non-GAAP operating profit margin during the quarter and am now confident that we will exceed our full year non-GAAP operating margin goal of 18%. We are increasingly confident that we can achieve and potentially exceed our long term operating margin goal of 20% in 2016.… ***In addition to our record performance during the quarter, we recently secured a $232.5 million, three-year agreement between our Argentina subsidiary, Medix, and the Venezuelan Ministry of Health.*** This agreement will provide over fifty hospitals with a broad range of obstetric and neonatal devices, supplies and services including more than $50 million of Medix and Natus equipment and supplies.

*     *     *

> ***For the fourth quarter of 2015, the Company increased its revenue guidance to $102.0 million to $105.0 million and guided non-GAAP earnings per share of $0.47 to $0.49.***

> ***Full year 2015 earnings guidance was increased with expected non-GAAP earnings per share of $1.51 to $1.53. Full year 2015 revenue guidance also increased to $378 million to $381 million compared to previous guidance of $376 million to $378 million.***

(emphasis added).

36.     During a conference call held the same day, Defendant Hawkins confirmed that revenue from the Supply Contract was factored into the Company's increased fourth quarter 2015 guidance, stating that "we put in a couple million dollars in there," but claiming that this estimate and the forecasted economic impact of the Supply Contract was "***conservative***," and that "***[i]t's sort of a practice of ours anyway. We'd rather be on the conservative side***, and if we do better, great." (emphasis added).

37.     During the November 19, 2015 Jefferies Autumn Global Healthcare Conference, Defendant Hawkins continued to assure investors that the Supply Contract would positively impact the Company's financial results, stating: "***with Venezuela we are going to have rate growth*** … So, we are quite happy overall of just keeping to what we are doing and ***growing the business and growing earnings***." (emphasis added).

38.     On December 1, 2015, Defendant Hawkins again touted "***a very large order that***

*we received from Venezuela totaling $232.5 million* for newborn and obstetric equipment along with supplies and service for over 50 hospitals in Venezuela." Hawkins continued, "*We look for some of these revenues to start in December. We expect to get our first $23 million payment in the weeks ahead and then we'll be prepaid on all of this as we go forward on a rolling basis. It's quite a big order for us and we are very excited to not only have it ourselves, but also for the babies and mothers in Venezuela*." (emphasis added).

### B. Defendants' Disclosure Duties Regarding The Supply Contract

39.     Item 1.01 of the Instructions to SEC Form 8-K and the SEC's interpretive releases require the disclosure of the material terms of any "Material Definitive Agreement" entered into by issuers within four business days.[4] These rules also state that the SEC "encourage[s] companies to file the [contract as an] exhibit with the Form 8-K when feasible, particularly when no confidential treatment is requested."[5] Despite this directive, Defendants first made the Supply Contract available to investors on February 29, 2016, when it was attached as Exhibit 10.12 to the Company's 2015 Form 10-K, and only after a number of prepayments due under the Supply Contract were already months in default.

40.     Of course, Defendants also were required to disclose all such material information necessary in order to make their statements made about the Contract, in light of the circumstances under which they were made, not misleading.

### C. Defendants Try To Convince The Market That The Supply Contract Is Reliable Based On Medix's History With Venezuela, But Misrepresent And Conceal Major Prior Problems With Venezuela

41.     Defendants touted a previous supply contract and the "ongoing relationship" between Medix and Venezuela as precedent for the supposed success and certainty of the Supply Contract. For example, on October 21, 2015, Defendant Kennedy stated:

---

[4] *See* Form 8-K, Item 1.01 of General Instructions, Information to be Included in the Report, at p.4; *see also* Final Rule: Additional Form 8-K Disclosure Requirements and Acceleration of Filing Date, 69 F.R. 15594, at 15597 (Mar. 25, 2004).

[5] *See* Final Rule, 69 F.R., at 15597, *supra* n. 4.

*The other comment to make about this, this isn't the first contract with Venezuela that Medix has entered into. So this is a continuation of an ongoing relationship. While it's lumpy, it comes over the course of several years. The orders are typically very large, and stretch out over many years. So when we acquired Medix in 2010, they had just completed, I want to say, about a $100 million deal with Venezuela.* So there is an ongoing relationship between Medix and other South American countries that is valuable.

(emphasis added).

42.     Similarly, during the November 19, 2015 Jefferies Autumn Global Healthcare Conference, Defendant Hawkins responded to a Jefferies analyst who directly questioned the likelihood of payment under the Supply Contract, stating:

Jefferies: So, when you receive this $200 million plus contract *how certain are you that [Venezuela is] going to be able to perform against that contract and that you will actually receive those monies over the next three years?*

Hawkins: Yes, so, always a potential risk with any contract. The one thing I would say with this one, before we bought our subsidiary, which is located in Buenos Aires, which is who received this order, a company called Medix, *they had received an $82 million order maybe seven years ago and it came through just fine. The money showed up as expected, and it did happen.*

*So, we have pretty good confidence that it should happen. We have been told the money is set aside, and we are looking to get our first payment here by the end of December*.

(emphasis added).

43.     Confidential witnesses in a position to know the history between Medix and the government of Venezuela paint a different picture of the previous supply contract, however, and their accounts refute Hawkins' claim that "[t]he money showed up as expected[.]"

44.     For example, CW2, who was Natus Medical's Director of Operations in Argentina from January 2011 through February 2013, confirms that this prior contract between the Ministry of Health and Medix was troubled during CW2's tenure at Natus Medical, explaining that: "The contract with Venezuela was always in the air. Medix was always trying to close it." CW2 reported that "there were issues with the last part of the payment," and "a history of difficulties with payments with Venezuela."  CW2 explained that "everybody [at Medix] knew Venezuela

was a really risky country so everybody knew to sign a contract with Venezuela has a lot of risks" and that with respect to making payments under its contractual obligations, "Venezuela has never been reliable at all."

45.     CW3, a Regional Sales Manager for Natus Medical in Latin America from 2005 to July 2015, recalled that payment under a previous contract with Venezuela "very late – a very late payment. One or two years late."  CW3 was personally involved in trying to secure a $20,000 payment from Venezuela that Venezuela owed to Medix under a smaller contract entered into in or around 2013.  CW3 recounts that Venezuela was over a year late, maybe as much as two years late, in making the payment.  CW3 further recounted that "Venezuela is a country that everybody in Latin America knows doesn't pay[.]  I, as a manager, wouldn't do a contract for millions of dollars with a country like Venezuela. It's very probable they're not going to pay." CW3 continued, "Everybody who works in Latin America knows Venezuela isn't going to pay anybody. Even in 2015, Venezuela was already in a huge financial crisis. I'm surprised that a big company like Natus or Medix would do a contract like that. I'm surprised. Really surprised."  CW3 explained that CW3 formed this impression based on CW3's professional experience working in sales in Latin America, and based on CW3's prior experience at Medix with the government of Venezuela, specifically.

**D.     The Ministry Fails To Perform Under The Supply Contract, As Defendants Conceal and Misrepresent the Extent of the Default**

46.     The terms of the Supply Contract – which were not publicly available until February 29, 2016 – required payments totaling 30% of the value of the Contract to be made as an advance to the Company on the following schedule: (i) $24,413,410.95 due in October 2015; (ii) $22,669,595.89 due in November 2015; and (iii) $22,669,595.89 due in December 2015, ***for a total pre-payment advance of $69,752,602.73 due to the Company before the end of 2015***.  *See* Contract at pp. 6-8.

47.     The remaining 70% of the value of the Contract (approximately $162.75 million)

1    was to be paid over the next three (3) years (or 36 months),[6] in the total amount of approximately

2    $132,734,137.38 for the supply of devices and consumables (as shipments were made), and an

3    additional $21,360,097.50 (due in nine equal installments, each to be paid every four months, over

4    the 36-month term) for preventive and corrective maintenance services.  Thus, under this schedule,

5    an additional payment of $2.373 million for preventive and corrective maintenance would have

6    been due by the 15th day following the beginning of the next quarter (*i.e.*, by January 15, 2016).

7    *See* Contract, at pp. 8-9.

8         48.    None of the foregoing required payments was timely made.  In fact, no payment

10   under the original Supply Contract was *ever* made.  Instead, on September 6, 2016 – almost a year

11   after the Supply Contract was originally announced – Defendants announced that the Company

12   had received "an initial payment" of $20 million under an amended agreement with the Ministry

13   of Health that was worth a total of only $120.7 million (approximately half the value of the

14   original Supply Contract).  That new agreement called for six installments of approximately $20

15   million to be paid by the Ministry to Medix/Natus (one payment every six months for three years).

16   Thus far, Natus has reported receiving only the first payment.

17        49.    Information provided by CW1 – who was the Ministry of Health's General

18   Manager of Supplies from March 2013 through January 2016 and the Ministry's Purchasing

19   Coordinator from February 2016 to July 2016 – sheds light on the circumstances surrounding the

20   Ministry's nonpayment under the original Contract during the Class Period.  As the General

21   Manager of Supplies, CW1 was responsible for tracking and verifying that the Ministry was

22   receiving all supplies, equipment and services due to it in accordance with its contracts with

23   vendors and suppliers.  As such, CW1 had access to and maintained records of the Ministry's

24   supply and service contracts, such as the Contract at issue in this case, and tracked what supplies

25   or services were owed to the Ministry thereunder and verified the Ministry's receipt of the same.

26   As the Ministry's Purchasing Coordinator, CW1 had responsibility for selecting suppliers,

27   _____

28   [6] Dividing this remaining $162.75 million value of the Contract across the 3-year term, the value
of the Contract was approximately $54.25 million per year.

negotiating supply and service contracts, and ensuring that the Ministry was performing its payment obligations under its supply and service contracts.  As such, CW1 had access to and maintained records of all payments due and owing by the Ministry under contracts such as the Supply Contract at issue in this case.

50.     As the General Manager of Supplies during the fourth quarter of 2015, CW1 was not aware of any contract with Medix during that time, and CW1 was not expecting any provision of supplies or services from Medix during that time.  Moreover, according to CW1, no payments were scheduled as due or owing by the Ministry of Health to Medix/Natus, or otherwise relating to the Supply Contract at issue, during the fourth quarter of 2015 or the first quarter of 2016.  As the Purchasing Coordinator in early 2016, responsible for tracking the Ministry of Health's contracts and debts, CW1 had access to records which reflected the Ministry of Health's contractual obligations, including, specifically, access to the Ministry's records of its contractual obligations dating back to the year 2015, which CW1 reviewed.  CW1 reports that neither the specific Supply Contract at issue in this litigation, nor any other contractual payment obligation owed to Medix/Natus, was reflected in the record of Ministry contracts for 2015 or 2016, to which CW1 had access.  Indeed, CW1 confirms that no payments were being prepared to be made by the Ministry of Health to Medix/Natus at any point during CW1's tenure as the Purchasing Coordinator in the first quarter of 2016.

51.     Having told investors on November 19, 2015 and December 1, 2015 that only one $23 million payment was expected by the end of the year, and having concealed the true terms of the Supply Contract *which required the entire $69 million to be paid by the end of 2015*, Defendants materially misrepresented the extent of the Ministry's default when they announced on January 11 and 27, 2016 that "*the prepayment* under the contract was delayed" – misleading investors to believe that only a single $23 million payment was then late.

52.     During the first quarter of 2016, having successfully obfuscated the true extent of the Ministry's default, Defendants continued to tout the value of the Contract and lull investors in to a misleading sense of confidence in the Contract.  On the Company's January 27, 2016

conference call, Defendant Hawkins continued to tout the Supply Contract, insisting that "***the large order from Venezuela uniquely positions Natus for an exciting future***." (emphasis added). Later, when asked by an analyst during the January 27, 2016 conference call, "[w]hat gives you confidence that that contract will begin this quarter," Defendant Hawkins reiterated that he was "***very confident that this business will happen***" (emphasis added). Similarly, when questioned by an analyst whether it was "***safe to assume guidance implies about $0.20 in earnings from Venezuela this year***" (emphasis added), Defendant Hawkins responded "yes."

53.     Moreover, Hawkins internally acknowledged the importance of the Supply Contract to Natus Medical's stock price at the Company's annual sales meeting held in late January or early February 2016.  As reported by CW4, who was employed as a newborn sales representative for the region covering Michigan, Ohio, and Indiana for six years (including during the entire Class Period), Defendant Hawkins described the importance of the Supply Contract during the Company's annual sales meeting in early 2016, explaining that the Contract would increase the Company's stock price.

54.     Thus, as late as March 14, 2016, Defendants continued to tout the Supply Contract. Presenting at a Roth investor conference, Hawkins insisted that "***we really believe this is going to happen***." (emphasis added). Hawkins explained that the Company had "an agent there that is the number one distributor and supplier of product in Venezuela who we rely upon to really give us this feedback."

55.     Then, only about two weeks later on April 4, 2016, Defendants admitted that no payment was made by the Ministry during the first quarter and the Company missed its first quarter guidance as a result.  In response, the Company's stock price plummeted, dropping by $7.80 per share. On April 20, 2016, conceding that no payment was expected to be forthcoming from the Ministry of Health, Defendants announced that the Company would "no longer include revenue or earnings from the agreement" in its revenue guidance.

/ / /

## V.   MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS

56.   On October 21, 2015, Defendants announced that they were increasing the Company's fourth quarter and year-end 2015 revenue guidance to incorporate revenue from the Supply Contract, and Defendants Hawkins and Kennedy held a conference call with analysts and investors. During the conference call, Defendant Hawkins misleadingly described the Supply Contract as follows:

> Last Friday we announced that Medix, our Argentine subsidiary, signed a three-year agreement with the Ministry of Health of Venezuela for $232.5 million to supply Venezuela with neonatal and obstetric equipment supplies and services. ***As stated in our filing, we are to receive three payments totaling $69 million by the end of the first quarter of 2016. Prepayments are to continue throughout the contract period as we fulfill our requirements***. We expect to commence on this contract in our fourth quarter, but revenue is expected to be minimal in the fourth quarter.

(emphasis added).

57.   Defendant Hawkins further misrepresented the Supply Contract in response to analyst questioning during the October 21, 2015 conference call. For example:

> Roth Capital Partners: I wanted to start on the Venezuelan contract; hoping you could provide a little bit more color just on how we should think about that contract contributing next year, both in terms of revenues and earnings, and the cadence of when those prepayments expected by the first quarter will be recognized as revenues throughout 2016.

> Defendant Hawkins: [I]t will probably be fairly even throughout the three years … ***We expect to receive some payments here by the end of the year, to start those three payments totaling the $69 million. And then to – most likely those would extend into the first quarter of next year*** … As we – way this contract is, we're ***going to be prepaid throughout the entire contract***. So we'll ship after we get prepaid. We'll get more prepayments, and it will have that kind of cadence.

(emphasis added).

58.   The above-quoted statements from the October 21, 2015 conference call (¶¶56, 57), including Hawkins' statement that under the Contract, "we [Natus Medical] are to receive three payments totaling $69 million by the end of the first quarter of 2016[,]" were materially false and misleading because they misrepresented and clearly conflicted with the terms of the Supply

Contract, which required three independent pre-payments to be separately paid in each October, November, and December 2015, *such that the entire $69 million was actually due before the end of the year 2015*. Hawkins' statements that "we expect to receive some payments here by the end of the year, to start those payments totaling the $69 million" and that "those [payments] would extend into the first quarter of next year" were similarly materially false and misleading because Hawkins omitted the material fact that the Supply Contract actually required *the entirety* of the $69 million in prepayments to be completed by the end of December 2015.

59.     On November 19, 2015, Defendant Hawkins presented for Natus Medical at the Jefferies Autumn Global Healthcare Conference. Opening his remarks, Defendant Hawkins reiterated the guidance provided on October 21, 2015, stating: "[t]o look at our financials, which we are very proud of, we've been able to show very consistent revenue growth over the last few years. ***And we have guided to almost $380 million mid guidance this year***." (emphasis added). Further, expressly lauding the supposedly lucrative Supply Contract, Defendant Hawkins stated:

> We also recently announced a major contract, supply agreement, with Venezuela where our Argentine subsidiary received a $232 million agreement to supply medical products and services to Venezuela over a three-year period. Not only is this for our products, but a variety of newborn care and obstetric products to service over 50 hospitals in Venezuela.
>
> You can see that the Natus products represent about $50 million and the other products that we will be bringing in and then also the service, warranty, installation and all that is for the rest of the contract. It is a very exciting piece of business. We will be paid up front as we go on this business.
>
> ***We are looking to get our first payment in by the end of the year***, and those payments would continue throughout the life of the contract.

(emphasis added).

60.     Also during the November 19, 2015 Jefferies Autumn Global Healthcare Conference, Defendant Hawkins responded to a Jefferies analyst who directly questioned the likelihood of payment under the Supply Contract, stating:

> Jefferies: So, when you receive this $200 million plus contract ***how certain are you that [Venezuela is] going to be able to perform against that contract and***

*that you will actually receive those monies over the next three years?*

Hawkins: Yes, so, always a potential risk with any contract. The one thing I would say with this one, before we bought our subsidiary, which is located in Buenos Aires, which is who received this order, a company called Medix, they had received an $82 million order maybe seven years ago and it came through just fine. The money showed up as expected, and it did happen.

So, we have pretty good confidence that it should happen. *We have been told the money is set aside, and we are looking to get our first payment here by the end of December*.

(emphasis added).

61.     The above-quoted statements from the November 19, 2015 Jefferies Autumn Global Healthcare Conference (¶¶59, 60) were materially false and misleading because Defendant Hawkins misrepresented and failed to disclose that: (i) pursuant to the terms of the Supply Contract, three independent pre-payments were separately due in October, November, and December 2015, not, as Defendant Hawkins had represented, the "first payment [] by the end of December" or the "first payment in by the end of the year[;]" (ii) the Ministry of Health had *already* defaulted on its first $24 million pre-payment due under the terms of the Supply Contract, and the *second* pre-payment (of $23 million) was actually due to be paid *before the end of November 2015*; and (iii) as a result of the foregoing, Defendants were aware of undisclosed facts tending to seriously undermine the Company's 2015 financial guidance, which Defendants had increased in October 2015 to incorporate revenue from the Supply Contract.

62.     On December 1, 2015, Defendant Hawkins presented for Natus Medical at the Piper Jaffray Healthcare Conference, during which he opened his remarks by reiterating the increased 2015 guidance: "[y]ou can see that our revenues have been growing nicely, *and we've guided this year to $378 million to $381 million*." (emphasis added). Defendant Hawkins proceeded to, again, laud the allegedly lucrative and financially important Supply Contract, stating:

Another announcement that we recently made: *we have a very large order that we received from Venezuela totaling $232.5 million* for newborn and obstetric

equipment along with supplies and service for over 50 hospitals in Venezuela. This is an order that will be over three years. We have a Venezuelan partner that will be responsible for doing all the installation, training, and service and we're going to be the ones selling our products along with purchasing other products.

As you can see from the graph here, approximately $51 million is products that Natus manufacturers, with the remainder being other people's products. And that also then breaks down into equipment, supplies, and services, as you can see in the bar chart.

***We look for some of these revenues to start in December. <u>We expect to get our first $23 million payment in the weeks ahead</u> and then we'll be prepaid on all of this as we go forward on a rolling basis.*** It's quite a big order for us and we are very excited to not only have it ourselves, but also for the babies and mothers in Venezuela.

63.     Later, during the Q&A session of the December 1, 2015 Piper Jaffray Healthcare Conference, Defendant Hawkins gave "a little more color" on the Supply Contract "and certainty of revenue," without disclosing the fact that the Venezuelan government had ***already*** failed to make any of the required prepayments under the Supply Contract. Similarly, instead of disclosing the fact that the Supply Contract was apparently contingent on political and economic circumstances in Venezuela (an assertion Defendants would make in January 2016), Defendant Hawkins claimed that Venezuela was following through on a "commitment" to make the required payments, stating in pertinent part as follows:

Sure. The question was for those that are listening on the Venezuela contract, a little more color on that and the certainty of revenue. How are we going to get paid and all of that.

Well, certainly, it's a very interesting situation. The order has come through our Argentinean subsidiary, which is one of the largest, if not the largest, medical device company in Argentina. Argentina has a very strong relationship with Venezuela that Argentina historically has had a commitment: whenever they buy oil outside of Argentina, they buy it from Venezuela. And Venezuela has said whenever we buy medical devices, when appropriate, we'll buy them through Argentina.

And with that, there's been this balance of trade situation that Argentina has bought a lot more oil than Venezuela has bought medical devices. So it's now such that ***Venezuela is now exercising this commitment to fund the medical device purchases***.

The money is being [sic] that we are receiving for this purchase is all in US dollars. And there always is some potential currency risk as we transfer those dollars into Argentine pesos to do the purchasing and delivering of product. ***But overall, over this three-year period, we are convinced it's going to be a good piece of business for us***.

***It will have average corporate margins of 18% to 20%***. And although the gross profits won't be near that, but the bottom line operating margin should be the same. So we are quite encouraged. ***<u>We're expecting to get payment here in the next few weeks</u>** and looking for this to kick off, Bill*.

(emphasis added).

64.     The above-quoted statements from the December 1, 2015 Piper Jaffray Healthcare Conference (¶¶62, 63) were materially false and misleading because Defendant Hawkins misrepresented and failed to disclose that: (i) pursuant to the terms of the Supply Contract, independent pre-payments were separately due in October, November, and December 2015, not, as Hawkins had represented, just the first $23 million payment "in the weeks ahead" or "in the next few weeks[;]" (ii) the Ministry of Health had *already* defaulted on both its first and second pre-payments (totaling $47 million) due under the terms of the Supply Contract, and the *third* pre-payment (of $23 million) was actually due to be paid before the end of December 2015; and (iii) as a result of the foregoing, Defendants were aware of undisclosed facts tending to seriously undermine the Company's 2015 financial guidance, which Defendants had increased in October 2015 to incorporate revenue from the Supply Contract.

## VI.     UNDISCLOSED RISKS BEGIN TO MATERIALIZE AND THE TRUTH ABOUT THE SUPPLY CONTRACT EMERGES THROUGH A SERIES OF PARTIAL, YET STILL MISLEADING, DISCLOSURES

65.     On January 11, 2016, Natus Medical filed a Current Report on Form 8-K with the SEC, signed by Defendant Kennedy, attaching a press release announcing its first quarter and fiscal year 2016 financial guidance, which revealed that the Ministry had not made *any* payment under the Supply Contract due to a purported "delay," which Defendants explained caused Natus Medical to miss its earnings guidance:

For the full year 2016, the Company expects to report revenue of $445 million to

$450 million and non-GAAP earnings per share of $1.84 to $1.88. For the first quarter of 2016, the Company expects to report revenue of $96.5 million to $97.5 million and non-GAAP earnings per share of $0.34 to $0.35, an increase of 10% to 13% over the first quarter of 2015 non-GAAP earnings per share of $0.31.

The Company expects to report revenue of approximately $100.0 million for the fourth quarter of 2015, compared to prior guidance of $102.0 million to $105.0 million and full year 2015 revenue of $375.9 million compared to prior guidance of $378.0 million to $381.0 million. ***The guidance provided by the Company in October for the fourth quarter of 2015 included expected revenue of approximately $4 million under the new Venezuelan Ministry of Health contract. The Company was not able to ship product on the anticipated schedule because the prepayment under the contract was delayed.*** The Company believes the delay was most likely due to a combination of important national elections that occurred in Argentina in November and Venezuela in December, Argentina's currency devaluation in December as well as national Christmas holidays. ***The Company now expects to receive prepayment and begin shipments in the first quarter of 2016. The first quarter 2016 guidance includes $5 million of revenue from Venezuela and $60 million of revenue for the full year guidance.***

(emphasis added).

66.     On this revelation, the price of Natus Medical common stock declined, falling from its close of $43.20 per share on January 8, 2016 to close at $38.25 per share on January 11, 2016, a decline of almost $5, or 11%, on usually high trading of approximately 1.4 million shares, more than four times the average daily volume over the preceding ten trading days.

67.     Notwithstanding the partial disclosure and partial materialization of risk, Defendants' statements in the January 11, 2016 Form 8-K and press release were materially false and misleading because Defendants failed to disclose all such material information necessary in order to make their statements, in light of the circumstances under which they were made, not misleading.  Specifically: (i) because Defendants had previously told investors that only the "first" prepayment of $23 million under the Contract was expected in December 2015, investors were thus misled to believe that only a single $23 million payment was "delayed," and Defendants continued to effectively hide the Supply Contract's actual payment requirements (which required the entire $69 million in prepayments to be made *before the end of 2015*) – thus concealing the extent of the Ministry of Health's default – from investors; and (ii) as a result of Defendants'

concealment of the Contract's true payment terms and their omission of the extent of the Ministry of Health's default, Defendants' blaming the Ministry's non-payment on a purportedly one-time "delay" caused by elections, currency devaluation, and Christmas was false and misleading. Moreover, as a result of the foregoing (*i.e.*, that the Contract was actually $69 million in default, rather than only $23 million as investors were misled to believe), there existed facts known to Defendants but unknown to investors which tended to seriously undermine the Company's 2016 financial guidance, which included $5 million of revenue from the Supply Contract in first quarter 2016 guidance and $60 million of revenue from the Supply Contract in full year guidance. And as a result of the foregoing, the stock price remained artificially inflated.

68.   Indeed, analysts believed, and repeated, Defendants' false narrative. For instance, Roth Capital Partners' "Company Note" issued on January 12, 2016, referred to a "delay with [the Company's] Venezuela contract" and stated that, "[w]hile Venezuela remains an uncertainty, ***management is confident shipments will begin in 1Q***." (emphasis added).

69.   Similarly, on January 20, 2016, Roth published a "FLASH NOTE" entitled "BABY 4Q Preview: Preannouncement Should Leave Little Surprise," in which Roth stated that it received the following additional reassurances from Natus Medical's management:

- Based on our discussions, management remains confident the contract should begin this quarter after political elections in Argentina and Venezuela, along with the Argentinian currency devaluation, all of which occurred in 4Q, caused the delay.

- Management has assumed it will receive Venezuelan prepayments by the end of February and begin shipping on the contract thereafter, which would allow Natus to record ~$5 million of revenues in 1Q and remain on track with the $60 million revenue assumption imbedded in its 2016 guidance.

70.   Next, On January 27, 2016, Natus Medical filed a Current Report on Form 8-K with the SEC, signed by Defendant Kennedy, attaching a press release reaffirming that the revenue shortfall in the fourth quarter of 2015 was a result of the purported "delay" in receiving prepayments under the Supply Contract, and that Natus Medical's guidance depended on revenues

from the Supply Contract. The release also reiterated the Company's 2016 financial guidance, including "revenue from our recently signed Venezuela supply contract of approximately $5.0 million for the first quarter of 2016 and $60.0 million revenue for the full year 2016[,]" and disclosed unspecified "risks associated with our Venezuela contract."

71.    On a conference call held the same day, Defendant Hawkins stated that, "the guidance…provided in October 2015 included expected revenue of approximately $4 million under the new $232 million Venezuela Ministry of Health contract to supply neonatal and obstetric equipment," but claimed that the Company "did not ship product on the anticipated schedule because *the* prepayment under the contract was delayed." Later in the call, Defendant Hawkins confirmed that "[t]he first-quarter [2016] revenue guidance includes approximately $5 million from the Venezuela contract" and that the "[f]ull-year [2016] revenue guidance includes approximately $60 million from the Venezuela contract."

72.    The above-quoted statements in the January 27, 2016 Form 8-K and press release and conference call (¶¶70, 71), including the Company's 2016 revenue guidance and Defendants' mischaracterization of the Ministry of Health's failure to perform as a mere "delay," were false and misleading for the same reasons as set forth in ¶67, *supra*.  Moreover, by January 27, 2016, Defendants knew, and investors did not, that *another* payment for approximately $2.373 million for preventive and corrective maintenance under the Supply Contract had also been missed.

73.    Defendant Kennedy provided similar false assurances as to the economic benefits of the Supply Contract, when, during the January 27, 2016 conference call, he responded to an analyst's question asking for information on the gross margin associated with the Supply Contract by stating: "***The operating piece we can pretty much predict. If I had a gun to my head and had to predict, it's probably in the mid-40%s for a gross profit margin, and Jim said just under 20% for the operating***." (emphasis added).

74.    Defendant Kennedy's above-quoted statement from the January 27, 2016 conference call purporting to provide guidance on the profit margins associated with the Supply Contract was false and misleading and made with scienter where Kennedy knew, and investors did

not, that the Supply Contract was already in default to the tune of over $72.1 million ($69.752 million prepayment plus the first $2.373 million maintenance payment missed) – an undisclosed fact which tended to seriously undermine the guidance.   As a result of the foregoing misrepresentations and omissions, the stock price remained artificially inflated.

75.     Despite Defendants' numerous assurances, following the release of the Form 8-K and the conference call, some analysts expressed skepticism that the Supply Contract would convey the economic benefits that Defendants had previously reported. For instance, stock research analysts from William Blair stated in their January 27, 2016 research report that while they still held out hope the Ministry of Health prepayments would come in, they were removing them from their modeling, stating:

> As the company alluded to in its prerelease, the top line fell short of original guidance by about $4 million due to a delay with the implementation of a recently signed contract with the Venezuelan Ministry of Health. . . .
>
> Regarding Venezuela, management remains optimistic the contract will be executed fairly. ***However, it seems clear that the timing of payments and ability to actually record revenue from the prepayments is still uncertain and we remain skeptical that the full $60 million of revenue attributable to the Venezuela contract in 2016 will materialize this year. As a result, we continue to strongly advise investors to focus exclusively on the impressive performance in the base business***.
>
> The company also reiterated first-quarter guidance (revenue of $96.5 million-$97.5 million and adjusted EPS of $0.34-0.35) and 2016 guidance ($445 million-$450 million in revenues and $1.84-$1.88 in EPS), both of which include contribution from Venezuela. ***Excluding Venezuela, guidance appears to call for 2%-4% revenue growth and EPS of around $1.67 or $1.68***.

(emphasis added).

76.     On this news, the price of Natus Medical stock fell once again, from its close of $37.15 per share on January 27, 2016 to close at $34.71 per share on January 28, 2016, a decline of $2.44 per share, on abnormally high trading volume.

77.     However, as a result of the false and misleading statements and omissions set forth in ¶¶70-74, *supra*, the stock price remained artificially inflated.

78.     On February 29, 2016, Natus Medical filed the 2015 Form 10-K, disclosing that, "[f]ollowing the announcement of [the Ministry of Health] contract, there ha[d] been elections in both Venezuela and Argentina leading to significant political changes in those countries" and "it [had been] reported that Venezuela [was] experiencing a highly inflationary economy and recessionary economic conditions," stating that "[t]hese developments may impact the likelihood of the Venezuelan Ministry of Health's following through with orders under the agreement, and Medix ha[d] not yet received any prepayments under the agreement and no products or services ha[d] been shipped or provided." The 2015 Form 10-K stated that if "the Venezuelan Ministry of Health does not make the required prepayments to initiate deliveries under the Medix agreement, we will not receive any benefit from it."

79.     For the first time, the Company attached a copy of the Supply Contract as Exhibit 10.12 to the 2015 Form 10-K, which revealed to investors for the first time that the entire $69 million in prepayments by the Ministry of Health had actually been due by the end of 2015, including more than ***$24 million that was due in October 2015, approximately $23 million that was due in November, and another approximately $23 million that was due in December 2015***.

80.     On this news, the price of Natus Medical stock once again declined, falling from its close of $37.21 per share on February 26, 2016 to close at $36.32 per share on February 29, 2016.

81.     However, despite the disclosures in ¶¶78-79, *supra*, the full extent of the risks underlying the Supply Contract remained concealed from the market as Defendants continued to include the Supply Contract in the Company's guidance, and the Company's stock price thus continued to remain artificially inflated.

82.     Finally, on April 4, 2016, Natus Medical issued a press release announcing its preliminary first quarter 2016 results. The release disclosed that "[r]evenue for the first quarter of 2016 is expected to be approximately $87.5 million versus previous guidance of $91.5 million to $92.5 million, excluding revenue from the Venezuela Ministry of Health contract." The release revealed that Natus Medical did not have "'any revenue associated with the Venezuela Ministry of Health contract as [it] did not receive any prepayments during the quarter.'"

83.     On this news and final materialization of the risk, the price of Natus Medical stock declined precipitously, falling from its previous close of $39.64 per share on Friday, April 1, 2016 to close at $31.84 per share on April 4, 2016, a decline of $7.80 per share, or nearly 20%, on unusually high trading volume of more than 2.7 million shares, or more than eight times the average daily trading volume over the preceding ten trading days.

## VII.   ADDITIONAL SCIENTER ALLEGATIONS

84.     As alleged herein, Defendants acted with scienter in that Defendants knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly or recklessly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Natus Medical, their control over, and/or receipt or modification of Natus Medical's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Natus Medical and the Supply Contract at issue, participated in the fraudulent scheme alleged herein.

85.     More specifically, Defendants knew, and investors did not, the extent to which the Supply Contract was in default for the vast majority of the Class Period.

86.     Defendant Hawkins' false and misleading statements made in October, November, and December regarding his "expectations" as to the timing of the Ministry's payments were made with scienter because at that time, Hawkins knew and/or recklessly disregarded that his statements effectively hid the Supply Contract's actual payment terms, and thus the Ministry's default, from investors.  Indeed, Defendant Hawkins had actual access to and knowledge of the Contract's required payment terms, and Defendant Hawkins knew (but investors did not) the nature and extent of the Ministry's default.  Defendant Hawkins' decision to knowingly present an expectation of the Ministry's performance under the Contract to the market (*i.e.*, that only $23

million would be paid before the end of 2015) that directly conflicted with the clear requirements of the Contract itself (which required all $69 million of the initial prepayments to be paid before the end of 2015) was not inadvertent or the result of an oversight; it was calculated from the outset to conceal the true state of affairs from investors and to mislead them as to the certainty and value of the Contract and the Ministry's ability to perform in accordance with its terms.

87.     Defendants further knew that the 2015 guidance provided in November and December 2015 was likely to mislead investors because Defendants knowingly omitted some glaring and material facts: by November 2015, the Contract was already $24 million in default; and by December 2015, the Contract was already approximately $47 million in default. Defendants' failure to disclose that the Contract was *already* over $47 million in default, while simultaneously touting the value of the Contract and providing financial guidance that depended on revenues from the Contract, was a highly unreasonable and extremely reckless omission that supports a strong inference of scienter.

88.     Defendants also knew that the 2016 guidance provided on January 11 and January 27, 2016 was likely to mislead investors for the same glaring omissions, *and more*: by January 11, 2016, the Contract was over $69 million in default and by January 27, 2016, the Contract was over $71.1 million in default (having by then missed an additional maintenance payment that would have been due by January 15, 2016). While Defendants did tell investors that *a* payment under the Contract had been "delayed" – misleading investors to believe, based on Defendants' previously expressed "expectations" as to the timing of the Ministry's payments, that only $23 million was late – Defendants continued to conceal the extent and nature of the Ministry's default under the Contract.   Defendants' obfuscation of and failure to disclose the fact that the Contract was *in fact* in default to the tune of $69–$71 million in January 2016, while simultaneously touting the value of the Contract and providing financial guidance that depended on revenues from the Contract, was a highly unreasonable and extremely reckless omission that supports a strong inference of scienter.

89.     Whereas Defendants knew that the Company's ability to meet its revenue guidance

depended, at least in part, on revenue generated from the Contract, Defendants also knew that their continued inclusion of revenue from the Contract in the Company's guidance, at times when the Contract was in material default – *without disclosing the true nature and extent of that default to investors* – presented a real danger of misleading investors.

90.    The amount by which the Contract was in default by January 2016 further lends to a strong inference of scienter.  Indeed, the amount by which the Contract was in default as of Defendants' January 27, 2016 statements constituted over 58% of the value of the Contract from its inception to *the end of the year* 2016.[7]  Put another way, Defendants knew but investors did not, that when Defendants led investors to believe in January 2016 that a mere "delay" in only the first Ministry payment had occurred, *well over half of the value of the Contract for the period from its inception <u>to the end of the year</u> 2016 was already in default*.  This was a highly unreasonable and extremely reckless omission that supports a strong inference of scienter.

91.    Finally, the materiality of the Contract itself, and its impact on the Company's revenues, further supports a strong inference of scienter.  For example, projected revenue attributed to the Contract for the first quarter of 2016 ($5 million) accounted for over 5% of the first quarter revenue guidance of $96.5-$97.5 million.  For the full year 2016, projected revenue from the Contract ($60 million) accounted for ***over 13%*** of the Company's full year revenue guidance of $445-$450 million.

## VIII.   LOSS CAUSATION

92.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

93.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused

---

[7] Assuming, as analyst William Blair did, "a roughly even distribution of business over the three years of the agreement," the 70% balance ($162.75 million) due under the Contract for its three-year term was worth approximately $54.25 million per year.  $54.25 million for year 1 (+) $69.752 million advance 2016 = approximately $124 million total Contract value from its inception to the end of 2016.  As of January 27, 2017, over $72.1 million was in default ($69.752 million prepayment plus the first $2.373 million maintenance payment missed).

the economic loss suffered by Plaintiff and other Class members. During the Class Period, Plaintiff and other Class members purchased or acquired Natus Medical securities at artificially inflated prices in reliance on Defendants' material misrepresentations and/or omissions. The price of those securities declined significantly when information was disclosed to the market for the first time during the Class Period, revealing those material misrepresentations and/or omissions.

94.     Prior to January 11, 2016, Defendants had concealed material risks and misled investors regarding the Ministry of Health's pre-payments under the Supply Contract and the impact of these pre-payments on Natus Medical's financial guidance. These concealed risks partially materialized when, on January 11, 2016, Natus Medical filed a Current Report on Form 8-K, attaching a press release, which announced that "the prepayment under the contract was delayed" and that the Company "now expects to receive prepayment and begin shipments in the first quarter of 2016." In reaction to this news, the price of Natus Medical common stock declined, falling from its close of $43.20 per share on January 8, 2016 to close at $38.25 per share on January 11, 2016, a decline of almost $5, or 11%, on usually high trading of approximately 1.4 million shares, or more than four times the average daily volume over the preceding ten trading days.

95.     Defendants continued to conceal material risks and mislead investors regarding the Ministry of Health's pre-payments under the Supply Contract and the impact of these pre-payments on Natus Medical's financial guidance, until, on January 27, 2016, these risks partially materialized when, following the release of Natus Medical's Form 8-K, attaching a press release, and the Company's conference call, analysts expressed skepticism that the Supply Contract would convey the economic benefits that Defendants had previously reported. In reaction to this news, the price of Natus Medical stock fell once again, from its close of $37.15 per share on January 27, 2016 to close at $34.71 per share on January 28, 2016, a decline of $2.44 per share, on abnormally high trading volume.

96.     Next, on February 29, 2016, certain material risks regarding the Ministry of Health's pre-payments under the Supply Contract and the impact of these pre-payments on

Natus Medical's financial guidance were partially revealed when the Company filed its 2015 Form 10-K, attaching the Supply Contract, which revealed that three separate pre-payments had been due in 2015 and warned that if the Ministry of Health "does not make the required prepayments to initiate deliveries under the Medix agreement, [Natus Medical] will not receive any benefit from it." On this news, the price of Natus Medical stock once again declined, falling from its close of $37.21 per share on February 26, 2016 to close at $36.32 per share on February 29, 2016.

97.     Finally, on April 4, 2016, the material risks regarding the Ministry of Health's pre-payments under the Supply Contract and the impact of these pre-payments on Natus Medical's financial guidance were fully revealed and materialized when Natus Medical issued a press release announcing that the Company "did not receive any prepayments during the quarter" and that revenue from the Supply Contract had been excluded from the Company's financial guidance. On this news, the price of Natus Medical stock declined precipitously, falling from its close of $39.64 per share on April 1, 2016 to close at $31.84 per share on April 4, 2016, a decline of $7.80 per share, or nearly 20%, on unusually high trading volume of more than 2.7 million shares, or more than eight times the average daily trading volume over the preceding ten trading days.

## IX.     PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

98.     At all relevant times, the market for Natus Medical common stock was an efficient market for the following reasons, among others:

a.     Natus Medical stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b.     According to the Company's Form 10-Q filed on November 3, 2016, the Company had more than 32.9 million shares outstanding as of October 28, 2016. During the Class Period, on average, 330,000 shares of Natus Medical stock were traded on a daily basis, demonstrating a very active and broad market for Natus Medical stock and permitting a very strong presumption of an efficient market;

c.     Natus Medical was qualified to file a less comprehensive Form S-3 registration statement with the SEC that is reserved, by definition, to well-established and largely capitalized issuers for whom less scrutiny is required;

d.   As a regulated issuer, Natus Medical filed periodic public reports with the SEC;

e.   Natus Medical regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services, the Internet and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

f.   Natus Medical was followed by many securities analysts who wrote reports that were distributed to the sales force and certain customers of their respective firms during the Class Period and each of these reports was publicly available and entered the public marketplace; and

g.   unexpected material news about Natus Medical was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

99.   As a result of the foregoing, the market for Natus Medical common stock promptly digested current information regarding Natus Medical from publicly available sources and reflected such information in Natus Medical's stock price. Under these circumstances, all purchasers of Natus Medical common stock during the Class Period suffered similar injury through their purchase of Natus Medical common stock at artificially inflated prices, and a presumption of reliance applies.

100.   In addition, Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 496 U.S. 128 (1972), because the claims asserted herein are predicated on material omissions of fact that Defendants had a duty to disclose.

## X.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

101.   The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to the false or misleading statements pleaded in this Complaint.

102.   The statements complained of herein were not forward-looking statements, nor were they identified as such when made. Rather, the statements at issue herein – including statements about payments under the Supply Contract, as well as statements about the Ministry of Health's performance under the Supply Contract – were statements of historical fact or statements

1 of purportedly current facts and conditions at the time the statements were made.

2   103. To the extent that any of the false and misleading statements alleged herein can be

3 construed as forward-looking, those statements were not accompanied by meaningful cautionary

4 language identifying important factors that could cause actual results to differ materially from

5 those in the statements. Chief among such factors is Defendants' glaring omission that the

6 Ministry of Health was late on its pre-payments throughout 2015 and missed an additional

7 maintenance payment in January 2016. Given these then-existing material facts which were not

8 adequately disclosed, any generalized risk disclosures were insufficient to insulate Defendants

10 from liability for their materially false and misleading statements.

11   104. Alternatively, Defendants are also liable for any forward-looking statements

12 because the speaker knew that the statements were false or misleading when made, or the

13 statement was approved by an Individual Defendant who knew that the statement was false or

14 misleading when made.

15 **XI. CLASS ACTION ALLEGATIONS**

16   105. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

17 Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

18 otherwise acquired Natus Medical common stock during the Class Period (the "Class"); and were

19 damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are

20 Defendants herein, the officers and directors of the Company, at all relevant times, members of

21 their immediate families and their legal representatives, heirs, successors or assigns and any entity

22 in which Defendants have or had a controlling interest.

23   106. The members of the Class are so numerous that joinder of all members is

24 impracticable. Throughout the Class Period, Natus Medical common stock was actively traded on

25 the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and

26 can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or

27 thousands of members in the proposed Class. Record owners and other members of the Class may

28 be identified from records maintained by Natus Medical or its transfer agent and may be notified

of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

107.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

108.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

109.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Natus Medical;

- whether the Individual Defendants caused Natus Medical to issue false and misleading statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

- whether the prices of Natus Medical common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

110.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.

111.    There will be no difficulty in the management of this action as a class action.

**XII.    CAUSES OF ACTION**

**COUNT I**

**For Violation of §10(b) of the Exchange Act
and Rule 10b-5 Against All Defendants**

112.    Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

113.    Throughout the Class Period, Defendants, in pursuit of their scheme and continuous course of conduct to inflate the market price of Natus Medical common stock, had the ultimate authority for making, and knowingly or recklessly made, materially false or misleading statements or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

114.    During the Class Period, Defendants, and each of them, carried out a plan, scheme, and course of conduct using the instrumentalities of interstate commerce and the mails, which was intended to and, throughout the Class Period did: (a) artificially inflate and maintain the market price of Natus Medical common stock; (b) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (c) cause Plaintiff and other members of the Class to purchase Natus Medical common stock at inflated prices; and (d) cause them losses when the truth was revealed over time. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein, in violation of §10(b) of the Exchange Act and Rule 10b-5, 17 C.F.R. §240.10b-5.

115.    In addition to the duties of full disclosure imposed on Defendants as a result of their affirmative false and misleading statements to the investing public, defendants had a duty to promptly disseminate truthful information with respect to Natus Medical's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that market price of the Company's common stock would be based on truthful, complete and accurate information.

116.    Defendants had actual knowledge of the misrepresentations and omissions of

material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were either known or readily available to them.

117.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts as set forth above, the market price of Natus Medical common stock was artificially inflated during the Class Period. In ignorance of the fact that the market price of Natus Medical common stock was artificially inflated, and relying upon the integrity of the market in which the shares traded, Plaintiff and other members of the Class purchased Natus Medical stock during the Class Period at artificially high prices and, when the truth was revealed, were damaged thereby.

118.     Had Plaintiff and the other members of the Class and the marketplace known of the true facts, which were knowingly or recklessly concealed by defendants, Plaintiff and the other members of the Class would not have purchased their Natus Medical shares during the Class Period, or if they had purchased such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

119.     By virtue of the foregoing, defendants Natus Medical and the Individual Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10-5.

### COUNT II

### For Violation of §20(a) of the Exchange Act
### Against All Defendants

120.     Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

121.     The Individual Defendants had control over Natus Medical and made the materially false and misleading statements and omissions on behalf of Natus Medical within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their share ownership, executive and board positions and stock ownership, and their culpable participation, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly,

influence and control the decision making of the Company, including the content and dissemination of the various statements which plaintiff contends were false and misleading. The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

122. In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein. Natus Medical had the power to control and influence, and did control and influence, the Individual Defendants and all of its employees.

123. By reason of such wrongful conduct, Natus Medical and the Individual Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A. Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such other and further relief as the Court may deem just and proper.

1

**XIV.   DEMAND FOR TRIAL BY JURY**

2

      Plaintiff hereby demands a trial by jury.

3

4

DATED:  April 6, 2018                 GLANCY PRONGAY & MURRAY LLP

5

6

                             By:   *s/ Kara M. Wolke*

7

                             Robert V. Prongay

8

                             Kara M. Wolke
                             Alexa Mullarky

10

                             1925 Century Park East, Suite 2100
                             Los Angeles, California 90067

11

                             Telephone:  (310) 201-9150
                             Facsimile:  (310) 201-9160

12

                             Email:  info@glancylaw.com

13

                             *Attorneys for Lead Plaintiff John Costabile*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old.  On April 6, 2018, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on April 6, 2018, at Los Angeles, California.


*s/ Kara M. Wolke*
Kara M. Wolke

# Mailing Information for a Case 4:17-cv-00458-JSW Costabile v. Natus Medical Incorporated et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Marie Caroline Bafus**
  mbafus@fenwick.com,pnichols@fenwick.com

- **Jennifer Ann Ebling**
  jebling@fenwick.com,jtosches@fenwick.com

- **Kevin Peter Muck**
  kmuck@fenwick.com,kayoung@fenwick.com,lkelleybourne@fenwick.com

- **Alexa Jean Mullarky**
  amullarky@glancylaw.com

- **Lesley F. Portnoy**
  LPortnoy@glancylaw.com,info@glancylaw.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,robert-prongay-0232@ecf.pacerpro.com,bmurray@glancylaw.com

- **Kara M Wolke**
  kwolke@glancylaw.com,kara-wolke-0535@ecf.pacerpro.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)